# EXHIBIT 1

Electronically FILED by Superior Court of California, County of Los Angeles on 01/05/2023 11:10 PM David W. Slayton, Executive Officer/Clerk of Court, by R. Perez, Deputy Clerk

Case 2:23-cv-02570-GW-AS   Document 1-2   Filed 04/05/23   Page 2 of 137   Page ID #:19

Assigned for all purposes to: Stanley Mosk Courthouse, Judicial Officer: Jon Takasugi

Joseph Prencipe
1718 W Mansfield Ave
Spokane, WA, 99205
Email: Joe@Prencipe.com
Telephone: (310) 728-9994

*Pro Se*

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**COUNTY OF LOS ANGELES**

| | |
|---|---|
| JOSEPH PRENCIPE, an individual,<br><br>               Plaintiff,<br><br>      v.<br><br>AFSHIN P. PISHEVAR, an individual;<br><br>SHERVIN K. PISHEVAR, an individual;<br><br>DRYFTWOOD, INC., D/B/A SIZZLE, a<br><br>Delaware corporation;<br><br>DRYFTWOOD, INC., D/B/A SIZZLE, a<br><br>Florida corporation;<br><br>GOBRANDS, INC., D/B/A GOPUFF, a<br><br>Delaware corporation;<br><br>DOES 1-20,<br><br>               Defendants. | CASE NO.: __23STCV00248__<br><br>**PLAINTIFF'S COMPLAINT FOR:**<br><br>**(1) BREACH OF ORAL CONTRACT**<br>**(2) BREACH OF IMPLIED CONTRACT**<br>**(3) PROMISSORY ESTOPPEL**<br>**(4) QUANTUM MERUIT**<br>**(5) CONSTRUCTIVE DISCHARGE**<br>**(6) BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**<br>**(7) LABOR CODE §970 VIOLATION**<br>**(8) LABOR CODE §1050 VIOLATION**<br>**(9) DEFAMATION**<br>**(10) INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**<br>**(11) NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS**<br>**(12) FAILURE TO ACCOMMODATE DISABILITY**<br>**(13) INTENTIONAL INTERFERENCE WITH A CONTRACT**<br>**(14) INTENTIONAL INTERFERENCE WITH ECONOMIC RELATIONS**<br>**(15) CONSTRUCTIVE FRAUD**<br>**(16) NEGLIGENT MISREPRESENTATION**<br>**(17) UNDUE INFLUENCE**<br><br><br>**DEMAND FOR JURY TRIAL** |

1    Plaintiff Joseph alleges as follows for his complaint against Defendants:

2                                    **INTRODUCTION**

3    1.    **This is a case about a Florida employer who hired a California employee to**

4    **move across the country, and then aggressively abused him and breached his contract.**

5    2.    Joseph was a California resident working in California.

6    3.    Sizzle is a Florida tech startup.

7    4.    **Sizzle hired Joseph to move to Florida to work for them**.

8    5.    **Joseph did just that. He moved to Florida and began working at Sizzle**. He

9    terminated his lease in California. He rented a U-Haul. He moved his family across the country.

10   He leased a home in Florida. And he worked for Sizzle for a year.

11   6.    **Joseph held up his end of the bargain. But Sizzle didn't do anything it agreed**

12   **to do**. Sizzle did not give Joseph the agreed salary, job title, working hours, work days, work

13   location, or work responsibility.

14   7.    On top of that, Defendants aggressively abused Joseph. They did this while

15   knowing that he has a mental illness. They even demanded that he stop taking his medication.

16   8.    **This caused severe damage to Joseph**. Joseph has lost over $700,000 in income

17   and counting. Joseph's mental illness was significantly aggravated. Now, he has tremors,

18   hypertension, occasional lock-jaw, and other medical complications.

19   9.    **On the other hand, Defendants have netted over $20 million dollars from**

20   **Joseph's work for Defendants**.

21   10.   **This is completely - and utterly - _wrong_. Now, Joseph seeks justice to make**

22   **this _right_**. Joseph seeks a judgment against Defendants for breach of oral contract, intentional

23   infliction of emotional distress and other counts. Joseph seeks to receive damages.

24   11.   **This Court must act to protect the residents of California from this abusive,**

25   **manipulative behavior. If the Court does not, then it is supporting a heinous precedent that**

26   **California residents can be intentionally lured out of state and harmed without recourse in**

27   **California courts.**

28   12.   **This Court must grant Joseph damages**.

**PARTIES**

13.     Joseph Prencipe ("**Joseph**"), an individual residing in Santa Monica, California at all times described in the complaint.

14.     Afshin P. Pishevar ("**Afshin Pishevar**"), an individual residing in Rockville, MD, at all times described in the complaint. Afshin Pishevar is the CEO of Sizzle. Afshin Pishevar is also an officer, shareholder, and director of Sizzle. Afshin Pishevar is also an employee of GoPuff.

15.     Shervin K. Pishevar ("**Shervin Pishevar**"), an individual residing in Miami, FL, at all times described in the complaint. Shervin Pishevar is the Chairman of Sizzle. Shervin Pishevar is also an officer, shareholder, and director of Sizzle. Shervin Pishevar is also an investor of GoPuff. Afshin Pishevar and Shervin Pishevar are a family of billionaires.

16.     Dryftwood, Inc. D/B/A Sizzle is a Delaware corporation with principal place of business in Philadelphia, PA ("**Sizzle Delaware**").

17.     Dryftwood, Inc. D/B/A Sizzle is a Florida corporation with principal place of business in Philadelphia, PA ("**Sizzle Florida**"). Taken together, Sizzle Delaware and Sizzle Florida are "**Sizzle**". Sizzle is a tech startup that was ideated by Joseph and formed by Afshin Pishevar and Shervin Pishevar.

18.     GoBrands, Inc., D/B/A GoPuff ("**GoPuff**") is a Delaware corporation with its headquarters in Philadelphia, PA, and with operations nationwide. GoPuff is a major national ecommerce company with over a $10 billion dollar market valuation. GoPuff bought Sizzle.

19.     Plaintiff is unaware of the true names and capacities of Defendants DOES 1 through 20, inclusive, and therefore sues those parties by fictitious names ("**DOES 1-20**") (all of the above, taken together, the "**Defendants**"). Plaintiff alleges that DOES 1-20 are responsible in some manner for the events herein. Plaintiff will seek leave to amend the Complaint to state the true names and capacities of DOES 1-20 when they have been ascertained or their liability is discovered.

20.     Upon information and belief, at all relevant times herein alleged, each of the Defendants conspired with, acted in concert with, and aided and abetted each other to commit the

**COMPLAINT**

wrongs against Plaintiff. Upon information and belief, Plaintiff alleges that at all times herein mentioned, each Defendants was also the agent, servant, joint venturer, partner, successors-in-interest, predecessors-in-interest, co-venturer, co-owner, purported co-author or joint author, alter ego, and/or employee of each and every other Defendant, and was acting within the course and scope of its authority, and each Defendant ratified, authorized, and approved the acts of each other Defendant. Plaintiff is hereby informed and believes and thereon alleges that any act or omissions attributed herein to a corporation or other business entity were authorized acts, performed by an authorized representation of said entity, acting within the course and scope of its agency or authority, and were ratified by reasonable representatives of the entity. Upon information and belief, each of the Defendants agreed to a common plan or design to commit the tortious acts described below, had actual knowledge that the unlawful conduct was planned, and concurred in the scheme with knowledge of its unlawful purpose.

21.     Upon information and belief, at all times relevant, Afshin Pishevar and Shervin Pishevar treated Sizzle as their alter ego and there is a unity of interest between such parties such that upholding the corporate entity would sanction a fraud or promote an injustice.

22.     Actions of the Afshin Pishevar and Shervin Pishevar alleged herein are actions done on behalf of and directed by Sizzle as their principal and are imputed on Sizzle.

## JURISDICTION; VENUE

23.     Jurisdiction is proper in the Superior Court of the State of California for the County of Los Angeles pursuant to Section 410.10 of the California Code of Civil Procedure.

24.     This Court has personal jurisdiction over Afshin Pishevar, Shervin Pishevar, and Sizzle because they hired Joseph when he resided in Santa Monica, California. Each such Defendant knew that Joseph resided in Santa Monica, California, at the time of such hiring. Each such Defendant hired Joseph to move from Santa Monica, California to Florida.

25.     Afshin Pishevar's contacts with California are substantial, systematic, and continuous. Afshin Pishevar regularly travels to California and regularly conducts business in California with other California businesses.

**COMPLAINT**

26.    Shervin Pishevar's contacts with California are substantial, systematic, and continuous. Shervin Pishevar regularly travels to California and regularly conducts business in California with other California businesses. Shervin Pishevar owns, directly or indirectly, interests in dozens of California businesses.

27.    Sizzle's contacts with California are substantial, systematic, and continuous. Sizzle operates in California and regularly conducts business in California.

28.    GoPuff's contacts with California are substantial, systematic, and continuous. GoPuff operates at over 100 locations in California and regularly conducts business in California.

29.    In these and in other ways, each Defendant has extensive minimum contacts with the State of California such that the exercise of jurisdiction does not offend the traditional notions of fair play and substantial justice.

a.    Each of the Defendants has purposefully availed themselves of the benefits of the forum state. Each of the Defendants hired a California resident to work for them. Each of the Defendants has put goods into the stream of commerce in California to economically benefit.

b.    Plaintiff's claim arises out of or has a substantial connection to the Defendants' contacts with California.

c.    California has an extremely strong interest in protecting its residents from conduct like that of Defendants in this case. California cannot let out-of-state companies lure its citizens out-of-state, abuse them, breach on them, and then get away with it without being subject to California jurisdiction. If this were to be allowed to happen, then California citizens would face tremendous risk when getting hired by anyone in the entire rest of the country.

d.    The Plaintiff has a strong interest in obtaining convenient and effective relief from this court. If Plaintiff were forced to adjudicate this case in a foreign forum, then Plaintiff would be subject to an increase in travel costs and attorneys' fees.

e.  It's in the interest of the interstate judicial system to obtaining the most efficient resolution if this controversy is adjudicated upon in this forum. The majority of witnesses are based in Los Angeles, California. California courts will be most efficient to adjudicate this case, because this case must be brought under California law. It would be inefficient, and use significantly more court resources, if a foreign court attempted to rule under this case applying California law.

f.  Defendants are not substantially burdened by litigating in California. Defendants do significant and ongoing business in California. Defendants are, each of them, billionaires, while Plaintiff was left nearly bankrupted by them.

g.  It is in the shared interests of all States that each of them be able to and have the power to protect their own citizens from bad actor employers from out-of-state.

30.  Venue is proper in this County and this Court because the contract entered into between Joseph and Defendants, which forms part of the subject matter of this action, were entered into while Joseph resided in Santa Monica, California. Defendants lured Joseph to move to another county. Defendants then abused and breach their contract with Joseph. Joseph should not be subject to the courts of the other county to which he was enticed to travel to. Venue is also proper in this County and this Court because the Defendants do or did business in this County during all times relevant to this lawsuit.

31.  State policy favors jurisdiction and venue in this County and this State. The Joseph was a resident of Los Angeles County, California when offered the job described in this complaint. The Defendants enticed the Joseph to move his residence out of California, where they then breached their agreement with Joseph. The State of California has a policy of protecting California residents.

## STATEMENT OF FACTS

## JOSEPH LIVED AND WORKED IN CALIFORNIA

32.  Joseph's family is from California. *Declaration of Joseph*, ¶1, attached as Exhibit 1.

33.     Joseph lived in Santa Monica, California, when offered a job by Defendants. *Id*, ¶3; *see Lease Agreement*, attached as Exhibit 2.

34.     Joseph worked at a company called McLear from his home office in Santa Monica, California, when offered a job by Defendants. *Id*, ¶4; *see Consultancy Agreement*, attached as Exhibit 3.

35.     Joseph worked as the General Counsel, CEO, and Chairman of McLear. Declaration of Joseph, ¶5; s*ee Consultancy Agreement*.

36.     Defendants were well aware that Joseph lived in Santa Monica, California. Joseph and the Pishevars worked on a prior business in California. Defendants and Joseph frequently met in California. *Declaration of Joseph*, ¶6, *see e.g. Photo of Afshin Pishevar and Joseph in California* dated 19 May 2019, attached as Exhibit 4. Indeed, Afshin Pishevar stayed at Joseph's home in Los Angeles multiple times. *See e.g. Photo of Afshin Pishevar at Joseph's California Home*, attached as Exhibit 5.

**JOSEPH CREATED SIZZLE'S BUSINESS PLAN**

37.     In April 2019, Defendants Afshin Pishevar and Shervin Pishevar were discussing starting a food tech business. Afshin Pishevar asked Joseph for insight on how to start one. *Declaration of Joseph*, ¶7.

38.     Joseph spent four years planning a food tech business. *Id*, ¶8. He appeared in a newspaper on the front page regarding it. *Id.* He created business plans and business analyses in regards to it. *Id; see e.g. Business Plan* dated 15 September 2015, attached as Exhibit 6, *Email from Joseph* dated 16 September 2015, attached as Exhibit 7.

39.     Joseph sent these business plans to Afshin Pishevar. *See e.g. Email from Joseph* dated 25 February 2020, attached as Exhibit 8.

40.     Afshin Pishevar and Shervin Pishevar started a food business modeled after Joseph's business plans. They named this business Sizzle.

**SIZZLE HIRED JOSEPH TO WORK IN FLORIDA**

41.     **In August 2019, Afshin Pishevar verbally offered Joseph a job at Sizzle and asked him to move to Miami, FL**. *Declaration of Joseph*, ¶11.

42.     Joseph verbally accepted the offer. *Id.*

43.     The terms of the verbal agreement were as follows:

a.  Afshin Pishevar will provide Joseph with a written agreement to be prepared by Afshin Pishevar's lawyer Kyle Hunter,

b.  Joseph will work at Sizzle as the General Counsel and Chief Strategy Officer,

c.  the scope of work will comprise the standard general counsel legal work for a startup business, strategic advice, and minor fundraising activities,

d.  Sizzle will pay Joseph a General Counsel market salary of $350,000 per annum with stock options in Sizzle,

e.  the location of work is Miami, FL, and

f.  standard work hours will be 40 hours per week, Monday through Friday, 9AM to 5PM. *Id*, ¶12.

**JOSEPH ACTED IN REASONABLE RELIANCE ON THE AGREEMENT**

44.     **Joseph relied on the agreement in taking several actions**. Joseph terminated his lease in California, rented a U-Haul, moved across the country, leased a property in Miami, began working at Sizzle, did not engage in other employment, then moved his belongings to WA in a U-Haul, and then moved to and worked in Philadelphia, PA. *Declaration of Joseph*, ¶13; U-Haul Receipt, attached as Exhibit 9; Miami Rental Application, attached as Exhibit 10.

45.     **Joseph's reliance on the verbal agreement was reasonable for several reasons**. He worked with Afshin Pishevar and Shervin Pishevar for several years on multiple businesses together. *Declaration of Joseph*, ¶14. They had entered into multiple employment contracts together. *Id.* Afshin Pishevar and Shervin Pishevar had never breached an employment contract with Joseph before. *Id.* It is not reasonable to believe the Defendants would suddenly cease honoring their contracts. *Id.* Most importantly, they had a close personal relationship, and often helped the other out on personal matters. *Id.* At one time, Afshin Pishevar lived with Joseph when he needed a place to stay. *Id.* Moreover, Joseph had provided Afshin Pishevar the business plan for Sizzle, so it was reasonable that Joseph would be part of founding Sizzle with him as an executive and receive the terms he was offered. *Id.* Lastly, Joseph had four years of

prior experience building a food tech company, and Afshin Pishevar had none, therefore it was reasonable to believe that Afshin Pishevar would not breach his agreement with Joseph, as Afshin Pishevar would need Joseph for the development of the business. *Id*.

## DEFENDANTS BREACHED THE AGREEMENT

46.    On or around January 10-15th, 2021, Defendants breached the agreement. Defendants verbally and in writing informed Joseph that he would not give him the terms which they had agreed to. *Declaration of Joseph*, ¶15; *see e.g. Email from GoPuff* dated 15 January 2021, attached as Exhibit 11.

47.    Afshin Pishevar and GoPuff communicated to Joseph that he would not receive the title of General Counsel and Chief Strategy Office. *Id,* ¶16. Instead, he would receive the title of General Manager, the lowest rank at GoPuff in seniority and salary. *Id.* This title was seven ranks below any executives with a "Chief" title, including Chief Strategy Officer and General Counsel roles. *Id.* This title would position Joseph to not work alongside any executives, but rather at the very bottom of the totem pole. *Id.*

48.    Afshin Pishevar and GoPuff communicated to Joseph that he would not receive the scope of work of a General Counsel and Chief Strategy Officer, as agreed. *Id,* ¶17. Instead, he was required to take an extensive scope of work covering managing all operations of Sizzle. *Id.* This would have been an enormous task that required multiple executives to perform, and was impossible for one person to perform. *Id.*

49.    Afshin Pishevar and GoPuff communicated to Joseph that he would not receive the General Counsel market annual salary of $350,000 per annum, as agreed. *Id,* ¶18. Instead, he was to receive a salary of $55,000, which would not have supported his family's living expenses and living expenses in Philadelphia. *Id.* This was three to four times less than what was Joseph was paid at his prior four jobs, total in cash and stock. *Id.* The job he quit to work at Sizzle paid over double in cash alone than $55,000. *Id.* Afshin Pishevar knew this. *Id.*

50.    Afshin Pishevar and GoPuff communicated to Joseph that he would not receive stock options in Sizzle, as agreed. *Id,* ¶19.

51.     Afshin Pishevar and GoPuff communicated to Joseph that he would not live in Miami, FL, as agreed. *Id,* ¶20. They required him to live in Philadelphia, PA for at least two years. *Id.* This was not possible for him because of family considerations, primarily elderly parents who would not move to Philadelphia. *Id.*

52.     Afshin Pishevar communicated to Joseph that he must continue to work for 112 hours per week, including weekends and holidays. *Id,* ¶21. They did not give him the agreed 40 hours per week, with weekends and holidays off. *Id.* This schedule was physically impossible to perform. *Id.*

**DEFENDANTS AGGRESSIVELY ABUSED JOSEPH**

53.     Joseph has a mental illness called Generalized Anxiety Disorder ("GAD"). Joseph undergoes psychotherapeutic counseling and takes regularly prescribed medication for it. *Declaration of Joseph*, ¶22.

54.     Joseph made Afshin Pishevar aware of this. *Declaration of Joseph*, ¶23. In 2019, Afshin Pishevar was General Counsel and Chief Strategy Officer of McLear. *Id*. Joseph was CEO and Chairman of McLear. *Id*. Between June and November 2019, Joseph took medical leave from McLear because of his mental illness. *Id*. He communicated this on the corporate record to all staff, including Afshin Pishevar. *Id*.

55.     Joseph informed Afshin Pishevar that he took xanax, sertraline, hydroxyzine, and/or medical marijuana daily between 2015-2021. *Declaration of Joseph*, ¶24.

56.     A month after moving to Philadelphia, Afshin Pishevar suddenly demanded that Joseph quit taking his medication or he would be fired. *Id*, ¶25. Having no choice, Joseph complied with Afshin Pishevar's demand. *Id.*

57.     Afshin Pishevar traumatically psychologically abused all employees including Joseph daily. *Id*, ¶26. This caused employees Talmadge Newry, Sulffian Yansaneh, Maurice, Jon, and others to quit. *Id.*

58.     In October-January 2021, Joseph worked for 112 hours per week on average. *Id*, ¶27.

59.     In December-January 2021, Afshin Pishevar vacationed on a private beach island and spent time lounging at home with his family in another state. *Id*, ¶28.

60.     The net effects of Afshin Pishevars actions are that Joseph's mental illness has become substantially aggravated and deteriorated, as stated by his psychotherapist. *Id*, ¶29. Joseph now lives in a constant state of fully-body hypertension and anxiety, causing him constant pain. *Id.* His debilitating state and his fully-body pain materially conflict with his ability perform the high-level cognitive tasks required of his profession. *Id.*

61.     The actions of Afshin Pishevar herein occurred inside and outside of the workplace, including at home at a rental apartment during work off-hours. *Id*, ¶30.

62.     Afshin Pishevar and Shervin Pishevar communicated about how Afshin Pishevar should handle communicated to and treating his employees, and Shervin Pishevar often gave advice or directed Afshin Pishevar's communications. *Id*, ¶31.

**CONCLUSION**

63.     **This is a case about a Florida employer who hired a California employee to move across the country, and then aggressively abused him and breached his contract.**

64.     Joseph was a California resident working in California.

65.     Sizzle is a Florida tech startup.

66.     **Sizzle hired Joseph to move to Florida to work for them**.

67.     **Joseph did just that. He moved to Florida and began working at Sizzle**. He terminated his lease in California. He rented a U-Haul. He moved his family across the country. He leased a home in Florida. And he worked for Sizzle for a year.

68.     **Joseph held up his end of the bargain. But Sizzle didn't do anything it agreed to do**. Sizzle did not give Joseph the agreed salary, job title, working hours, work days, work location, or work responsibility.

69.     On top of that, Defendants aggressively abused Joseph. They did this while knowing that he has a mental illness. They even demanded that he stop taking his medication.

70.     **This caused severe damage to Joseph**. Joseph has lost over $700,000 in income and counting. Joseph's mental illness was significantly aggravated. Now, he has tremors, hypertension, occasional lock-jaw, and other medical complications.

71.     **On the other hand, Defendants have netted over $20 million dollars from Joseph's work for Defendants**.

72.     **This is completely - and utterly - *wrong*. Now, Joseph seeks justice to make this *right***. Joseph seeks a judgment against Defendants for breach of oral contract, intentional infliction of emotional distress and other counts. Joseph seeks to receive damages.

73.     **This Court must act to protect the residents of California from this abusive, manipulative behavior. If the Court does not, then it is supporting a heinous precedent that California residents can be intentionally lured out of state and harmed without recourse in California courts.**

74.     **This Court must grant Joseph damages**.

**FIRST CAUSE OF ACTION**

**BREACH OF ORAL CONTRACT**

**AGAINST ALL DEFENDANTS AND DOES 1-20**

75.     Joseph realleges and incorporates by reference all allegations in the Complaint.

76.     Joseph and Defendants entered into an oral contract.

77.     Joseph and Afshin Pishevar, Shervin Pishevar, and Sizzle entered into an oral contract in August, 2019.

78.     Joseph and GoPuff entered into an implied contract in November, 2020. GoPuff executives communicated to Joseph that GoPuff is acquiring Sizzle, and that Joseph's employment would be switched over to GoPuff. GoPuff executives communicated to Joseph that he would have the same employment at GoPuff as offered by Sizzle. Joseph worked with GoPuff and Sizzle as consideration for this promise.

79.     Joseph performed under the contract. Joseph did all, or substantially all, of the obligations that the contract required him to do, except those obligations that Joseph was prevented or excused from performing.

80.     Between January 10-15th, 2021, the Defendants breached and failed to perform the implied contract. GoPuff sent to Joseph a contract which did not have the agreed terms in it. Afshin Pishevar verbally communicated to Joseph that he would not be receiving the terms agreed. Defendants failed (1) to provide the agreed written form of contract with the agreed terms to Joseph, (2) to provide the role/position agreed to be given to Joseph, (3) to provide the scope of work agreed to be given to Joseph, (4) to provide the salary/stock options agreed to be given to Joseph, (5) to provide the location of work agreed to be given to Joseph, and (6) to provide the work hours agreed to be given to Joseph.

81.     Joseph was thereby significantly harmed in the sum as stated below.

82.     The breach of contract of Defendants was a substantial factor in causing Joseph's harm.

83.     As a direct and proximate result of the breach, Joseph has lost over $700,000 in income and counting.

84.     The aforementioned conduct by the specific Defendants, and each of them, was willful, oppressive, fraudulent, and malicious, and Joseph is therefore entitled to punitive damages.

85.     Joseph is entitled to an award of attorneys' fees upon prevailing in this action.

**SECOND CAUSE OF ACTION**

**BREACH OF IMPLIED CONTRACT**

**AGAINST ALL DEFENDANTS AND DOE DEFENDANTS**

86.     Joseph realleges and incorporates by reference all allegations in the Complaint.

87.     Joseph and Defendants entered into an implied contract.

88.     Joseph and Afshin Pishevar, Shervin Pishevar, and Sizzle entered into an implied contract in August, 2019. The conduct and relationship of Afshin Pishevar, Sizzle, and Joseph evidence this. Afshin Pishevar regularly gave Joseph tasks to work on while he worked at Sizzle. Joseph regularly performed those tasks. Joseph reported to Afshin Pishevar as the CEO of Sizzle. Afshin Pishevar introduced Joseph to other staff that Joseph was the General Counsel and Chief Strategy Officer of Sizzle.

89.     Joseph and GoPuff entered into an implied contract in November, 2020. GoPuff executives communicated to Joseph that GoPuff is acquiring Sizzle, and that Joseph's employment would be switched over to GoPuff. GoPuff executives communicated to Joseph that he would have the same employment at GoPuff as offered by Sizzle. The conduct of GoPuff executives was such that they actively worked on the acquisition of Sizzle by GoPuff. GoPuff executives had meetings with Sizzle in which they continually praised the success of Sizzle in meeting and exceeding its targets and expectations. GoPuff and Joseph knew, and had reason to know, that the other would interpret this as meaning GoPuff agreed to hire Joseph.

90.     Joseph performed under the contract. Joseph did all, or substantially all, of the obligations that the contract required him to do, except those obligations that Joseph was prevented or excused from performing.

91.     Between January 10-15th, 2021, the Defendants breached and failed to perform the implied contract. GoPuff sent to Joseph a contract which did not have the agreed terms in it.

**13**

**COMPLAINT**

Afshin Pishevar verbally communicated to Joseph that he would not be receiving the terms agreed. Defendants failed (1) to provide the agreed written form of contract with the agreed terms to Joseph, (2) to provide the role/position agreed to be given to Joseph, (3) to provide the scope of work agreed to be given to Joseph, (4) to provide the salary/stock options agreed to be given to Joseph, (5) to provide the location of work agreed to be given to Joseph, and (6) to provide the work hours agreed to be given to Joseph.

92.     Joseph was thereby significantly harmed in the sum as stated below.

93.     The breach of contract of Defendants was a substantial factor in causing Joseph's harm.

94.     As a direct and proximate result of the breach, Joseph has lost over $700,000 in income and counting.

95.     The aforementioned conduct by the specific Defendants, and each of them, was willful, oppressive, fraudulent, and malicious, and Joseph is therefore entitled to punitive damages.

96.     Joseph is entitled to an award of attorneys' fees upon prevailing in this action.

### THIRD CAUSE OF ACTION

### PROMISSORY ESTOPPEL

### AGAINST ALL DEFENDANTS AND DOE DEFENDANTS

97.     Joseph realleges and incorporates by reference all allegations in the Complaint.

98.     Defendants provided Joseph with a Promise.

99.     Afshin Pishevar, Shervin Pishevar, and Sizzle promised Joseph in 2019 terms of employment as set out in the complaint.

100.     GoPuff promised Joseph that his employment would be switched over to GoPuff on the same terms he had with Sizzle.

101.     The Defendants should reasonably have expected the promise to induce action or forbearance on the part of Joseph. The promise required that Joseph terminate his lease in Santa Monica, CA, rent a U-Haul to move to Miami, FL, initiate a lease in Miami, FL, not engage in

other employment, work for Defendants, then move his belongings to WA, and move to Philadelphia, PA.

102.     Joseph was induced by the promise to action and/or forbearance, and relied on the promise. Joseph terminated his lease in Santa Monica, CA, rented a U-Haul and moved to Miami, FL, initiated a lease in Miami, FL, rented a U-Haul and moved his belongings to WA, flew to Philadelphia, PA and lived in Philadelphia, PA, did not engage in other employment, and worked for Defendants.

103.     Injustice can be avoided only by enforcement of the promise. If the promise is not enforced, then Joseph will have satisfied his part of the bargain, while leaving the Defendants to reap the benefit of Joseph's performance without paying him. Joseph's performance led to the creation and the sale of the business Sizzle to GoPuff, and the operation of Sizzle, now known as GoPuff Kitchens, through which Defendants have reaped over a million dollars. On the other hand, reliance and performance has caused Joseph to lose hundreds of thousands of dollars out of pocket and income from other employment.

104.     Joseph was thereby significantly harmed in the sum as stated below.

105.     Reliance by Joseph was a substantial factor in causing Joseph's harm.

106.     As a direct and proximate result of the breach, Joseph has lost over $700,000 in income and counting.

107.     The aforementioned conduct by the specific Defendants, and each of them, was willful, oppressive, fraudulent, and malicious, and Joseph is therefore entitled to punitive damages.

108.     Joseph is entitled to an award of attorneys' fees upon prevailing in this action.

**FOURTH CAUSE OF ACTION**

**QUANTUM MERUIT**

**AGAINST ALL DEFENDANTS AND DOE DEFENDANTS**

109.     Joseph realleges and incorporates by reference all allegations in the Complaint.

110.     Defendants requested, by word and conduct, that Joseph perform services for Defendants for the benefit of Defendants.

111.    Joseph performed the services as requested.

112.    Defendants have not paid for the services to the extent agreed.

113.    The reasonable value of the goods and services was $29,166.66 per month, for a total of $350,000 over 12 months.

## FIFTH CAUSE OF ACTION

## CONSTRUCTIVE DISCHARGE

## AGAINST ALL DEFENDANTS AND DOE DEFENDANTS

114.    Joseph realleges and incorporates by reference all allegations in the Complaint.

115.    Defendants intentionally created or knowingly permitted working conditions to exist that were so intolerable that a reasonable person in Joseph's position would have had no reasonable alternative choice except to no longer work for Defendants.

a.    Defendants informed Joseph that they could not provide him with the terms of contract which they had agreed to. This had the effect of constructively discharging Joseph.

b.    Joseph worked for Defendants in various locations, including Florida and then Philadelphia. While working in Philadelphia, Joseph was not paid sufficient money to even cover his rental fees, food, and personal bills. Defendants were aware of this. Defendants refused to pay Joseph the sums they had agreed to pay him. This had the effect of constructively discharging Joseph.

c.    Defendants Afshin Pishevar and Sizzle were aware that Joseph had a mental illness and took medication for it. Defendants Afshin Pishevar and Sizzle demanded that Joseph cease taking his mental illness medication. In aggravation of his mental illness, Defendants continually traumatically psychologically abused Joseph on a daily basis. This had the effect of constructively discharging Joseph.

d.    Defendants required Joseph to work over 112 hours per week, destroying the health of his mind and body, and which would have further destroyed the health of his mind and body. Defendants required that Joseph take the responsibility to

1   run all operations, while Defendants rested at home and reaped the profits from

2   his operations. This had the effect of constructively discharging Joseph.

3   116.   Joseph was constructively discharged because of these working conditions.

4   117.   Joseph was thereby significantly harmed in the sum as stated below.

5   118.   The constructive discharge by Defendants was a substantial factor in causing

6   Joseph's harm.

7   119.   As a direct and proximate result of the constructive discharge, Joseph has lost

8   over $700,000 in income and counting.

9   120.   The aforementioned conduct by the specific Defendants, and each of them, was

10   willful, oppressive, fraudulent, and malicious, and Joseph is therefore entitled to punitive

11   damages.

12   121.   Joseph is entitled to an award of attorneys' fees upon prevailing in this action.

13   <center>**SIXTH CAUSE OF ACTION**</center>

14   <center>**BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**</center>

15   <center>**AGAINST ALL DEFENDANTS AND DOE DEFENDANTS**</center>

16   122.   Joseph realleges and incorporates by reference all allegations in the Complaint.

17   123.   Joseph and Defendants entered into a contract. Joseph and Afshin Pishevar,

18   Shervin Pishevar, and Sizzle entered into an implied and/or oral contract in August, 2019. Joseph

19   and GoPuff entered into an implied and/or oral contract in November, 2020.

20   124.   Joseph performed under the contract. Joseph did all, or substantially all, of the

21   obligations that the contract required him to do, except those obligations that Joseph was

22   prevented or excused from performing.

23   125.   Between January 10-15th, 2021, the Defendants conduct prevented Joseph from

24   receiving benefits under the contract. At such time, the Defendants negotiated separately from

25   Joseph and without his consent, and agreed not to give Joseph what they had contracted to give

26   him. Defendant Afshin Pishevar informed Joseph of this.

27   126.   By doing so, Defendants did not act fairly and in good faith.

28   127.   Joseph was thereby significantly harmed in the sum as stated below.

<center>**17**</center>
<center>**COMPLAINT**</center>

128.     The conduct of Defendants was a substantial factor in causing Joseph's harm.

129.     As a direct and proximate result of such conduct, Joseph has lost over $700,000 in income and counting.

130.     The aforementioned conduct by the specific Defendants, and each of them, was willful, oppressive, fraudulent, and malicious, and Joseph is therefore entitled to punitive damages.

131.     Joseph is entitled to an award of attorneys' fees upon prevailing in this action.

**SEVENTH CAUSE OF ACTION**

**LABOR CODE §970 VIOLATION; FRAUDULENT INDUCEMENT OF EMPLOYMENT AGAINST AFSHIN PISHEVAR, SHERVIN PISHEVAR, SIZZLE AND DOE DEFENDANTS**

132.     Joseph realleges and incorporates by reference all allegations in the Complaint.

133.     Defendants Afshin Pishevar, Shervin Pishevar, and Sizzle intentionally misrepresented to Joseph that they would give him employment on the terms described in the complaint

134.     This misrepresentation was a key component of Joseph's decision to accept or continue employment with Sizzle.

135.     This misrepresentation was reasonably relied on by Joseph. Joseph had worked with Defendants before without any prior bad dealings. They worked together for several years. They worked together on four companies. They never breach a contract with each other. Quite the contrary: they regularly performed under contracts with each other.

136.     Joseph suffered the tangible injury of continued loss of employment, and non-payment of the sum agreed to be paid by Defendants.

137.     The misrepresentation of Defendants was a substantial factor in causing Joseph's harm.

138.     As a direct and proximate result of the misrepresentation, Joseph has lost over $700,000 in income and counting.

**18**
**COMPLAINT**

139. The aforementioned misrepresentation by the specific Defendants, and each of them, was willful, oppressive, fraudulent, and malicious, and Joseph is therefore entitled to punitive damages.

140. Joseph is entitled to an award of attorneys' fees upon prevailing in this action.

**EIGHTH CAUSE OF ACTION**

**LABOR CODE §1050 VIOLATION**

**AGAINST AFSHIN PISHEVAR AND SHERVIN PISHEVAR AND DOE DEFENDANTS**

141. Joseph realleges and incorporates by reference all allegations in the Complaint.

142. After Joseph's employment with Sizzle ended, Afshin Pishevar and/or Shervin Pishevar made a representation to Mike Lincoln of Cooley, LLP about Joseph.

143. The representation was not true.

144. Afshin Pishevar and/or Shervin Pishevar knew that the representation was not true.

145. Afshin Pishevar and/or Shervin Pishevar knew that the representation was not true when they made it.

146. Afshin Pishevar and/or Shervin Pishevar made the representation with the intent of preventing Joseph from obtaining employment.

147. The misrepresentation of Defendants was a substantial factor in causing Joseph's harm.

148. As a direct and proximate result of the misrepresentation, Joseph has lost over $350,000 in income and counting.

149. The aforementioned misrepresentation by the specific Defendants, and each of them, was willful, oppressive, fraudulent, and malicious, and Joseph is therefore entitled to punitive damages.

150. Joseph is entitled to an award of attorneys' fees upon prevailing in this action.

**NINTH CAUSE OF ACTION**

**DEFAMATION**

**AGAINST AFSHIN PISHEVAR AND SHERVIN PISHEVAR AND DOE DEFENDANTS**

151.    Joseph realleges and incorporates by reference all allegations in the Complaint.

152.    Afshin Pishevar and/or Shervin Pishevar made a representation to Mike Lincoln of Cooley, LLP about Joseph.

153.    Because the facts and circumstances known to the listener of the statements, the statements tended to injure Joseph in his occupation and/or to expose him to hatred, contempt, ridicule, or shame, and/or to discourage others from associating or dealing with him.

154.    Afshin Pishevar and/or Shervin Pishevar knew or should have known that the statements were not true.

155.    The statements of Defendants were a substantial factor in causing Joseph's harm.

156.    As a direct and proximate result of the statements, Joseph has lost over $350,000 in income and counting.

157.    The aforementioned statements by the specific Defendants, and each of them, was willful, oppressive, fraudulent, and malicious, and Joseph is therefore entitled to punitive damages.

158.    Joseph is entitled to an award of attorneys' fees upon prevailing in this action.

## TENTH CAUSE OF ACTION

### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

### AGAINST ALL DEFENDANTS AND DOE DEFENDANTS

159.    Joseph realleges and incorporates by reference all allegations in the Complaint.

160.    Conduct of Defendants Afshin Pishevar, Shervin Pishevar, and Sizzle was outrageous.

161.    Defendants Afshin Pishevar, Shervin Pishevar, and Sizzle acted in reckless disregard of the probability that Joseph would suffer emotional distress from their conduct directed toward him, as described in the complaint.

162.    Joseph suffered severe emotional distress from the significant aggravation of his mental illness.

163.    Defendants' conduct was a substantial factor in causing Joseph's severe emotional distress.

1    164.    The conduct of Defendants was a substantial factor in causing Joseph's harm.

2    165.    As a direct and proximate result of the conduct, Joseph has suffered damages in

3    an amount to be determined at trial.

4    166.    The aforementioned conduct by the specific Defendants, and each of them, was

5    willful, oppressive, fraudulent, and malicious, and Joseph is therefore entitled to punitive

6    damages.

7    167.    Joseph is entitled to an award of attorneys' fees upon prevailing in this action.

8                    **ELEVENTH CAUSE OF ACTION**

9              **NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS**

10              **AGAINST ALL DEFENDANTS AND DOE DEFENDANTS**

11    168.    Joseph realleges and incorporates by reference all allegations in the Complaint.

12    169.    Defendants Afshin Pishevar, Shervin Pishevar, and Sizzle acted negligently of the

13    probability that Joseph would suffer emotional distress from their conduct directed toward him,

14    as described in the complaint.

15    170.    Joseph's mental illness was severely aggravated thereby, causing severe emotional

16    distress.

17    171.    The conduct of Defendants was a substantial factor in causing Joseph's harm.

18    172.    As a direct and proximate result of the conduct, Joseph has suffered damages in

19    an amount to be determined at trial.

20    173.    The aforementioned conduct by the specific Defendants, and each of them, was

21    willful, oppressive, fraudulent, and malicious, and Joseph is therefore entitled to punitive

22    damages.

23    174.    Joseph is entitled to an award of attorneys' fees upon prevailing in this action.

24                    **TWELTH CAUSE OF ACTION**

25        **FAILURE TO ACCOMMODATE DISABILITY (Govt. Code, §12940(m))**

26              **AGAINST ALL DEFENDANTS AND DOE DEFENDANTS**

27    175.    Joseph realleges and incorporates by reference all allegations in the Complaint.

28

---

**21**
**COMPLAINT**

176.     Defendants Afshin Pishevar, Shervin Pishevar, and Sizzle were employers of Joseph.

177.     Defendants Afshin Pishevar, Shervin Pishevar, and Sizzle knew of Joseph Joseph's mental illness.

178.     Joseph was able to perform the essential duties of his position with reasonable accommodation.

179.     Defendants Afshin Pishevar, Shervin Pishevar, and Sizzle failed to provide reasonable accommodation to Joseph.

180.     Defendants' failure to accommodate Joseph's mental disability harmed Joseph. Joseph's mental illness was significantly aggravated and his mental health substantially declined.

181.     The conduct of Defendants was a substantial factor in causing Joseph's harm.

182.     As a direct and proximate result of the conduct, Joseph has suffered damages in an amount to be determined at trial.

183.     The aforementioned conduct by the specific Defendants, and each of them, was willful, oppressive, fraudulent, and malicious, and Joseph is therefore entitled to punitive damages.

184.     Joseph is entitled to an award of attorneys' fees upon prevailing in this action.

**THIRTEENTH CAUSE OF ACTION**

**INTENTIONAL INTERFERENCE WITH A CONTRACT**

**AGAINST AFSHIN PISHEVAR, SHERVIN PISHEVAR, GOPUFF AND DOE DEFENDANTS**

185.     Joseph realleges and incorporates by reference all allegations in the Complaint.

186.     There was a contract between Joseph and Sizzle.

187.     Afshin Pishevar, Shervin Pishevar, and GoPuff knew of the contract.

188.     Afshin Pishevar, Shervin Pishevar, and GoPuff's conduct prevented performance or made performance more expensive or difficult.

189.     Afshin Pishevar, Shervin Pishevar, and GoPuff's intended to disrupt the performance of this contract or knew that disruption of performance was certain or substantially certain to occur.

1    190.    Joseph was harmed thereby.

2    191.    The conduct of Defendants was a substantial factor in causing Joseph's harm.

3    192.    As a direct and proximate result of the conduct, Joseph has suffered damages in

4    an amount to be determined at trial.

5    193.    The aforementioned conduct by the specific Defendants, and each of them, was

6    willful, oppressive, fraudulent, and malicious, and Joseph is therefore entitled to punitive

7    damages.

8    194.    Joseph is entitled to an award of attorneys' fees upon prevailing in this action.

9                        **FOURTEENTH CAUSE OF ACTION**

10   **INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC RELATIONS**

11   **AGAINST AFSHIN PISHEVAR, SHERVIN PISHEVAR, GOPUFF AND DOE DEFENDANTS**

12   195.    Joseph realleges and incorporates by reference all allegations in the Complaint.

13   196.    There was an economic relationship between Joseph and Sizzle.

14   197.    Afshin Pishevar, Shervin Pishevar, and GoPuff knew of the relationship.

15   198.    Afshin Pishevar, Shervin Pishevar, and GoPuff's conduct prevented performance

16   or made performance more expensive or difficult.

17   199.    Afshin Pishevar, Shervin Pishevar, and GoPuff's intended to disrupt the

18   performance of this contract or knew that disruption of performance was certain or substantially

19   certain to occur.

20   200.    The relationship was disrupted.

21   201.    Joseph was harmed thereby.

22   202.    The conduct of Defendants was a substantial factor in causing Joseph's harm.

23   203.    As a direct and proximate result of the conduct, Joseph has suffered damages in

24   an amount to be determined at trial.

25   204.    The aforementioned conduct by the specific Defendants, and each of them, was

26   willful, oppressive, fraudulent, and malicious, and Joseph is therefore entitled to punitive

27   damages.

28   205.    Joseph is entitled to an award of attorneys' fees upon prevailing in this action.

**FIFTEENTH CAUSE OF ACTION**

**CONSTRUCTIVE FRAUD**

**AGAINST ALL DEFENDANTS AND DOE DEFENDANTS**

206.     Joseph realleges and incorporates by reference all allegations in the Complaint.

207.     There was an employment relationship between Joseph and Sizzle.

208.     Defendants misled Joseph to work for Sizzle and GoPuff by failing to disclose to Joseph that they would not provide him with certain contractual terms and rights, and/or with providing him with inaccurate information that he would be given certain contractual terms and rights if he gave certain services to Sizzle and GoPuff.

209.     Defendants knew, or should have known, before the eleventh hour of GoPuff buying Sizzle, that this information was concealed and/or false.

210.     Joseph was harmed thereby.

211.     The misrepresentation of Defendants was a substantial factor in causing Joseph's harm.

212.     As a direct and proximate result of the misrepresentation, Joseph has suffered damages in an amount to be determined at trial.

213.     The aforementioned misrepresentation by the specific Defendants, and each of them, was willful, oppressive, fraudulent, and malicious, and Joseph is therefore entitled to punitive damages.

214.     Joseph is entitled to an award of attorneys' fees upon prevailing in this action.

**SIXTEENTH CAUSE OF ACTION**

**NEGLIGENT MISREPRESENTATION**

**AGAINST ALL DEFENDANTS AND DOE DEFENDANTS**

215.     Joseph realleges and incorporates by reference all allegations in the Complaint.

216.     Defendants represented to Joseph that Joseph's employment would be transferred to work for GoPuff from Sizzle on the same terms and conditions.

217.     Defendants knew, or should have known, that this information was false.

**COMPLAINT**

218.    Although Defendants may have believed that this representation was true, Defendants had no reasonable grounds for believing it was true when they made it.

219.    Defendant intended that Joseph rely on that representation.

220.    Joseph reasonably relied on that representation.

221.    Joseph was harmed thereby.

222.    The representation of Defendants was a substantial factor in causing Joseph's harm.

223.    As a direct and proximate result of the representation, Joseph has suffered damages in an amount to be determined at trial.

224.    The aforementioned representation by the specific Defendants, and each of them, was willful, oppressive, fraudulent, and malicious, and Joseph is therefore entitled to punitive damages.

225.    Joseph is entitled to an award of attorneys' fees upon prevailing in this action.

### SEVENTEENTH CAUSE OF ACTION

### UNDUE INFLUENCE

### AGAINST AFSHIN PISHEVAR, SHERVIN PISHEVAR, AND SIZZLE AND DOE DEFENDANTS

226.    Joseph realleges and incorporates by reference all allegations in the Complaint.

227.    Joseph was an employee of Afshin Pishevar, Shervin Pishevar, and Sizzle.

228.    Joseph was vulnerable by means of his mental illness and other factors.

229.    Afshin Pishevar, Shervin Pishevar, and Sizzle had apparent authority over Joseph as his employer.

230.    Afshin Pishevar, Shervin Pishevar, and Sizzle used excessive persuasion that overcame Joseph's free will by means of continual, daily, aggressive verbal abuse, screaming, yelling, intimidation, coercion, and restricting his sleep.

231.    Afshin Pishevar, Shervin Pishevar, and Sizzle's excessive persuasion caused Joseph to cease taking his mental illness medication.

232.    An inequitable result ensued - namely, the severe degradation of Joseph's mental illness.

233.    Joseph was harmed thereby.

234.    The representation of Defendants was a substantial factor in causing Joseph's harm.

235.    As a direct and proximate result of the representation, Joseph has suffered damages in an amount to be determined at trial.

236.    The aforementioned representation by the specific Defendants, and each of them, was willful, oppressive, fraudulent, and malicious, and Joseph is therefore entitled to punitive damages.

237.    Joseph is entitled to an award of attorneys' fees upon prevailing in this action.

**PRAYER**

**WHEREFORE**, Plaintiff prays for judgment as follows:

1.      A judgment in favor of Plaintiff on all counts.

2.      Defendants be ordered to pay Plaintiff their actual damages and any further damages resulting from Defendants' conduct as alleged herein.

3.      Defendants be ordered to pay to Plaintiff special, exemplary, and/or punitive damages by reason of Defendants' willful, intentional, oppressive, fraudulent, and/or malicious conduct.

4.      Defendants be ordered to pay double damages for fraudulent inducement of employment.

5.      Joseph be awarded attorneys' fees for his time spent on this action.

6.      All other costs, expenses, or fees related to bringing this lawsuit.

7.      Pre-judgment interest at the legally allowable rate on all amounts owed.

8.      Any equitable relief that this Court deems just and proper.

9.      Any further relief that this Court deems just and proper.

Dated: January 5th, 2023

By: _____

Joseph Prencipe

*Pro Se*

**COMPLAINT**

1

## **DEMAND FOR JURY TRIAL**

2

Plaintiff demands trial by jury on all issues triable as a matter of right at law.

3

Dated: January 5th, 2023

4

5

By: _____

6

Joseph Prencipe

*Pro Se*

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 1

Joseph Prencipe
1718 W Mansfield Ave
Spokane, WA, 99205
Email: Joe@Prencipe.com
Telephone: (310) 728-9994

*Pro Se*

# SUPERIOR COURT OF THE STATE OF CALIFORNIA

## COUNTY OF LOS ANGELES

JOSEPH PRENCIPE, an individual,

        Plaintiff,

      v.

AFSHIN P. PISHEVAR, an individual;

SHERVIN K. PISHEVAR, an individual;

DRYFTWOOD, INC., D/B/A SIZZLE, a

Delaware corporation;

DRYFTWOOD, INC., D/B/A SIZZLE, a

Florida corporation;

GOBRANDS, INC., D/B/A GOPUFF, a

Delaware corporation;

DOES 1-20,

        Defendants.

CASE NO.: _____

**DECLARATION OF JOSEPH PRENCIPE**

**<u>DECLARATION OF JOSEPH PRENCIPE</u>**

I, Joseph Prencipe, hereby declare as follows:

1.      I have personal knowledge of the matters stated in this declaration, and, if called as a witness, I could and would testify competently thereto.

2.      My family is from California.

3.      I lived in Santa Monica, California, when offered a job by Defendants.

4.      I worked at a company called McLear from my home office in Santa Monica, California, when offered a job by Defendants.

5.      I worked as the General Counsel, CEO, and Chairman of McLear.

6.      Defendants were well aware that I lived in Santa Monica when they hired me. I worked with the Pishevars on a prior business in California. I frequently met with the Pishevars in California. Afshin Pishevar stayed at my home there multiple times.

**JOSEPH CREATED SIZZLE'S BUSINESS PLAN**

7.      In April 2019, Defendants Afshin Pishevar and Shervin Pishevar were discussing starting a food tech business. Afshin Pishevar asked me for insight on how to start one.

8.      I spent four years planning a food tech business. I appeared in a newspaper on the front page regarding it. I created business plans and business analyses in regards to it.

9.      I sent these business plans to Afshin Pishevar.

10.     Afshin Pishevar and Shervin Pishevar started a food business modeled after my business plans. They named this business Sizzle.

**SIZZLE HIRED JOSEPH TO WORK IN FLORIDA**

11.     In August 2019, Afshin Pishevar verbally offered Joseph a job at Sizzle and asked him to move to Miami, FL. I verbally accepted that offer.

12.     The terms of the verbal agreement were as follows:

    a.   Afshin Pishevar will provide Joseph with a written agreement to be prepared by Afshin Pishevar's lawyer Kyle Hunter,

    b.   Joseph will work at Sizzle as the General Counsel and Chief Strategy Officer,

**1**
**DECLARATION OF JOSEPH PRENCIPE**

c. the scope of work will comprise the standard general counsel legal work for a startup business, strategic advice, and minor fundraising activities,

d. Sizzle will pay Joseph a General Counsel market salary of $350,000 per annum with stock options in Sizzle,

e. the location of work is Miami, FL, and

f. standard work hours will be 40 hours per week, Monday through Friday, 9AM to 5PM.

**JOSEPH ACTED IN REASONABLE RELIANCE ON THE AGREEMENT**

13.     I relied on the agreement in taking several actions. I terminated my lease in California, rented a U-Haul, moved across the country, leased a property in Miami, began working at Sizzle, did not engage in other employment, then moved my belongings to WA in a U-Haul, and then moved to and worked in Philadelphia, PA.

14.     My reliance on the verbal agreement was reasonable for several reasons. I worked with Afshin Pishevar and Shervin Pishevar for several years on multiple businesses together. We had entered into multiple employment contracts together. Afshin Pishevar and Shervin Pishevar had never breached an employment contract with me before. It is not reasonable to believe the Defendants would suddenly cease honoring their contracts. I had a close personal relationship with the Defendants, and we often helped the other out on personal matters. At one time, Afshin Pishevar lived with me when he needed a place to stay. Moreover, I had provided Afshin Pishevar the business plan for Sizzle, so it was reasonable that I would be part of founding Sizzle with him as an executive and receive the terms he was offered. Lastly, I had four years of prior experience building a food tech company, and Afshin Pishevar had none, therefore it was reasonable to believe that Afshin Pishevar would not breach his agreement with me, as Afshin Pishevar would need me for the development of the business.

**DEFENDANTS BREACHED THE AGREEMENT**

15.     On or around January 10-15th, 2021, Defendants breached the agreement. Defendants verbally and in writing informed me that he would not give me the terms which we had agreed to.

**2**
**DECLARATION OF JOSEPH PRENCIPE**

16.     Afshin Pishevar and GoPuff communicated to me that I would not receive the title of General Counsel and Chief Strategy Office. Instead, I would receive the title of General Manager, the lowest rank at GoPuff in seniority and salary. This title was seven ranks below any executives with a "Chief" title, including Chief Strategy Officer and General Counsel roles. This title would position me to not work alongside any executives, but rather at the very bottom of the totem pole.

17.     Afshin Pishevar and GoPuff communicated to me that I would not receive the scope of work of a General Counsel and Chief Strategy Officer, as agreed. Instead, I was required to take an extensive scope of work covering managing all operations of Sizzle. This would have been an enormous task that required multiple executives to perform, and was impossible for one person to perform.

18.     Afshin Pishevar and GoPuff communicated to me that I would not receive the General Counsel market annual salary of $350,000 per annum, as agreed. Instead, I was to receive a salary of $55,000, which would not have supported my family's living expenses and living expenses in Philadelphia. This was three to four times less than what was I was paid at my prior four jobs, total in cash and stock. The job I quit to work at Sizzle paid over double in cash alone than $55,000. Afshin Pishevar knew this.

19.     Afshin Pishevar and GoPuff communicated to me that I would not receive stock options in Sizzle, as agreed.

20.     Afshin Pishevar and GoPuff communicated to me that I would not live in Miami, FL, as agreed. They required me to live in Philadelphia, PA for at least two years. This was not possible for me because of family considerations, primarily elderly parents who would not move to Philadelphia.

21.     Afshin Pishevar communicated to me that I must continue to work for 112 hours per week, including weekends and holidays. They did not give me the agreed 40 hours per week, with weekends and holidays off. This schedule was physically impossible to perform.

**DECLARATION OF JOSEPH PRENCIPE**

**DEFENDANTS AGGRESSIVELY ABUSED JOSEPH**

22.     I have a mental illness called Generalized Anxiety Disorder ("GAD"). I undertake psychotherapeutic counseling and takes regularly prescribed medication for it.

23.     I made Afshin Pishevar aware of this. In 2019, Afshin Pishevar was General Counsel and Chief Strategy Officer of McLear. I was CEO and Chairman of McLear. Between June and November 2019, I took medical leave from McLear because of my mental illness. I communicated this on the corporate record to all staff, including Afshin Pishevar.

24.     I informed Afshin Pishevar that I took xanax, sertraline, hydroxyzine, and/or medical marijuana daily between 2015-2021.

25.     A month after moving to Philadelphia, Afshin Pishevar suddenly demanded that I quit taking my medication or he would be fired. Having no choice, I complied with Afshin Pishevar's demand.

26.     Afshin Pishevar traumatically psychologically abused all employees including me daily. This caused employees Talmadge Newry, Sulffian Yansaneh, Maurice, Jon, and others to quit.

27.     In October-January 2021, I worked for 112 hours per week on average.

28.     In December-January 2021, Afshin Pishevar vacationed on a private beach island and spent time lounging at home with his family in another state.

29.     The net effects of Afshin Pishevars actions are that my mental illness has become substantially aggravated and deteriorated, as stated by my psychotherapist. I now live in a constant state of fully-body hypertension and anxiety, causing me constant pain. My debilitating state and my fully-body pain materially conflict with my ability perform the high-level cognitive tasks required of my profession.

30.     The actions of Afshin Pishevar herein occurred inside and outside of the workplace, including at home at a rental apartment during work off-hours.

31.     Afshin Pishevar and Shervin Pishevar communicated about how Afshin Pishevar should handle communicated to and treating his employees, and Shervin Pishevar often gave advice or directed Afshin Pishevar's communications.

**A FAMILY DISTURBANCE**

32.     I had a strong working relationship with Afshin Pishevar for over 5 years, when he suddenly began psychologically abusing me and breached the agreement with me. ████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

██  ████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████

██  ████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████

██  ████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████

██  ████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF JOSEPH PRENCIPE

**DECLARATION OF JOSEPH PRENCIPE**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF JOSEPH PRENCIPE

**9**

DECLARATION OF JOSEPH PRENCIPE

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**DECLARATION OF JOSEPH PRENCIPE**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**DECLARATION OF JOSEPH PRENCIPE**

1        I swear under penalty of perjury under the laws of the State of California that the

2    foregoing is true and correct. Execute this 5th day of January 2023 in Washington State.

3

4                        By: _____

5                               Joseph Prencipe

                           *Pro Se*

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 2

# CALIFORNIA LEASE AGREEMENT

| 1. | LANDLORD NAME: | PR SM Biella, LLC |
|---|---|---|
| | LANDLORD'S AGENT: | Alliance Communities Inc. |
| | LANDLORD ADDRESS: | 1519 6th Street, Ste. 100, Santa Monica, CA  90401 |
| | PHONE/E-MAIL: | (310) 393-3500 / santamonica@allresco.com |

| 2. | RESIDENT NAME: | Joseph N. Prencipe and Anna Afanasyeva |
|---|---|---|
| | OTHER OCCUPANTS: | |
| | RESIDENT ADDRESS: | 1411 7th Street, Santa Monica, CA 90401 |
| | | UNIT: #506        PARKING SPACE: #P1-39, P1-40        MAILBOX: #506 |

| 3. | LEASE TERM: | 1 year | ❑ Lease Renewa : |
|---|---|---|---|
| | | START DATE: August 20, 2018 | END DATE: August 19, 2019 |
| | | MOVE-IN DATE: August 20, 2018 | |

| 4. | MONTHLY CHARGES | | 5. | DEPOSITS | |
|---|---|---|---|---|---|
| | Base Rent | $3,663.00 | | Depos t | $3,831.50 |
| | TOTAL | $3,663.00 | | TOTAL | $3,831.50 |

| 6. | KEYS: | ❑ APARTMENT | 2 | ❑ MAIL | 2 |
|---|---|---|---|---|---|
| | | ❑ REMOTE | 2 | ❑ POOL | 0 |
| | | ❑ GARAGE | 0 | ❑ STORAGE | 0 |
| | | ❑ CARD | 0 | ❑ COMMON AREA | 0 |

Th s Lease s entered nto on the date s gned, by and between the above named part es here n after ca ed respect ve y LANDLORD and RESIDENT. In the event of more than one Res dent, each Res dent s jo nt y and severa y  ab e for each prov s on of th s Lease and serv ce of any not ce or demand upon one sha  const tute not ce to each other Res dent.

Each Res dent states that they are of  ega  age to enter nto a b nd ng Lease for  odg ng. A  ob gat ons hereunder are to be performed n the county and state where the Commun ty s ocated. No ora  agreements have been entered nto w th respect to th s Lease. Th s Lease sha  not be mod f ed un ess by an nstrument n wr t ng s gned by Res dent and an Agent of Land ord. Land ord hereby  eases and Res dent hereby h res and takes the prem ses as def ned n Sect on 2 out n ng the  eased prem ses for the term spec f ed here n and subject to a  of the terms and prov s ons set forth.

## A. TERM OF LEASE

**7.** **INITIAL TERM:**   The n t a term of th s Lease sha  commence and end as out ned n Sect on 3 and sha  **automatically continue as a tenancy from month-to-month upon expiration of the term.**

**8.** **LEASE EXPIRATION:**   E ther party, Land ord or Res dent, may term nate th s Lease after the n t a term by g v ng the other party at  east **thirty (30) days'** wr tten not ce of ts ntent on to term nate the tenancy; prov ded that f Res dent has been res d ng n the Commun ty for more than one (1) year, Land ord sha  g ve Res dent at  east s xty (60) days wr tten not ce of ts ntent on to term nat on the tenancy. In the absence of wr tten not ce of term nat on, or a new  ease, after the exp rat on of the n t a term, the tenancy sha  become month-to-month subject to a renta  rate ncrease and app cab e fees as a owed under state aw. Res dent agrees to pay a  rent up to and nc ud ng the end of any **thirty (30) day** (or, as app cab e, s xty (60) day) not ce per od (wh ch may not occur before the end of the Lease term) or unt  the prem ses are re-occup ed, wh chever occurs f rst.

In t a s:    

**9.** **FAILURE TO VACATE AFTER NOTICE:**   If Res dent g ves wr tten not ce to vacate the prem ses and fa s to comp ete y vacate pr or to the exp rat on of the not ce, Res dent sha  be  ab e, un ess otherw se proh b ted by aw, n add t on to a  other damages prov ded for under th s Lease, for the da y renta  based on a pro-rat on of the month y renta  prov ded for n the Lease for each day Res dent rema ns n the prem ses. In add t on, Land ord may co ect cost for  oss suffered from future res dent  osses,  ega  costs,  ost rent, and other expenses, and any other amount a owed by aw.

**10.** **OPTION FOR EARLY TERMINATION:**   Res dent s expected to rema n a Res dent for the ent re term spec f ed n the Lease. If Res dent fa s to do so, Res dent w  be respons b e to Land ord for a  damages prov ded by aw, nc ud ng (but not m ted to) rent due through the end of the contract term, m nus rents pa d by a rep acement res dent ( f any). Th s amount w  vary depend ng upon how  ong t takes Land ord to f nd a rep acement res dent wh ch typ ca y cannot be determ ned n advance of move-out.

To avo d th s uncerta nty, Res dent may choose to exerc se an Ear y Term nat on Opt on. Res dent understands and acknow edges that Land ord s not  ega y ob gated to a ow ear y term nat on of the Lease un ess prov ded for pursuant to statutory or common  aw. To exerc se th s opt on, Res dent must de ver to Land ord:

    **i.**    A wr tten not ce stat ng that Res dent has e ected to exerc se the Ear y Term nat on Opt on;
    **ii.**    An ear y term nat on payment of **$7,326.00**;
    **iii.**    An executed agreement for repayment of concess ons rece ved pr or to the ear y term nat on ( f app cab e, see Concess on Sect on); and
    **iv.**    Payment of rent and other amounts due through the new Lease end date.

When Land ord rece ve the wr tten not ce and the Ear y Term nat on Opt on payment and (2) s gned the not ce, the Lease end date w  be amended. The new Lease end date w  be the date spec f ed n the not ce wh ch must be at  east **thirty** days after the wr tten e ect on and payment are g ven to Land ord. Exerc se of the Ear y Term nat on Opt on w  affect on y Res dent's rent ob gat ons after the new Lease end date. Res dent must comp y w th a  other Lease ob gat ons.

 nitials      1    

The not ce w  not move the Lease end date forward  f:

   **i.**   Res dent  s  n defau t under the Lease at the t me that Res dent g ves not ce of Res dent s exerc se of the opt on;

   **ii.**   Res dent prov des the not ce unaccompan ed by the Ear y Term nat on Opt on payment; or

   **iii.**   Res dent does not proper y exerc se the Ear y Term nat on Opt on by fo ow ng the procedures spec f ed above, but vacates the Un t before the end date spec f ed  n the Lease.

**EARLY TERMINATION:**   In the event Res dent vacates the Un t before the Lease end date, and fa s to exerc se the Ear y Term nat on Opt on as spec f ed above. Res dent sha  be  ab e for a  rent owed for the rema nder of the Lease term m nus amounts pa d by a rep acement res dent ( f any), p us any other amounts as spec f ed by  aw.

In t a s : 

11. **DELAY OF POSSESSION:**   If the Land ord, for any reason, cannot de ver the possess on of the prem ses to Res dent at the commencement of the term, as here n above spec f ed, th s Lease sha  not be vo d or vo dab e, nor sha  Land ord be  ab e to Res dent for any  oss or damages resu t ng therefrom; but  n that event there sha  be a per d em deduct on of rent cover ng the per od between commencement of the term and the t me when Land ord can de ver possess on.

12. **FAILURE TO MAKE PAYMENTS PRIOR TO COMMENCEMENT:**   If Res dent fa s to make any payment due pr or to the commencement date of Lease shown  n Sect on 3, Land ord has no duty to prov de possess on of the prem ses, and Land ord may app y any and a  prev ous y made payments to amounts due to Land ord.

# B. PAYMENTS, DEPOSITS, AND FEES

13. **MONTHLY RENTAL PAYMENT:**   The tota  rent  s as out ned  n Sect on 4; Res dent hereby agrees to prorate rent  n order that renta  payments sha  fa  due  n advance on the **FIRST DAY OF EACH MONTH.** A  renta  payments must be tendered by **certified cashier's check or online payment options made available by Landlord. Personal checks, cash and money orders are not accepted.** Payments made by cash er s check must be made payab e to **PR SM Biella, LLC**  ocated at: **1519 6th Street, Ste. 100, Santa Monica, CA  90401.** Norma  bus ness hours of de very of renta  payments are: **7 days a week , 10 am to 6 pm**, exc ud ng ho days. If payment  s made ate, t w  be subject to a  app cab e charges and may be rejected by Land ord  f payment s not made  n the fu  amount of rent due at the t me a ong w th a  reasonab e  ate fees and not ce fees, f app cab e, or  f the payment tendered  s not tendered  n the form requ red by the "Charges For Late Payments" and "Returned Payments" sect ons of th s Lease. **Initial payment due for move in must be made in the form of a cashier's check or via credit card only online.** If a rent "drop box"  s ava ab e,  t sha  be used at Res dent s own r sk. Land ord reserves the r ght at any t me to change a  e ectron c and cred t card payment prov ders, po c es and procedures.

14. **CHARGES FOR LATE PAYMENTS:**   Land ord and Res dent agree that  t s h gh y  mpract ca  and/or extreme y d ff cu t to ascerta n the actua  damages susta ned by Land ord as a resu t of Res dent s  ate payment of rent or an e ectron c check that does not c ear. Res dent further agrees that the  ate fee s a fa r and reasonab e est mate of actua  expenses  ncurred by Land ord as a resu t of Res dent s fa ure to pay rent when due. The actua  expenses are not suscept b e to ready ca cu at on but  nc ude Land ord s cost of commun cat ng w th Res dent regard ng the  ate payment and  ncreased account ng expenses. Payment of  ate fee w  not excuse Res dent from the ob gat on to perform Res dents ob gat ons under the Lease, and w  not bar Land ord from any other remed es a owed under the  ease or app cab e  aw. Accord ng y, Land ord and Res dent hereby agree to the fo ow ng:  f Res dent does not pay the fu  amount of the rent shown  n Sect on 4 by the end of the **1st** day of the month, Land ord sha  co ect a fee of **$100.00**. Furthermore, f Res dent does not pay by the end of the **5th** day of the month, Res dent may on y pay by cash er s check or on ne payment opt ons ( f offered).  Land ord w  on y accept a cash er s check after the **5th** day of the month, or  n response to a not ce to pay rent or qu t, or a not ce to perform covenant or qu t requ r ng payment. Land ord may term nate th s Lease for fa ure to pay  ate charges and may term nate th s Lease for non-payment of rent, as deta  ed  n Sect on 4.

15. **RETURNED PAYMENTS:**   Land ord may co ect a fee of **$25.00** for a payment that  s not honored and  ate fees w  be assessed back to the  or g na  day that rent was cons dered  ate. The charges d scussed  n th s paragraph are  n add t on to the regu ar month y rent payab e by Res dent. If Res dent g ves Land ord two payments that are returned for nonpayment dur ng the term of th s Lease, then the future rent sha  be payab e by cash er s check on y for the rema nder of the Lease term.

16. **SECURITY DEPOSITS:**

It s understood by Res dent that Land ord w  not app y any port on of the secur ty depos t toward  ast month s rent or unpa d damages pr or to vacat ng the prem ses. If the prem ses  s rented by more than one person, Land ord may pay the refund to any or a  Res dent(s)  dent f ed n th s Lease and Res dents agree that they w  work out the deta s of d v d ng any refund among themse ves.

Land ord agrees to return the secur ty depos t n comp ance w th C v  Code § 1950.5, after fu  possess on of the prem ses has been recovered, to Res dent  ess any  tem zed deduct ons made for fa ure to return the prem ses to the same  eve  of c ean ness as the or g na  cond t on n wh ch t was rece ved w th the except on of norma  wear and tear.  The depos t may be used to compensate Land ord for Res dent s defau t n renta  payments, to repa r damages to the prem ses (exc us ve of wear and tear) caused by Res dent, h s/her guests, and other househo d members, to c ean the prem ses, and to remedy future defau ts by Res dent n any ob gat on under th s Lease  nc ud ng the ob gat on to restore, rep ace or return persona  property or appurtenances, exc us ve of ord nary wear and tear.

   **i.**   Pr or to move out, where requ red by  aw, Land ord sha  prov de wr tten not ce to e ect for  nspect on no more than two weeks pr or to move out. Res dents may choose to be present dur ng the t me of  nspect on.

   **ii.**   In order to m n m ze secur ty depos t deduct ons,  tems  n need of repa r sha  be noted so that Res dent may have the opportun ty to make repa rs.

# C. RESIDENT DEFAULT

17. **DEFAULT BY RESIDENT:**   Res dent s performance of each of Res dent s ob gat ons under th s Lease  s a cond t on as we  as a covenant. Res dent s r ght to cont nue n possess on of the prem ses s cond t oned upon such performance. T me s of the essence n the performance of a  covenants and cond t ons. Res dent sha  be n mater a  defau t under th s Lease n the fo ow ng c rcumstances:

   **i.**   If Res dent abandons or vacates the prem ses;

   **ii.**   If Res dent fa s to pay rent or any other charge requ red to be pa d when due and the fa ure to pay cont nues for three (3) days after wr tten not ce has been g ven to Res dent; or

   **iii.**   If Res dent fa s to perform any of Res dent s non-monetary ob gat ons under th s Lease for a per od of three (3) days after wr tten not ce from Land ord.

 

18. **REMEDIES:**   Upon the occurrence of any defau t by Res dent, Land ord may exerc se any r ght or remedy wh ch Land ord may have at aw or n equ ty, each and a of wh ch are cumu at ve and nonexc us ve. Add t ona y, Land ord sha be ent t ed to recover from Res dent a damages ncurred by Land ord by reason of Res dent s defau t. W thout m tat on the forego ng, upon the occurrence of any event of defau t by Res dent, Land ord sha have the opt on to pursue any one or more of the fo ow ng remed es, each and a of wh ch sha be cumu at ve and nonexc us ve:

    **i.** Term nate th s Lease and Res dent s r ght to possess on of the eased prem ses and recover from Res dent a damages a owed at aw or n equ ty, nc ud ng those a owed under C v Code Sect on 1951.2 nc ud ng:
        **a.** The worth at the t me of award of the unpa d rent wh ch had been earned at t me of term nat on;
        **b.** The worth at the t me of award of the amount by wh ch the unpa d rent wh ch wou d have been earned after term nat on unt the t me of award exceeds the amount of such renta oss that the Res dent proves cou d have been reasonab y avo ded;
        **c.** Subject to subsect on ( ), the worth at the t me of award of the amount by wh ch the unpa d rent for the ba ance of the term after the t me of award exceeds the amount of such renta oss that the Res dent proves cou d be reasonab y avo ded; and
        **d.** Any other amount necessary to compensate the Land ord for a the detr ment prox mate y caused by the Res dent s fa ure to perform Res dent s ob gat ons under the Lease or wh ch n the ord nary course of th ngs wou d be ke y to resu t therefrom.
    **ii.** The "worth at the t me of award" of the amounts referred to n paragraphs a and b of subsect on ( ) s computed by a ow ng nterest at **10% per year**, but no greater than the max mum nterest rate perm tted by aw. The worth at the t me of award of the amount referred to n paragraph c of subsect on ( ) s computed by d scount ng such amount at the d scount rate of the Federa Reserve Bank of San Franc sco at the t me of award p us 1 percent.
    **iii.** Land ord may recover damages that nc ude the worth at the t me of award of the amount by wh ch the unpa d rent of the ba ance of the term after the t me of award, exceeds the amount of renta oss for the same per od Res dent proves cou d be reasonab y avo ded.
    **iv.** Efforts by the Land ord to m t gate the damages caused by the Res dent s breach of the Lease do not wa ve the Land ord s r ghts to recover damages under th s sect on.
    **v.** Noth ng n th s sect on affects the r ght of the Land ord under a Lease to ndemn f cat on for ab ty ar s ng pr or to the term nat on of the Lease for persona njur es or property damage where the Lease prov des for such ndemn f cat on.
    **vi.** Land ord has the remedy descr bed n Ca forn a C v Code Sect on 1951.4 ( essor may cont nue ease n effect after essee s breach and abandonment and recover rent as t becomes due, f essee has the r ght to sub et or ass gn, subject on y to reasonab e m tat on). Accord ng y, f Land ord does not e ect to term nate th s Lease on account of any defau t by Tenant, Land ord may, from t me to t me, w thout term nat ng th s Lease, enforce a of ts r ghts and remed es under th s Lease, nc ud ng the r ght to recover a rent as t becomes due.

19. **DAMAGE BY RESIDENT:**   If any damage or destruct on to the prem ses s caused by Res dent or re ated part es, Res dent sha pay for any expenses, damage or repa r occurred. Res dent further agrees to pay rent for the per od the prem ses s damaged whether or not hab tab e, f such damage s caused by Res dent or re ated part es. Any such damage or destruct on of the prem ses caused by Res dent or re ated part es const tutes grounds for term nat on of the Lease; add t ona y such act ons w not const tute any r ght of rent reduct on.

20. **RESIDENT INFORMATION:**   If Res dent has supp ed nformat on to Land ord by means of a renta app cat on or s m ar nstrument, Res dent covenants that a such nformat on was g ven vo untar y and know ng y by Res dent, and f such nformat on proves to be fa se or m s ead ng, Land ord sha have the r ght to term nate th s Lease, n wh ch event Res dent sha mmed ate y surrender the prem ses. In the case of bond-f nanced propert es, Res dent hereby cert f es the accuracy of the statements made n the Cert f cat on of Tenant E g b ty and Income Ver f cat on (the "Cert f cate") prev ous y executed, and further agrees that the fam y ncome, fam y compos t on and other e g b ty requ rements set forth n the Cert f cate be deemed substant a and mater a ob gat ons of Res dent s tenancy; that Res dent w comp y w th a requests for nformat on wh respect thereto from Land ord or any Mortgagee; that Res dent s fa ure to prov de accurate nformat on deemed a defau t by Res dent, wh ch sha ent t e Land ord to pursue a r ghts and remed es set forth n the **"DEFAULT BY RESIDENT"** sect on or otherw se perm tted by aw, and that Res dent s fa ure to furn sh accurate and current nformat on on the Cert f cate cou d subject Res dent to c v ab ty.

21. **UNLAWFUL MISCONDUCT:**   Res dent agrees not to engage or perm t un awfu act v t es n the prem ses, n the common areas or on the grounds of the Commun ty. Res dent and any member of Res dent s househo d or a guest or other person under Res dent s contro sha not engage or fac tate n cr m na act v ty, nc ud ng drug-re ated cr m na act v ty, on or near the prem ses. "Drug-re ated cr m na act v ty" means ega manufacture, sa e, d str but on, use or possess on w th ntent to manufacture, se , d str bute, or use of a contro ed substance (as def ned n Sect on 102 of the Contro ed Substances Act (21 U.S.C. 802)). Res dent and any member of Res dent s househo d, or a guest or other person under Res dent s contro sha not engage n any act of v o ence or threats of v o ence, nc ud ng, but not m ted to, the un awfu d scharge of f rearms, on or near prem ses. Res dent and peop e under Res dent s contro may not harass Land ord or re ated management part es n any manner.

22. **ATTORNEY'S FEES:**   If an act on s brought for the recovery of rent or other mon es due or to become due under th s Lease or by reason of a breach of any covenant here n conta ned or for the recovery of the possess on of sa d prem ses, or to compe the performance of anyth ng agreed to be done by Res dent, or to recover for damages to sa d property, or to enjo n any act contrary to the prov s ons hereof, the preva ng party w be ent t ed to a the costs n connect on herew th nc ud ng, but not by way of m tat on, reasonab e attorney s fees whether or not the act on proceeds to judgment.

## D. CONDITION OF RESIDENCE:

23. **CONDITION OF UNIT:**   By s gn ng the Move In/Move Out Inspect on Form wh ch s an attachment to th s Lease, Res dent acknow edges that the prem ses s safe, c ean, and n good cond t on w th a app ances and equ pment n good work ng order, except as noted. Res dent a so agrees that Land ord has made no prom se to decorate, a ter, repa r or mprove the prem ses, except as sted on the Move In/Move Out Inspect on Form.

24. **KEYS, LOCKS, AND ACCESS DEVICES:**

   nitials 



   **i.**   **Keys and Locks:** Resident agrees not to change or add any locks or gates on any doors or windows to the premises without prior written consent of Landlord. If Landlord approves request to install locks, Resident agrees to immediately provide Landlord with a key for each lock. When Lease ends, Resident agrees to return all keys to the premises to Landlord. Landlord may charge Resident **$10.00** for each key that is lost or not returned.

   **ii.**   **Access:** Resident agrees to promptly notify Landlord in writing of any problem, defect, malfunction or failure of door locks, window latches, control ed access gates, intrusion alarms, and any other security device. Resident agrees to be responsible for all fines, penalties and other charges resulting from or attributable to the alarm, including false alarm charges. It is understood that Landlord is not responsible for providing access to the premises after office hours. Resident is responsible for contacting a locksmith, at Resident's expense, to gain access to the premises in the event of lockout. If Resident has called a locksmith, Landlord must be notified and then change locks at Residents expense.

   **iii.**   **Access Devices:** If Resident has received gate cards, fitness, restroom and/or entry gate keys as indicated in Section 6 of this Lease, Resident understands that if any of these items are lost or not returned upon move out, that the following fees will apply:

     Gate Access Device **$150.00** Entry Gate Key **$75.00**

     Resident further understands that if they do not have a working phone, they will not be able to access the gate from the premises to allow guests into the Community.

**25.**  **ENTRY:** Landlord will have the right to enter the premises as allowed by law. Law permits entry in case of emergency, to make necessary or agreed repairs, decorations, alterations or improvements, supply necessary or agreed services, to test smoke detectors, or exhibit the dwelling unit to prospective or actual purchasers, mortgagees, tenants, workmen or contractors or to make an inspection pursuant to subdivision (f) of Civil Code §1950.5 when the Resident has abandoned or surrendered the premises and pursuant to court order. Landlord will serve Resident with written notice before entry unless:

   **i.**   Entry is due to an emergency, surrender or abandonment of the premises, or

   **ii.**   Resident and Landlord agree orally to an entry to make agreed repairs or supply agreed services at an approximate day and time within one week of the oral agreement, or

   **iii.**   Resident is present and consents to entry at the time of entry, or

   **iv.**   To exhibit the premises to prospective or actual purchasers of the property, provided that Landlord has notified Resident in writing within 120 days of the oral notice that the property is for sale and that Resident may be contacted to allow for an inspection.

**26.**  **MAINTENANCE:** Resident is responsible to notify Landlord in writing of maintenance issues arise in or around the premises (except in the event of an emergency). Residents will be responsible for repacking, pick-up, broken, damaged, or missing articles already furnished and for any damages caused by Resident or Resident's guests to the building, fixtures or equipment. Maintenance requests will be handled after office hours only if an emergency. The on-duty maintenance associate will determine the appropriate course of action. To maintain the premises, Resident agrees to:

   **i.**   Keep the premises clean.

   **ii.**   Use all appliances, fixtures, and equipment in a safe manner and only for the purposes for which they are intended.

   **iii.**   Do not litter the grounds or common areas.

   **iv.**   Do not destroy, deface, damage or remove any part of the premises, common areas or grounds.

   **v.**   Give Landlord prompt written notice of any defects in the plumbing, fixtures, appliances, heating and cooling equipment or any other part of the premises or related facilities or observation of mold or mildew conditions in any portion of the premises.

   **vi.**   Do not make any repairs without Landlord's prior written consent.

   **vii.**   Maintain a minimum of 55 degrees inside the premises at all times to prevent water lines from freezing during winter months.

   **viii.**   Resident must dispose of all garbage, waste and recyclable materials in designated containers and/or designated areas and in accordance with applicable law and Landlord's instructions. Large items may not be disposed of in garbage containers and/or common areas.

**27.**  **SMOKE DETECTORS:** Resident's Unit has been equipped with smoke detectors. The smoke detectors have been tested prior to Resident's move in to ensure operational performance. Resident shall not disable smoke detector. It is the responsibility of Resident to periodically self test the smoke detectors to ensure its proper operation and notify Landlord of any malfunction.

**28.**  **SMOKE AND CARBON MONOXIDE DETECTORS:** The premises have been equipped with smoke and carbon monoxide detectors. The smoke detector and carbon monoxide detector have been tested prior to Resident's move in to ensure operational performance. Resident shall not disable smoke detector or carbon monoxide detector. It is the responsibility of Resident to periodically self test the smoke and carbon monoxide detectors to ensure its proper operation and notify Landlord of any malfunction.

**29.**  **RESTRICTIONS ON ALTERATIONS:** Resident agrees to refrain from making any alterations to the premises; including but not limited to:

   **i.**   Change or remove any part of the appliances, fixtures or equipment in the premises.

   **ii.**   Paint or install wallpaper or contact paper in the premises.

   **iii.**   Install washing machines, dishwashers, dryers, fans, heaters or air conditioners in the premises.

   **iv.**   Any modification made to the premises must be approved in writing from Landlord. Window coverings, signs, foil draperies or non-standard window coverings are not permitted.

**30.**  **SATELLITE DISHES:** If satellite dishes are allowed in the Community they must be one meter or less in size and may not be affixed to the patio or balcony of the premises. Resident is specifically prohibited from making physical modification to the premises and is prohibited from installing said satellite dish in the common areas of the Community, including, not limited to, outside walls, roofs, windows, common balconies or stairways. Resident will be responsible for damages caused by the satellite dish, including the cost of removal of in any violation of any satellite guidelines. Resident shall install, use, maintain and remove a satellite dish in a manner which is consistent with industry standards and shall be liable for any damage or injury sustained as a result of the negligent installation, maintenance, use or removal of said satellite dish. Allowable location may not provide an optimal signal or any signal at all.

  




**31.** **WATERBEDS AND AQUARIUMS:**   Waterbeds and 30+ ga on water tanks may on y be nsta ed w th pr or wr tten consent from Land ord. Pr or to nsta at on, a va d waterbed nsurance po cy or cert f cate of nsurance for property damage must be obta ned. The po cy sha be ssued by a company censed to do bus ness n Ca forn a and possess ng a Best s Insurance Report rat ng of "B" or h gher. The nsurance po cy sha be ma nta ned n fu force and effect unt the bedd ng/water tank s permanent y removed from the prem ses. The po cy sha be wr tten for no ess than **one hundred thousand dollars ($100,000.00)** of coverage. The po cy sha cover, up to the m ts of the po cy, rep acement va ue of a property damage, nc ud ng oss of use, ncurred by the Land ord or other caused by or ar s ng out of the ownersh p, ma ntenance, use, or remova of the waterbed on the prem ses on y, except for any damage caused ntent ona y or at the d rect on of the nsured, or for any damage caused by or resu t ng from f re. Land ord may requ re Res dent to produce ev dence of nsurance at any t me. The nsurance carr er sha g ve Land ord not ce of cance at on or non renewa 10 days pr or to th s act on. The bedd ng sha conform to the pounds-per-square foot we ght m tat on and p acement as d ctated by the f oor oad capac ty of the prem ses. The we ght sha be d str buted on a pedesta or frame wh ch s equ va ent to the d mens ons of the mattress tse f. Res dent sha nsta , ma nta n and remove the bedd ng, nc ud ng, but not m ted to, the mattress and frame, accord ng to standard methods of nsta at on, ma ntenance, and remova as prescr bed by the manufacturer, reta er, or state aw, wh chever prov des the h gher degree of safety. Res dent sha not fy Land ord n wr t ng of the ntent to nsta , remove, or move the waterbed. The not ce sha be de vered 24 hours pr or to the nsta at on, remova , or movement. The Land ord may be present at the t me of nsta at on, remova , or movement at Land ord s opt on. If the bedd ng s nsta ed or moved by any person other than Res dent, Res dent sha de ver to Land ord a wr tten nsta at on rece pt stat ng the nsta er s name, address, and bus ness aff at on where appropr ate.

**32.** **VENTILATION:**   Res dent agrees to take the fo ow ng steps to prevent the growth of mo d n the prem ses:

**i.**   Open w ndows. Proper vent at on s essent a . If t s not poss b e to open w ndows, run the fan on the Un t s a r-hand er to c rcu ate fresh a r throughout the prem ses.

**ii.**   In damp or ra ny weather cond t ons, keep w ndows and doors c osed.

**iii.**   If poss b e, ma nta n a temperature of between 50° and 80° Fahrenhe t w th n your Un t at a t mes.

**iv.**   Use the pre- nsta ed bathroom fan or a ternat ve vent at on when bath ng or shower ng and a ow the fan to run unt a excess mo sture has vented from the bathroom.

**v.**   Use the exhaust fan n the k tchen when cook ng or wh e the d shwasher s runn ng. A ow the fan to run unt a excess mo sture has vented from the k tchen.

**vi.**   Use care when water ng housep ants. If sp s occur, dry up excess water mmed ate y.

**vii.**   When wash ng c othes n warm or hot water, watch to make sure condensat on does not bu d up w th n the washer and dryer c oset. If condensat on does accumu ate, dry w th a fan or towe .

**viii.**   Thorough y dry any sp s on carpet ng.

**ix.**   Do not a ow damp or mo st stacks of c othes or other c oth mater a s to e n p es for an extended per od of t me.

**x.**   Immed ate y report to Land ord any ev dence of a water eak or excess ve mo sture n the prem ses, storage room, garage, or any common area.

**xi.**   Do not overf c osets or storage areas to a ow for proper vent at on.

**xii.**   C ean and dust the prem ses on a regu ar bas s. Regu ar vacuum ng, mopp ng, and use of env ronmenta y safe househo d c eaners s mportant to remove househo d d rt and debr s that contr bute to mo d growth.

**xiii.**   Per od ca y c ean and dry the wa s and f oors around the s nk, bathtub, shower, to ets, w ndows and pat o doors us ng a common househo d s nfect ng c eaner.

**xiv.**   On a regu ar bas s, w pe down and dry areas where mo sture somet mes accumu ates, ke counter tops, w ndows, w ndows s, bathroom s nks, to ets, and shower enc osures.

# E. LIMITATION ON LIABILITY:

**33.** **LIMITATION ON LANDLORD LIABILITY:**   In the event of njury, oss or damage to Res dent or re ated part es on the prem ses, Land ord sha not be ab e; exc ud ng n the event of w fu m sconduct, neg gence, fraud, or v o at on of aw. Res dent hereby agrees to ndemn fy and ho d Land ord harm ess from a ab ty for such njury, oss or damage.

**Other Limitations:**   Res dent a so agrees that Land ord sha not be ab e for, and Lease sha not be term nated by any nterrupt on or nterference w th serv ces or accommodat ons due Res dent caused by str ke, r ot, orders or acts of pub c author t es, acts of other Res dents, acts of Land ord, acc dents, the mak ng of necessary repa rs to the bu d ng of wh ch the Un t s a of part, or any other cause beyond Land ord s contro , except as otherw se prov ded by aw.

**Liability for Common Area Amenities:**   To the extent a owed by aw, Res dent agrees to assume a r sk of harm, and wa ve a c a ms aga nst Land ord and Land ord s aff ates, emp oyees and agents, resu t ng from use of common area amen t es, even f caused by the neg gence of Land ord and Land ord s aff ates, emp oyees and agents. To the extent a owed by aw, use of the common area amen t es s at the so e r sk of Res dent, Occupants, Res dent s guests and agents.

**34.** **DAMAGE AND DESTRUCTION:**   In the event of damage to the prem ses by f re, water, or other hazard; or n the event of ma funct on of equ pment or ut t es, Res dent sha mmed ate y not fy Land ord. Res dent hereby agrees to re mburse and/or ndemn fy Land ord for a damages, costs or expenses re ated to any damage or destruct on caused by the act or om ss on of Res dent and/or Res dent s guests. Res dent further agrees to pay rent for the per od the un t s damaged whether or not hab tab e, f (1) such damage s caused by Res dent and/or Res dent s guests, (2) a ternate accommodat ons are prov ded, or (3) re ocat on re mbursement s pa d as per the C ty of Santa Mon ca. Land ord may choose to term nate the Lease by g v ng not ce f the prem ses s so damaged by the event that substant a repa rs n Land ord s judgment, sha requ re such term nat on. Land ord w prov de re ocat on re mbursement as per the C ty of Santa Mon ca dur ng the per od of t me when the prem ses are not f t for occupancy.

**35.** **SECURITY:**   It s understood that no prom se of Res dent s persona secur ty has been made. Regard ess of any prevent ve measures prov ded by Land ord, no guarantee can be made of secur ty. If secur ty systems, secur ty dev ces, or wa k-through/dr ve-through serv ces are emp oyed at th s Commun ty, no representat on s be ng made that they w be effect ve n prevent ng cr m na act v ty. Land ord reserves the r ght to reduce, mod fy or e m nate any secur ty system, secur ty dev ces, serv ces, nc ud ng courtesy patro (other than those statutor y requ red) at any t me; and Res dent agrees that such act on sha not be a breach of any ob gat on or warranty on the part of Land ord. Res dent agrees to ho d Land ord harm ess from c a ms ar s ng out of cr m na acts of other res dents or th rd part es. Res dent understands that the protect ve steps Land ord has taken are ne ther a guarantee nor warranty that there w be no cr m na acts. Persona safety s each Res dent s persona respons b ty. Res dent understands that Land ord may reta n personne or serv ces wh ch are ava ab e for, d sturbances, f re a arm v o at ons, prob ems w th outdoor ght ng, etc. Res dent

   

ALLIANCE

agrees and understands that any measure Landlord has taken in this regard is neither police force nor a guaranteed deterrent to crime. In the event of criminal activity, the Police Department is to be contacted first by Resident. We request you also notify the Landlord that such a disturbance or emergency has occurred.

**36.   INSURANCE:**   Each Resident is required to purchase and maintain at Resident's sole expense a policy of Personal Liability Insurance in the amount of not less than **one hundred thousand dollars ($100,000.00)** per occurrence throughout the term of the Lease and any subsequent renewal periods. Each person occupying the premises must be listed on the policy and the Resident is responsible to provide proof of coverage to Landlord. **the Community, address of P.O. Box 979142 Miami, FL 33197-9142, 1519 6th Street, Ste. 100, Santa Monica, CA 90401** must be listed as an interested party on a policies written by third party insurance agents other than Assurant Specialty Property Insurance. Landlord's insurance does not protect Resident, occupants or Resident's guests against loss or damage to personal property or the belongings or cover Resident's liability. Resident is encouraged to obtain a policy of Renter's Insurance protecting Resident's household goods and personal property in addition to liability insurance.

Except where prohibited by law, if Resident fails to obtain and maintain liability insurance as required, Resident will be in violation of Resident's lease obligations. In such event, Resident will receive a written notice demanding that Resident cure the violation by procuring the insurance and supplying evidence of coverage to Landlord. In the sole discretion of Landlord, and as one of its non-exclusive remedies for a breach of this provision, Resident fails to supply evidence of such insurance to Landlord on or before the date set forth in said notice, **Resident agrees that, at Landlord's discretion,** the insurance requirement of this Lease Agreement may be satisfied by the Landlord, who may schedule the Resident's unit for coverage to meet the Minimum Required Insurance coverage listed above **and in no case, shall Landlord be responsible for any damage to Resident's property.** An amount equal to the total cost of the Liability coverage (premium, taxes and administrative fee) shall be charged to Lessee by the Landlord. If Resident fails to pay for the liability insurance, this will be considered a default under the Lease. These charges shall terminate when Resident procures an approved renter's liability insurance policy, and further demonstrates that the insurance requirements are satisfied per the lease. **The Landlord does not sell or provide insurance.** The total cost to the Resident for the Landlord obtaining Liability coverage shall be **$14.00** per month.

**37.   CONTRACTORS:**   Resident understands that Landlord may make acknowledgments as to the character of any contractors or service providers retained by Resident through Landlord's concierge service, nor is Landlord affiliated in any manner with the contractors or service providers. Resident agrees that Landlord has no obligation or liability for the acts or omissions, whether negligent or otherwise of any agent or employee of the contractors or service providers. Resident has been informed and understands and agrees that Resident's personal safety and security and the security of Resident's personal property is Resident's responsibility, and that Landlord recommends that Resident conduct their own investigation of the contractors or service providers.

**38.   MEGAN'S LAW:**   Pursuant to Section 290.46 of the Penal Code, information about specified registered sex offenders is made available to the public via internet website maintained by the Department of Justice at www.meganslaw.ca.gov. Depending on an offender's criminal history, this information on website include either the address at which the offender resides or the Community of residence and the zip code in which the offender resides in.

**39.   ENVIRONMENTAL INDEMNIFICATION:**   To the extent allowed by law, Resident expressly assumes and accepts any and all risks involved or related to the presence in the Community of any and all health affecting substances, and any power lines in the vicinity of the premises. Resident waives as claims and causes of action of any kind or nature, at law or in equity, including, but not limited to, claims or causes of action arising by statute, ordinance, rule, regulation or similar provision, against Landlord and Landlord's agents, principals, employees, legal representatives, affiliates, assignees, successors in title, partners, shareholders, officers, directors, parents, members and managers (herein collectively called the "Land ord Affiliates") with respect to any health hazard occurring in connection with the presence in the Community of material substances containing potentially health affecting substances, and claims arising out of or are based upon any potentially health affecting substances brought, or allowed to be brought, into the Community by Resident or any guest or other person living in, occupying, using or residing in the premises. Resident agrees to defend, indemnify and hold harmless the Land ord Affiliates against and from any and all actions, causes of action, claims, demands, liabilities, losses, damages and expenses of whatsoever kind, including, but not limited to, attorneys fees at both the trial and appellate levels, that any or all of the Land ord Affiliates may at any time sustain or incur by reason of any and all claims asserted against them arising out of potentially health affecting substances brought or allowed to be brought into the Community by Resident or any guest or other person living in, occupying, using or residing in the premises.

**40.   PROPOSITION 65 WARNING:**   The Community may contain chemicals known to the State of California to cause cancer, birth defects, and other reproductive harm. These chemicals may be contained in emissions and fumes from building materials, products and materials used to maintain the property, and emissions, fumes, and smoke from Resident and guest activities, including but not limited to the use of motor vehicles, barbecues, and tobacco products. These chemicals may include, but are not limited to carbon monoxide, formaldehyde, tobacco smoke, unleaded gasoline, soot, tars, and mineral oils.

For more information please contact OEHHA at (916) 445-6900 or visit http://www.oehha.org/prop65/pdf/Prop65tenants.pdf for additional information from the California Environmental Protection Agency's Office of Environmental Health Hazard.

**41.   PESTICIDE DISCLOSURE:**   Resident is aware that Landlord has contracted with a registered structural pest control company to provide pest control services to the Community per odically and acknowledges receiving a written notice regarding pesticides used on the premises as provided for under Business and Professions Code §8538 and California Civil Code §1940.8. Resident accepts a risks and hazards associated with chemicals used on the premises that are stated in the pesticide disclosure notice not attached to this Lease.

**42.   SOCIAL MEDIA:**   Landlord maintains an online presence through its website and social media. This online presence includes, but is not limited to, displaying images from community events organized by Landlord. From time to time Landlord will have its personnel or independent contractors capture still ("photo") and moving ("video") images at these events. Resident hereby acknowledges that by attending these events Resident accepts and agrees to the potential of being depicted in those images and further agrees to permit Landlord to use Resident, other occupants and Resident's guests likeness, WITHOUT COMPENSATION, for the limited purpose of Landlord's online presence. Please note that Landlord respects Resident's privacy and at Resident's written request Landlord will remove any image depicting Resident, other occupants or Resident's guests.

# F. COMMUNITY CONSIDERATION

**43.   GUESTS:**   Persons staying in the premises for longer than two weeks must complete a rental application and be approved and added to Lease. Any person occupying the premises longer than two weeks or 20 nonconsecutive days out of the year shall be considered an unauthorized occupant. Assignment or subletting any part of the premises, and the use of AirBNB or any other similar short term rental service without Landlord's prior written consent is strictly prohibited and shall constitute a non-curable breach of this Lease. Resident


 


**ALLIANCE**

sha be ab e for any v o at on costs ncurred by the Land ord.

44. **USE OF PREMISES:**   Res dent agrees to use the prem ses so e y as a pr vate res dence. The furn sh ng by Land ord to Res dent of any storage space, use of aundry, e ectron c access contro s and gates, or any other common area fac t es outs de the prem ses sha be deemed to be furn shed gratu tous y and Land ord makes no representat ons or guarantees as to the ava ab ty, adequacy, or f tness of such space, serv ce, or fac t es. Res dent acknow edges that Land ord w not prov de feguard serv ce at the sw mm ng fac t es, and Res dent agrees to take adequate and reasonab e care n use of a recreat ona fac t es to ensure the safety of Res dent, other occupants and Res dent's guests. A guests must be accompan ed by a Res dent to use recreat ona fac t es and amen t es. Land ord makes no representat ons, warrant es or guarantees express or mp ed, regard ng the presence or qua ty of recept on of e ectron c commun cat on or nformat on retr ev ng dev ces w th n the Un t or Commun ty.

45. **DISTURBANCE:**   In cons derat on of and cooperat on of others n the Commun ty, Res dent agrees to keep the vo ume of any rad o, stereo, te ev s on or mus ca nstrument at such a eve wh ch w not d sturb the other res dents at any t me. Any no se, d sturbance, or act v ty wh ch wou d, n the so e abso ute d scret on of Land ord, be reasonab y ke y to annoy or d sturb other res dents s str ct y proh b ted. Res dent agrees not to nterfere w th the safe and qu et enjoyment or comfort of others.

46. **PARKING:**   A veh c es must have cense p ates and reg strat on tags are to be current and d sp ayed at a t mes. Veh c es must be kept c ean and n operab e cond t on. Res dent, other occupants and Res dent's guests who park n f re anes, reserved park ng or undes gnated park ng w be towed at the veh c e owner's expense. Park ng of boats, campers, recreat ona veh c es and commerc a purpose veh c es s proh b ted. Veh c e repa r s proh b ted. Any veh c e that appears to be d sab ed, abandoned or cted w be towed at the veh c e owner s expense.

Each veh c e must be reg stered w th Land ord to prov de Land ord w th a record to attempt to fo ow up w th Res dent n hopes of avo d ng a cost y tow, charged to the veh c e owner c ted for v o at ng Commun ty park ng gu de nes. Land ord reserves the r ght to change ass gnments and po c es upon wr tten not ce to the Res dent. Unass gned spaces may be used by guests f ava ab e and not otherw se posted at the prem ses, on a f rst serve bas s; unass gned spaces may not be used for more than a 48-hour cont nua per od.

47. **REASONABLE ACCOMMODATIONS:**   It s the po cy of Land ord to reasonab y accommodate a Res dents as def ned under state and federa aws. It s agreed that Res dent sha not fy Land ord of any need re at ng to a reasonab e accommodat on to ensure the proper procedures are mp emented to comp y w th ex st ng aws. In the event Res dent fa s to not fy Land ord, Land ord sha not be ab e for damages suffered by Res dent. It s agreed that Land ord s under no ob gat ons to accommodate Res dent unt proper not f cat on w th support ng ver f cat on s prov ded to Land ord of d sab ty and d sab ty-re ated need for an accommodat on (un ess the d sab ty and d sab ty-re ated need are apparent).

48. **PETS:**   Res dent agrees that t w not keep or perm t to be kept n prem ses any dog, cat, b rd or other an ma un ess otherw se mutua y agreed to n wr t ng. Th s sha nc ude pets not owned by Res dents that may from t me to t me v s t. Land ord w a ow support ve/ass st ve an ma s for Res dent that prov des wr tten ver f cat on of d sab ty and d sab ty-re ated need for the support ve/ass st ve an ma (un ess the d sab ty and d sab ty-re ated need are apparent). The Pet Addendum sha be added to th s Lease as an attachment when app cab e. Perm ss on for v s t ng pets must be obta ned pr or to the r entrance to the Commun ty and the prem ses. Any unauthor zed pets or v s t ng pets w thout pr or wr tten consent const tute breach of Lease. Perm ss on to keep a pet may be granted or den ed at Land ord s so e d scret on.

# G. UTILITIES AND HOT WATER

49. **UTILITIES:**   Ut ty serv ces sha be prov ded d rect y from the ut ty prov der or, at the so e d scret on of Land ord, on a sub-meter ng, square footage, or other a ocat on bas s. Land ord reserves the r ght to mod fy the method by wh ch the ut t es are furn shed to the prem ses or b ed to Res dent dur ng the term of th s Lease and may mod fy b ng Res dent for ut t es prev ous y nc uded n the rent by g v ng Res dent a 30 day wr tten not ce. Reference the ut ty addendum for deta ed terms, cond t ons and methodo ogy.

The fo ow ng terms sha app y:

   i.   Res dent agrees to pay a charges for ut t es for the out ned prem ses for the term of the Lease nc ud ng but not m ted to those sted n the Ut ty B ng Addendum. Charges may be assessed by the ut ty prov der or Land ord or Land ord s des gnated B ng Party n the case of ut t es b ed to Res dent by Land ord n connect on w th Res dent s use of ut t es.

   ii.   Res dent shall not use any ut ty n a wastefu, unreasonab e, or hazardous manner and agrees to comp y w th a ut ty conservat on efforts mp emented by Land ord.

   iii.   Land ord s not ab e for c a ms ar s ng from ut ty serv ce outages, nterrupt ons, or f uctuat ons n ut t es prov ded to the prem ses not reasonab y w th n Land ord s contro.

   iv.   Res dent agrees not to d sturb, tamper, adjust, or d sconnect any ut ty serv ce, sub-meter ng dev ce or system.

   v.   Fa ure to make necessary arrangements for Res dent s ut ty serv ce may resu t n an nterrupt on of serv ces and Res dent s fa ure to transfer ut ty serv ces to Res dent s name may be, at Land ord s d scret on, cons dered a mater a breach of th s Lease and w perm t Land ord to term nate the Lease. Res dent agrees that f Land ord s b ed for ut ty serv ces wh ch are Res dent s respons b ty, Res dent w repay Land ord for the charges ncurred w th n 10 bus ness days of nvo ce. Res dent w a so be subject to an add t ona charge of **$50.00** for each b ng cyc e dur ng wh ch Res dent has fa ed to become the customer of record w th the ut ty prov der(s). Th s fee cons sts of the expenses ncurred by Land ord to commun cate w th the ut ty prov der and/or Res dent regard ng the ut t es and the cost nvestment va ue of funds requ red to be advanced on Res dent s beha f to pay ut t es for wh ch Res dent s respons b e. It s agreed between the part es that these expenses, though acknow edged to ex st, are d ff cu t to ascerta n and that the add t ona charge s a reasonab e est mate of the r actua amount.

50. **HOT WATER:**   The fo ow ng w app y.

   i.   The water temperature n the un t s set at 120 degrees Fahrenhe t or be ow. When the water temperature s 120 degrees Fahrenhe t, or be ow, bacter a may enter the water heater or assoc ated p umb ng and accumu ate. If Res dent des res the thermostat to rema n at 120 degrees Fahrenhe t, or be ow, Res dent assumes any and a r sks assoc ated w th any bacter a growth n the water heater or assoc ated p umb ng.

  



**ii.** Res dent acknow edges that some commun t es managed by Land ord have heat ng and coo ng serv ces supp ed by a bo er/ch er system. If th s commun ty and/or th s apartment un t rece ves such serv ces, Res dent acknow edges that adjustment to the heat ng or coo ng eve s for any one spec f c apartment un t s not poss b e and that the changeover between phases of the system cannot be made spec f ca y for any one apartment un t. Res dent a so acknow edges that to ach eve fu heat ng potent a , Land ord may f nd t necessary to ncrease the temperature of the heated water dur ng the co der months of the year when compared to the warmer months.

**iii.** Res dent shou d be aware that some un ts may be equ pped w th an HVAC heat ng system wh ch operates on hot water. To ach eve fu heat ng potent a , t may be necessary to ncrease the temperature of the water heater dur ng the co der months of the year. Res dent shou d a so be aware that some un ts operate on centra zed hot water systems wh ch serv ce mu t p e un ts and as such nd v dua adjustments n temperatures w not be poss b e.

**iv.** If Res dent des res the water temperature n the prem ses to be h gher than 120 degrees Fahrenhe t and the prem ses has an nd v dua hot water heater, Res dent w request, n wr t ng, the temperature of the hot water heater to be adjusted by Land ord, and Res dent sha spec fy the des red temperature at wh ch Land ord s requested to set the thermostat.

**v.** Res dent understands that f the temperature s set above 120 degrees Fahrenhe t, that the water re eased from the taps n the prem ses may sca d or burn anyone us ng water, and potent a y cause severe njury.

**vi.** Res dent may not tamper w th, or adjust the water temperature thermostat n the prem ses n any way w thout wr tten author zat on from Land ord.

**vii.** Res dent agrees to ndemn fy and ho d Land ord harm ess n any act on nvo v ng any njury re ated to the temperature of the water, the water system or the assoc ated p umb ng n the prem ses.

## H. ADDITIONAL TERMS

**51. MILITARY:** M tary personne on act ve duty may term nate th s ease under Federa aw f:

**i.** Res dent becomes a member of the Armed Forces of the Un ted States after Res dent enters nto the Lease; or

**ii.** Res dent s or becomes a member of the Armed Forces of the Un ted States and rece ves:

    **a.** Orders for a permanent change of stat on; or

    **b.** Orders to dep oy for a per od of at east 90 days.

Land ord fu y supports ts res dents who are act ve-duty or reserve m tary personne . Res dent must g ve Land ord wr tten not ce of term nat on. For renta s when rent s pa d month y, the term nat on becomes effect ve 30 days after the f rst date on wh ch the next renta payment s due after the term nat on not ce s de vered and no further rent w be owed fo ow ng the exp rat on of the not ce per od (or the actua move-out date, f ater). Res dent must furn sh the Land ord w th proof to estab sh that Res dent qua f es for th s m ted except on. Proof may cons st of any off c a m tary orders, or any not f cat on, cert f cat on, or ver f cat on from the serv ce member s command ng off cer, w th respect to the serv ce member s current or future m tary duty status. M tary perm ss on for base hous ng does not const tute a permanent change-of-stat on order.

**52. OFFICE OF FOREIGN ASSETS CONTROL:** Res dent represents and warrants that Res dent and each person or ent ty own ng an nterest n Res dent s

**i.** Not current y dent f ed on the Spec a y Des gnated Nat ona s and B ocked Persons L st ma nta ned by the Off ce of Fore gn Assets Contro , Department of the Treasury ("OFAC") and/or on any other s m ar st ma nta ned by OFAC pursuant to any author z ng statute, execut ve order or regu at on (co ect ve y, the "L st").

**ii.** Not a person or ent ty w th whom a c t zen of the Un ted States s proh b ted to engage n transact ons by any trade embargo, econom c sanct on, or other proh b t on of Un ted States aw, regu at on, or Execut ve Order of the Pres dent of the Un ted States.

**iii.** None of the funds or other assets of Res dent const tute property of, or are benef c a y owned, d rect y or nd rect y, by any Embargoed Person (as here nafter def ned).

**iv.** No Embargoed Person has any nterest of any nature whatsoever n Res dent (whether d rect y or nd rect y).

**v.** None of the funds of Res dent have been der ved from any un awfu act v ty w th the resu t that the nvestment n Res dent s proh b ted by aw or that the Lease s n v o at on of aw.

**vi.** Res dent has mp emented procedures, and w cons stent y app y those procedures, to ensure the forego ng representat ons and warrant es rema n true and correct at a t mes. The term "Embargoed Person" means any person, ent ty or government subject to trade restr ct ons under U.S. aw, nc ud ng but not m ted to, the Internat ona Emergency Econom c Powers Act, 50 U.S.C. § 1701 at seq., The Trad ng w th the Enemy Act, 50 U.S.C. App. 1 at seq., and any Execut ve Orders or regu at ons promu gated there under w th the resu t that the nvestment n Res dent s proh b ted by aw or Res dent s n v o at on of aw.

Res dent covenants and agree(s):


 




    **i.** To comply with a requirements of law relating to money laundering, anti-terrorism, trade embargo and economic sanctions, now or hereafter in effect.

    **ii.** To immediately notify Landlord in writing if any of the representations, warranties or covenants set forth in this section or the preceding paragraph are no longer true or have been breached or if Landlord has a reasonable basis to believe that they may no longer be true or have been breached.

    **iii.** Not to use funds from any "Prohibited Person" (as such term is defined in the September 24, 2001, Executive Order Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism) to make any payment due to Landlord.

    **iv.** At the request of Landlord, Resident may be asked to provide such information to determine Resident's compliance with the terms hereof.

    **v.** Resident hereby acknowledges and agrees that Resident's inclusion on the List at any time during the lease term shall be a material default of the Lease. Notwithstanding anything here in to the contrary, Resident shall not permit the premises or any portion thereof to be used or occupied by any person or entity on the List or by any Embargoed Person (on a permanent, temporary or transient basis), and any such use or occupancy of the premises by any such person or entity shall be a material default of the Lease.

**53. SUCCESSORS:** The terms and conditions contained in this Lease shall be binding upon and inure to the benefit of Landlord and Resident and their respective heirs, executors, administrator, personal representatives, successors and assigns.

**54. SUBORDINATION:** This Lease sha , without further act on the part of Resident, be subject and subordinate to the lien of any mortgage and/or any deed of trust or other encumbrance which may now exist, upon, or which may hereafter be placed by Landlord upon, the leased premises or property including the premises.

**55. ATTORNMENT:** Resident hereby agrees that Resident wi recognize as its Landlord under this Lease and sha attorn to any person succeeding to the interest of Landlord in respect of the land and the buildings on or in which the premises is contained upon any foreclosure of any mortgage upon such land or building upon the execution of any deed in lieu of such foreclosure in respect of such mortgage. If requested, Resident sha execute and deliver an instrument or instruments confirming its attornment as provided for herein; provided, however, that no such mortgagee or successor-in-interest sha be bound by any payment of rent for more than one 1 month in advance, or any amendment or modification of this Lease made without the express written consent of such mortgagee.

**56. CREDIT REPORTING:** Resident understands and agrees that Landlord may report Resident's credit and rental payment information to the national credit reporting agencies at any time throughout Resident's tenancy, including but not limited to Experian, TransUnion, Equifax. If applicable, Resident agrees to have Landlord submit their positive and/ or negative rental payment history data to Experian RentBureau or any other rental history data company on an ongoing basis.

**57. AUTHORIZATION FOR RELEASE OF INFORMATION.** Resident understands and agrees that personal information may be needed from time-to-time for third-party vendors, including but not limited to, package delivery systems, restoration and/or other service providers. Resident has been informed that this authorization is imited to tenant-related information on any, including name, address, phone number, Email address and other contact information, which will be maintained confidentially by the third-party vendor. Resident provides permission on for Landlord to distribute such personal information. Resident agrees that Landlord is not responsible for any breach in the information provided to third-party vendor and that Resident is responsible to properly report any such breach to the third-party vendor and work directly with such provider to remedy the breach.

**58. ESTOPPEL CERTIFICATE:** Resident agrees with in five 5 days of Landlord's request, Resident must execute and deliver to Landlord a written statement certifying that this Lease is unmodified and in full force and effect (or if modified, describing the modification). Any prospective or actual property purchaser may rely upon Resident's written statement. Should Resident fail to deliver a statement within the specified time, it wi be conclusively presumed that the Lease is unmodified and in full force and effect, except as otherwise indicated, and there are no uncured defaults in Landlord's performance, and any other details specified by Landlord or any requested of Resident.

**59. CONTENTS OF THIS LEASE:** The failure of Landlord to insist upon strict performance of any of the covenants and agreements of this Lease or any addenda thereto, or to exercise any option here in conferred in any one or more instances, sha not be construed to be a waiver or relinquishment of any such or any other covenants or agreements, but the same sha be and remain in full force and effect. Resident acknowledges and agrees that acceptance of rent by Landlord from the Resident or any person or entity on the Resident's behalf sha not be construed in any way as a waiver of Landlord's right to enforce a previously issued notice or use actions of Resident or Resident's guests or invitees which occurred prior to the acceptance of the rent as a basis for issuing and enforcing a notice. A parts, portions and provisions of this Lease sha be deemed separate and severable. In the event of the invalidity of any part, portion or provision, the rest of this Lease with such part, portion or provision deleted, sha be given full force and effect. This Lease and its attachments make up the entire Lease between Resident and Landlord regarding the premises. If any Court declares a particular provision of this Lease to be invalid or illegal, a other terms of the Lease wi remain in effect and both Landlord and Resident wi continue to be bound by them.

**60. NOTICES:** Any notice or document required or permitted to be delivered hereunder sha be deemed to be delivered, whether actually received or not, when deposited in the United States Ma , postage prepaid, addressed to Resident at the above premises. Personal delivery of any such notice by Landlord or Resident at the above address sha be deemed effective delivery hereunder. **ALL NOTICES TO RESIDENT MUST BE MADE PERSONALLY DELIVERED TO THE BUSINESS MANAGER, ASSISTANT BUSINESS MANAGER OR SALES ASSOCIATE DURING NORMAL BUSINESS HOURS. Normal business hours and hours of delivery of rental payments are: 7 days a week , 10 am to 6 pm on all non holidays.**

**61. ATTACHMENTS:** Resident certifies that Resident has received a copy of this Lease and attachments. Resident agrees to obey additional rules that may be established after the effective date of Lease including those outlined in the Community Policies. These policies may be modified, unless local law provides otherwise. Violation of these policies wi constitute a breach of Lease. If there is a conflict between these policies and the Lease, the Lease sha govern.

  

Initials



PR SM Biella, LLC

 ALLIANCE

| 1 | Addendum Re Use of Med ca Mar juana |
|---|---|
| 2 | An ma Addendum |
| 3 | Commun ty Po c es |
| 4 | Garage/Park ng Space Addendum |
| 5 | Move-In/Move-Out Inspect on Form |
| 6 | Pest Insect and Bed Bug Addendum |
| 7 | Res dent Commun cat on Log |
| 8 | Smoke-Free Addendum |
| 9 | Ut ty Addendum |
| 10 | Pest Contro Pest c de Not ce |

**SIGNATURES:**

**The undersigned expressly understands that the "TERM OF LEASE" Section above contains provisions under which the tenancy may automatically continue as a tenancy from month to month upon expiration of the Lease term.**

**Signed by Joseph N. Prencipe**
Fri Aug 17 02:17:44 AM PDT 2018
Key: 55741031; IP Address: 189.221.43.215

**Signed by Anna Afanasyeva**
Fri Aug 17 02:16:26 AM PDT 2018
Key: F32041B2; IP Address: 189.221.43.215

Joseph N Prencipe *(Resident)*                    *Date*

Anna Afanasyeva *(Resident)*                    *Date*

*(Agent for Owner)*                    *Date*

   

PR SM Biella, LLC

**ALLIANCE**

# ADDENDUM RE USE OF MEDICAL MARIJUANA

This document is an addendum to the Lease Agreement dated **August 20, 2018** between **Joseph N. Prencipe and Anna Afanasyeva** and **PR SM Biella, LLC** for the Unit #**506** located at **1411 7th Street Santa Monica, CA 90401**.

I have read the following and agree to adhere to the below rules and regulations for Medical Marijuana use at the community:

1. I have a physical or mental impairment that limits one (or more) major life activity. As a result of my disability, I require the use of Medical Marijuana. A copy of the Medical Marijuana Card is attached and incorporated by reference into this Addendum. I agree to notify Owner/Agent if the Medical Marijuana Card is revoked or expires and understand that this Agreement terminates immediately upon revocation or expiration of the Medical Marijuana Card.

2. The Office of Environmental Health Hazard Assessment and the California Environmental Protection Agency list marijuana smoke as a carcinogen. In 2009, the Carcinogen Identification Committee determined that marijuana smoke was shown to cause cancer, and was added to the Proposition 65 list, pursuant to Title 27, California Code of Regulations, section 25305(a)(1) (formerly Title 22, California Code of Regulations, section 12305(a)(1)).

3. I UNDERSTAND THAT ANY SECONDHAND MARIJUANA SMOKE THAT DRIFTS INTO THE WINDOWS OF OTHER UNITS, THROUGH THE VENTS, UNDER ANOTHER RESIDENTS DOOR, ONTO A BALCONY, OR IN A COMMON AREA (INCLUDING FITNESS CENTER AND POOL/SPA) IS PROHIBITED. I AGREE TO CONFINE THE SMOKE TO MY UNIT AND AGREE THAT ANY SMOKE THAT AFFECTS A NEIGHBORING RESIDENT WILL BE DEEMED A NUISANCE. I UNDERSTAND THAT I WILL BE REQUIRED TO TAKE THE MEDICATION IN AN ALTERNATE MEANS AND/OR SMOKE IN AN ALTERNATE LOCATION IF THE SMOKE IS HAVING AN ADVERSE IMPACT ON ANY NEIGHBORING RESIDENT.

4. I understand that there are reasonable alternate means to take the medication, including (among others) edibles, tinctures, beverages, cannabis oils, and pills. Owner/Agent understands that each individual's medical situation is different and will address the specific situation and alternate means to take the medication with advice from the prescribing physician.

5. The distribution and/or sale of Marijuana or any other narcotic or illegal substance is a violation of the community policies and basis for termination of tenancy.

6. Resident(s) are prohibited from making any unauthorized modifications to the unit, including indoor irrigation systems or any other alteration that may increase the moisture and/or humidity levels in the unit or risk of fire.

7. This Addendum may be modified for any reason at any time without Resident(s) approval in accordance with State and Federal law.

8. Except as expressly modified hereunder, the remaining terms and conditions of the Lease as previously amended shall remain in full force and effect.

9. Resident(s) hereby acknowledges that this addendum is incorporated into the rental agreement between the Resident(s) and Owner/Agent.

10. The parties hereto represent and acknowledge that in executing this Agreement they do not rely upon and have not relied upon any representation made by the other party with regard to the subject matter of this Addendum, or its effects, other than those representations specifically set forth herein. No supplement, modification, or amendment of this Addendum shall be binding unless executed in writing by both parties.

***This Addendum may be executed in counterparts and facsimile copies of same shall be admissible for all purposes and shall be deemed an original.***



# ANIMAL ADDENDUM

Th s document  s an addendum to the Lease Agreement dated **August 20, 2018** between **Joseph N. Prencipe and Anna Afanasyeva** and **PR SM Biella, LLC** for the **Unit # 506**  ocated at **1411 7th Street, Santa Monica, CA  90401**.

An ma s are not perm tted on the Prem ses w thout pr or or wr tten consent from Land ord, wh ch  nc udes unauthor zed or v s t ng an ma s.

**Resident declares no animal will reside on Premises.**

| Animal Description |
| --- |

**Resident and Landlord agree as follows:**

1. Res dent agrees to pay **$0.00** per month  n Pet Rent per month on or before the f rst of each month w th Month y Rent. Pet Rent  s add t ona "rent" for a  purposes.

2. Res dent agrees to pay $75.00 month y pet rent and w  be requ red to pay an add t ona  depos t of $500.00 at t me pet  s added to the  ease.

3. The add t ona  depos t sha  be subject to fu  nspect on of the Un t upon Res dent s move out and sha  be cons dered an add t ona depos t pursuant to the Lease terms.

4. Res dent sha  be  ab e for a  damages or expenses  ncurred by or  n connect on w th an ma .

5. An ma  w  not be perm tted outs de Res dent s Un t un ess restra ned by a  eash. Res dent must contro  an ma  act v ty wh e  n the Prem ses.

6. An ma s may not be  eft or t ed on ba con es, porches, or pat os and these areas must be kept c ean and free of an ma  waste.

7. Res dent  s respons b e for  mmed ate and proper c ean ng up and d sposa  of an ma  waste. P ease note that  andscape pest c des and chem ca s are used on the grounds of the Commun ty and therefore spec a  care shou d be taken when wa k ng an ma (s).

8. If an ma  s a cat, appropr ate  tter box sha  be ma nta ned, add t ona y a scratch ng post shou d be prov ded. Res dent must p ace so ed cat  tter  n a secure y t ed trash bag for d sposa .

9. If Res dent does not c ean up after an ma , Res dent w  be f ned **$50.00** per occurrence.

10. An ma s sha  not we gh over **65 pounds** fu  grown. An ma s under **3 months** of age are not perm tted.

11. The number of an ma s per apartment  s m ted to **2**.

12. Res dent sha  not perm t and represents an ma  w  not cause any damage, d scomfort, annoyance, nu sance or  n any way  nconven ences, or cause comp a nts, from any other res dent.

13. A  an ma s must have a  requ red vacc nat ons. Land ord may request, at any t me, proof from Res dent that a  requ red vacc nat ons have been adm n stered.

14. It  s strong y recommended that a  an ma s have an  dent f cat on tag show ng current address and te ephone number on the r co ar. Dogs are requ red to have a current  cense and an  dent f cat on tag at a  t mes.

15. Res dent agrees to comp y w th a  app cab e ord nances, regu at ons and  aws govern ng pets. Inc ud ng but, not  m ted to the fo ow ng  sted be ow:
    a. Except as restr cted by app cab e  oca  or county ord nance, State statute or adm n strat ve regu at on, or Federa  aw or regu at on, Management perm ts pets of the fo ow ng types: cats, dogs, hamsters, gu nea p gs, rabb ts, b rds, f sh, non-po sonous or non-venomous amph b ans, and non-po sonous or non-venomous rept es. Perm tted b rds must be kept caged and perm tted f sh, amph b ans, and rept es must rema n  n a tank/aquar um at a  t mes. Tanks and aquar a may not exceed **30 gallons**  n vo ume.
    b. A  an ma s must be Spayed/Neutered.
    c. Res dent sha  prevent any f eas or other  nfestat on of the Un t and on the Prem ses.
    d. B rds sha  not be  et out of cage.
    e. Res dent must obta n pr or or wr tten consent from Land ord to have f sh tanks over **30 gallons**. F sh tanks must be p aced  n a safe area  ns de of the Un t.
    f. Dangerous,  ega , exot c or po sonous an ma s (as determ ned so e y by the Land ord) are not perm tted on the Prem ses. Res dents are not a  owed to keep endangered spec es.
    g. Fera  an ma s cannot be fed or kept on the Prem ses.
    h. Res dent sha  not a  ow any an ma  on the property that has exh b ted any s gn of aggress ve behav or or aggress ve tendenc es




 n t als


PR SM Biella, LLC



towards any person.

   i.   A ance Standard Breed Restr ct on: A askan Ma amute, Boxer, Chow Chow, Da mat an, Doberman P nscher, German Sheperd, Be g an Ma no s, Husky Breeds, P t-Bu Breeds, Stafforsh re Terr er, Presa Canar o, Rottwe er and wo f hybr ds.

16.  Ass st ve An ma s ( nc ud ng compan on an ma s): Management w accept and eva uate a request for reasonab e accommodat on to a ow Res dent to have an ass st ve an ma . Ass st ve an ma s for persons w th d sab t es are not cons dered pets and are not subject to the fo ow ng requ rements:

   **a.**   Spayed/Neutered requ rement;

   **b.**   Breed restr ct on ( f part cu ar an ma s requ red because of d sab ty);

   **c.**   Age restr ct on ( f part cu ar an ma s requ red because of d sab ty);

   **d.**   We ght restr ct on ( f part cu ar an ma s requ red because of d sab ty);

   **e.**   The number of ass st ve an ma s per apartment sha be eva uated on case by case bas s;

   **f.**   Month y pet rent;

   **g.**   Pet fees and/or depos ts.

A request for a Reasonab e Accommodat on must be subm tted for Land ord s rev ew and Land ord sha not unreasonab y w thho d ts wr tten approva for an ass st ve an ma or an ma s. Res dent hereby agrees to comp y w th the terms and cond t ons of th s An ma Addendum, except for the except ons set forth n th s paragraph 15 for ass st ve an ma s. If add t ona mod f cat ons to the ru es set forth n th s An ma Addendum are requ red because of a d sab ty, Res dent shou d make an accommodat on request to Land ord.

17.  Th s addendum sha term nate w thout affect ng the Lease or Res dent s respons b t es under the ease and Res dent sha remove the an ma mmed ate y f any of the fo ow ng occurs:

   **a.**   Payment of Pet Rent s de nquent

   **b.**   The an ma d sp ays aggress ve behav or

   **c.**   Land ord perce ves the an ma to be dangerous or d srupt ve to Prem ses, other res dents, guest or emp oyees.

   **d.**   The an ma does not have a current and requ red vacc nat ons.

   **e.**   Upon th rty (30) day not ce by e ther party to the other of ntent to term nate th s Addendum

18.  Res dent agrees to ho d harm ess and ndemn fy Land ord from a ab ty perta n ng to an ma s on the property and Res dent sha ho d Land ord harm ess and ndemn fy Land ord for any and a damages or costs n connect on w th an ma .

Res dent(s) acknow edges to have read th s Addendum and understands the terms and cond t ons conta ned here n.



**Signed by Joseph N. Prencipe**
Fri Aug 17 02:18:15 AM PDT 2018
Key: 55741031; IP Address: 189.221.43.215

**Signed by Anna Afanasyeva**
Fri Aug 17 02:17:14 AM PDT 2018
Key: F32041B2; IP Address: 189.221.43.215

Joseph N Prencipe *(Resident)*         *Date*      Anna Afanasyeva *(Resident)*        *Date*

*(Agent for Owner)*        *Date*

  

PR SM Biella, LLC                                                                                    **ALLIANCE**

# COMMUNITY POLICIES

Th s document  s an addendum to the Lease Agreement dated **August 20, 2018** between **Joseph N. Prencipe and Anna Afanasyeva** and **PR SM Biella, LLC** for the **Unit # 506**  ocated at **1411 7th Street, Santa Monica, CA  90401**.

In order to ma nta n and promote the Commun ty, and as a cond t on of res dency, Land ord has estab shed the fo ow ng po c es for the comfort and conven ence of a  Commun ty Res dents. These Commun ty Po c es and Procedures are part of the Lease.

1.  **Service Requests:**      You may make your request on ne at **http://www.livingatsantamonica.com/residents/**. In the event of an emergency, ca  911 d rect y for he p. Not fy the Land ord  mmed ate y thereafter.

2.  **Appliances:**     The fo ow ng need to be adhered to regard ng app ances.
    a.  App ances sha  not be removed from the prem ses.
    b.  The d sposa  shou d be used for the purpose  n wh ch  t was constructed. The fo ow ng  tems shou d not be put  n the d sposa , to  nc ude but not  m ted to: meta , str ng, grease, coffee grounds, nut she s, fru t p ts, corn on the cob, potato pee s, paper, w re, str ngy foods, bones or non-food  tems. Res dent sha  be he d respons b e for any repa rs or damage resu t ng from the m suse of such equ pment and sha  re mburse Land ord for necessary expense  ncurred  n the repa r of such equ pment.
    c.  The bathroom f xtures shou d be used for the purpose  n wh ch they were constructed. The fo ow ng  tems shou d not be d sposed of  n the to ets, to  nc ude but not  m ted to: d apers, paper towe s, san tary napk ns, tampons, food, to et w pes, baby w pes and rags. Res dent sha  be he d respons b e for any repa rs or damage resu t ng from the m suse and sha  re mburse Land ord for necessary expense  ncurred  n the repa r of such equ pment.
    d.  D shwashers shou d not be over oaded and on y detergents made for automat c d shwashers shou d be used. We recommend us ng a r nse agent to  mprove dry ng and reduce spots and bu d up  n d shwasher.
    e.  To keep the oven c ean, use m d detergents fo ow ng each use and do not use hard abras ves on chrome or g ass parts of the oven. Never p ace fo  under the burner pans.
    f.  Res dent w  be charged for unc ogg ng p umb ng equ pment  n the event that a fore gn object used by the Res dent caused a ma funct on or damage to the equ pment.
    g.  Do not over oad the washer or dryer and do not use  t wash and/or dry bu ky  tems such as comforters. We recommend  eav ng washer door open after cyc e for better vent at on.
    h.  A ways c ean the  nt screen pr or to us ng the dryer and never operate  t w thout a  nt f ter.
    i.  Never dry  tems that come  n contact w th f ammab e substances (e.g., cook ng o  , gaso ne, pa nt th nner, a coho , etc.)

3.  **Interior Alterations:**     Res dent must obta n the pr or wr tten approva  of Land ord before mak ng any  nter or a terat on. Any charges  ncurred to restore the Un t w  be at the Res dent s expense.
    a.  Res dent may use na s and regu ar hangers when hang ng p ctures, m rrors, etc. P ease **DO NOT** use adhes ve hangers, s nce they damage the wa  boards on the wa s.

4.  **Maintenance for Granite/Stone Counter Tops:**     The fo ow ng c ean ng methods shou d be fo owed on gran te/stone counter tops. Fa  ure to fo ow the proper c ean ng methods can resu t n damage to the gran te/stone wh ch Res dent w  be respons b e for.
    a.  Proper c ean ng method s as fo ows:
        i.   Recommended method for wash ng the countertops s  ght soap and warm water.
        ii.  C ean k tchen countertop regu ar y w th a safe Marb e and Gran te c eaner.
        iii. B ot dry sp s as soon as poss b e.
        iv.  C ean stone surfaces w th a few drops of neutra  c eaner.
        v.   W ndex s okay as  ong as  t has no ammon a. Look for products that are eco fr end y.
        vi.  W th darker stones, dry or buff them w th a soft c oth to remove streaks.
    b.  Improper c ean ng methods:
        i.   Do not use v negar,  emon ju ce, or other c eaners conta n ng ac ds on your stone  nc ud ng bathroom c eaners, grout c eaners or tub and t e c eaners.
        ii.  Do not use abras ve c eaners such as dry c eansers, soft c eansers, scour ng powders or creams.
        iii. Do not m x b each and ammon a; th s comb nat on creates a tox c and  etha  gas. Do not m x chem ca s together un ess d rect ons spec f ca y nstruct to do so.
        iv.  Do not use more c eanser than recommended.
        v.   Do not use heavy soap and water. It can eventua y  ead to soap bu d up.

5.  **Window Coverings and Signs:**     Res dent sha  not use b ankets, sheets, fo  or non-standard w ndow cover ngs  n p ace of draper es or b nds. Res dents sha  not p ace objects on w ndow or w ndow s  wh ch are v s b e from the outs de.

6.  **Community Equipment and Facilities:**     Res dents, other occupants and Res dent s guests agree to ab de by a  ru es and regu at ons for the use of the recreat ona  fac t es and that Res dent w  avo d conduct that Land ord deems  nappropr ate or d srupt ve. Any person n v o at on of these ru es w  be asked to vacate the area  mmed ate y. Fa  ure to adhere str ct y to the posted ru es and regu at ons s acknow edged as grounds for suspens on of pr v eges or term nat on of the tenancy  n accordance w th the state aw. Land ord may

  n t a s                                 14                                              

PR SM Biella, LLC  ALLIANCE

change the rules and regulations at Landlords discretion. Recreational facilities may include, business centers, fitness rooms, swimming pools and community rooms. Resident hereby agrees to assume all risk of such occurrences and to hold Landlord harmless and indemnify and defend same against any and all claims, abilities, damages, liens and expenses, including without limitation reasonable attorney's fees arising directly or indirectly from any such occurrences. Exercise care when enjoying the recreational facilities/equipment, as Landlord is not responsible for physical injuries that result from the use of the recreational facilities/equipment. Any damages to any of the recreational facilities/equipment caused by Resident, other occupants and Resident's guests will result in Resident being responsible for the cost of the damages. Take caution to lock/close common area doors and gates. No animals are allowed in any of the recreational facilities.

7. **Communities with Pools:**   Residents required to limit guests to no more than two at a time and accompany them to the pool. Visitors not accompanied by Resident will be asked to leave. Glass containers are not allowed in the pool area. Please help keep the pool area clean. Proper pool attire, such as bathing suits and swim trunks, is required. Cut-off jeans, T-shirts and diapers are not allowed. Additional pool policies and hours are posted by the pool. For safety reasons, do not swim alone.

8. **Patios and Balconies:**   Resident shall comply with the following Patio and Balcony regulations:
   a.  Patios and balconies are to be kept neat and orderly at all times.
   b.  Do not hang bathing suits, brooms, mops, rugs, lights, etc. on the patio or balcony.
   c.  The installation of sunshades, blinds or hanging fabrics is not allowed.
   d.  No storage of any personal property or trash containers is allowed.
   e.  All plants must be free-standing and have saucers underneath them. Hanging plants are not permitted.
   f.  No bikes and/or motorcycles are allowed to be kept on any patios or balconies at any time. Unapproved bike hooks are not permitted and will be removed.
   g.  Only furniture designed for outdoor use is permitted.

9. **Trash Removal:**   Containers are located at various places throughout the Community. Residents shall secure trash and place it in a designated container. Residents shall not place trash on the ground if dumpster is full and should proceed to the next closest container to dispose of the trash. Residents shall not place large articles, such as furniture, for trash removal and Resident shall make a alternate arrangements with a private disposal service to pick up such item at Resident's expense. Boxes should be broken down before disposal. Residents shall not dispose of hazardous materials in any container or other location at the Community. Residents shall only dispose of refuse in compliance with applicable laws. Resident may be charged a fee for not following these guidelines.

   Do not store trash on porches, balconies or in the hallways unless it is an approved container provided by the Community and is served regularly by the Community or a third party vendor.

10. **Recycling:**   Resident agrees to comply with all present and future laws, orders and regulations of a state, federal, municipal and local governments regarding the collection, sorting, separation and recycling of waste products, garbage, refuse and trash.

11. **Barbeques:**   The use or storage of any charcoal burner, liquid petroleum, gas fueled or any other open flame cooking devices are prohibited in Resident's Unit or on the patio/balcony.

12. **Loitering:**   No unnecessary loitering in laundry facilities, leasing office, amenity areas or parking lots.

13. **Recreational Equipment:**   No recreational equipment (i.e. skateboards, motorcycles, bicycles, etc.) may be stored on the property in corridors, hallways, patios, or similar areas unless the area is designated for such types of items (i.e. bike storage facility, etc.). Skateboards, roller-blades, or similar recreational equipment usage on premises is prohibited.

14. **Posting Flyers:**   Resident is not authorized to distribute advertising, information or any other type of flyer, door-to-door, on cars, anywhere else in the building or throughout the Community. Landlord may designate a place for such items to be displayed and remove items that are not in keeping with the nature of the Community, as determined by Landlord.

15. **Guest Parking Permits:**   Resident understands that Resident will be issued **zero (0)** parking permits for guests and replacement permits will be **$0.00** each. Each permit is required to be clearly visible at all times through the front windshield of the vehicle, and it is the sole responsibility of the Resident to check regularly that each permit is secured on the appropriate vehicle and visible. Failure to properly display parking permits may result in the vehicle towed at Resident's own expense.

16. **Solicitors and Salespeople:**   Solicitors are not allowed in the Community. Residents shall report all solicitors or salespeople to the Landlord immediately.

17. **Car Wash and Repair:**   Vehicle repairs, including oil changes, and washing of vehicles are prohibited unless there is a designated area provided by Landlord.

18. **Moving of Furniture:**   Landlord may designate the time and method for moving items to and from the Unit such as any furniture, merchandise, goods, freight or other such items. Residents may not move furniture to and from the Unit through the lobby, patio doors, or through the use of elevators (if available) without Landlord's permission. If elevators are installed at the Community, Landlord does not guaranty that the elevators will be available for use by Resident nor shall Landlord be liable for any loss resulting from the unavailability of elevator service.

  

PR SM Biella, LLC



**19.    Parking:**    Res dent sha   report   n wr t ng to Land ord  any changes to the  make, mode  and   cense p ate number of every veh c e author zed to park at the Commun ty. Commerc a  veh c es, boats and recreat ona  veh c es are not author zed to park on the Prem ses un ess Land ord has a des gnated  ocat on.

**20.    Notification of Changes:**    Res dent sha   not fy Land ord  mmed ate y  n wr t ng w th any change to Res dent s emp oyer, emp oyer te ephone number, a ternate phone numbers, emergency contact and other pert nent  nformat on.

Res dent(s) acknow edges to have read th s Addendum and understands the terms and cond t ons conta ned here n.

**Signed by Joseph N. Prencipe**
Fri Aug 17 02:18:38 AM PDT 2018
Key: 55741031; IP Address: 189.221.43.215

_____
Joseph N  Prencipe *(Resident)*                                    *Date*

**Signed by Anna Afanasyeva**
Fri Aug 17 02:17:45 AM PDT 2018
Key: F32041B2; IP Address: 189.221.43.215

_____
Anna Afanasyeva *(Resident)*                                    *Date*

_____
*(Agent for Owner)*                                    *Date*

  

PR SM Biella, LLC  **ALLIANCE**

# PARKING SPACE ADDENDUM

This document is an addendum to the Lease Agreement dated **August 20, 2018** between **Joseph N. Prencipe and Anna Afanasyeva** and **PR SM Biella, LLC** for the **Unit # 506** located at **1411 7th Street, Santa Monica, CA  90401**.

| PARKING SPACE # | PARKING PERMIT # | PARKING SPACE FEE (MONTHLY) |
|---|---|---|
| P1-39   P1-40 | | |

| VEHICLE INFORMATION | | | | | |
|---|---|---|---|---|---|
| YEAR | MAKE | MODEL | COLOR | PLATE # | STATE |
| | | | | | |

1. The Parking Space shall be used only for parking the vehicle registered above with the Landlord and must have current registration tags and license plate properly displayed. The vehicles must be kept clean and in operable condition at all times.

2. Living at Santa Monica has contracted Parking Network Solutions, Inc. (PNS), a third-party source to enforce parking in the Living at Santa Monica garages. They provide 24 hour / 7 day a week enforcement for all registered residents to ensure that the rules and regulations of the community are being followed and most importantly, that there is enough parking for current and future residents.

3. All residents are required to register vehicles by logging on to www. parkingnetworksolutions.com, clicking on "Registration" and completing all required fields. Please be advised that there is a first-time registration fee of **$50.00** per vehicle/space registered and a **$25.00** charge for each subsequent vehicle change.

4. The Parking Space shall not be used to store equipment, personal items, containers, vehicle parts, flammable or toxic chemicals and/or waste.

5. Landlord shall not be liable, nor shall Resident make any claim against Landlord, for any loss, injury or damage to the person or property of Resident or guest occurring in or about the Parking Space or area from any cause whatsoever.

6. Landlord reserves the right to enter the Garage at any time without notice in the event of an emergency, or for the purpose of making repairs to the building in which the Garage is located.

7. This addendum may be terminated by either **thirty (30)** days prior written notice at the end of any month, after the minimum term stated above. Resident shall return any parking permits, remotes, garage door openers and/or keys to Landlord.

8. Any vehicle and belongings which remain in the Parking Space after termination of this Addendum will be deemed abandoned and will be subject to any costs associated with such removal of items and vehicle will be towed at Resident expense.

9. Resident agrees to pay any cost associated with removing any vehicle in violation of the parking guidelines or left in the Parking Space after termination, the cost of any damage to the Parking Space and the cost of replacing any parking permits, remotes, garage door openers and/or keys not returned at the time of termination.

10. Failure to comply with the provisions of this Addendum will be considered a material violation of the Lease Agreement and may result in Resident's eviction.

11. Resident(s) acknowledges that Resident's vehicle may be booted and/or towed if Resident is in violation of the provisions of this Addendum. Resident shall be liable for any and all costs, charges or damages arising from such violation, including without limitation towing and/or booting charges and attorney's fees.

Resident(s) acknowledges to have read this Addendum and understands the terms and conditions contained herein.

**Signed by Joseph N. Prencipe**
Fri Aug 17 02:22:23 AM PDT 2018
Key: 55741031; IP Address: 189.221.43.215

**Signed by Anna Afanasyeva**
Fri Aug 17 02:17:56 AM PDT 2018
Key: F32041B2; IP Address: 189.221.43.215

---
Joseph N Prencipe *(Resident)*                                        Date

---
Anna Afanasyeva *(Resident)*                                        Date

---
*(Agent for Owner)*                                        Date

   nitials



PR SM Biella, LLC

 **ALLIANCE**

# PEST, INSECT AND BED BUG ADDENDUM

Th s document  s an addendum to the Lease Agreement dated **August 20, 2018** between **Joseph N. Prencipe and Anna Afanasyeva** and **PR SM Biella, LLC** for the Un t **#506**  ocated at **1411 7th Street, Santa Monica, CA  90401**.

1. Background: The best strategy for effect ve pest contro  s prevent on. The fo ow ng are recommended steps  n the prevent on of  nfestat ons by  nsects,  nc ud ng bed bugs: (1) C ean U t regu ar y,  nc ud ng vacuum ng mattresses. (2) C ean up c utter to he p reduce the number of p aces  nsects  ke bed bugs can h de. (3) Carefu y and thorough y  nspect used furn ture or c othes you acqu re and br ng  nto the Un t.  Ask the person from whom you acqu re the  tems f the  tems were checked and treated for bed bugs. (4) Do not br ng d scarded furn ture, mattresses or c oth ng  nto the Un t.  (5) When trave ng or stay ng  n hote s, avo d p aces wh ch do not appear to be c eaned regu ar y.

2. Usefu  Informat on about Bed Bugs: In recent t mes, bed bugs have become a re-emerg ng prob em nat onw de. One reason for these  ncreas ng prob ems  s that  t s easy for persons to spread the prob em unknow ng y. Bed bugs read y h de n sma  crev ces and are notor ous h tch-h kers. Bed bugs are often transferred by purchas ng used furn ture and through trave  n uggage and n hote  beds and  nens.

3. The following description and general information on bedbugs should assist Resident(s) in identifying the potential presence of bed bugs:

   - Bed bugs have six legs. Adult bed bugs have flat bodies about 1/4 of an inch in length. Their color can vary from red and brown to copper colored. Young bed bugs are very small. Their bodies are about 1/16 of an inch in length. They have almost no color. When a bed bug feeds, its body swells, may lengthen, and becomes bright red, sometimes making it appear to be a different insect. Bed bugs do not fly. They can either crawl or be carried from place to place on objects, people, or animals. Bed bugs can be hard to find and identify because they are tiny and try to stay hidden.

   - An average bed bug lives for about 10 months. Female bed bugs lay one to five eggs per day. Bed bugs grow to full adulthood in about 21 days. Bed bugs can survive for months without feeding.

   - Because bed bugs usually feed at night, most people are bitten in their sleep and do not realize they were bitten. A person's reaction to insect bites is an immune response and so varies from person to person. Sometimes the red welts caused by the bites will not be noticed until many days after a person was bitten, if at all. Common signs and symptoms of a possible bed bug infestation include, but are not limited to, small red to reddish brown fecal spots on mattresses, box springs, bed frames, mattresses, linens, upholstery, or walls; molted bed bug skins, white, sticky eggs, or empty eggshells; very heavily infested areas may have a characteristically sweet odor; red, itchy bite marks, especially on the legs, arms, and other body parts exposed while sleeping. Some people do not show bed bug lesions on their bodies even though bed bugs may have fed on them.

   - For more information, see the Internet Web sites of the United States Environmental Protection Agency and the National Pest Management Association.

4. Agreement: Res dent acknow edges that they p ay an  mportant ro e  n he p ng to ma nta n the Prem ses, s nce they are  n the best pos t on to observe and ma nta n the Un t.  Res dent agrees that f they observe a pest prob em or  nfestat on, they w  report t to Land ord  mmed ate y v a te ephone or  n wr t ng. Res dent agrees not to treat the Un t w th the r own pest c des w thout the wr tten author zat on of Land ord. Upon not f cat on of a prob em or concern  nvo v ng pests, the Un t w  be  nspected to conf rm t and to deve op a pest e m nat on and contro  p an.

5. If the Un t or a nearby Un t  s  nfested w th pests,  nc ud ng bed bugs, a pest contro  profess ona  may be ca ed  n to app y pest c des. Any treatment w  be more effect ve f the Un t s proper y prepared beforehand. Res dent agrees to fo ow the recommended read ness procedures,  nc ud ng a ow ng fu  access for treatment. Res dent agrees that the cho ce of exterm nator s exc us ve y that of Land ord. Res dent agrees to be respons b e for:
   - The cost assoc ated w th treat ng bed bugs  n the Un t.
   - Any damages caused to the Un t  or to any of Res dents persona  property ( .e. furn ture, c oth ng, persona  be ong ngs, etc.) by bed bugs.
   - Any damage caused by an uncontro ed pest prob em spread ng to a ne ghbor ng Un t.

6. Res dent agrees to fu y re ease Land ord from any and a   ab ty for c a ms and damages caused by a prob em w th pests,  nc ud ng bed bugs.

7. By the r s gnature(s) be ow, Res dent adv ses Land ord that they have  nspected the Un t pr or to move- n and that, dur ng the course of the  nspect on, d d not observe any  ve pests,  nsects, or bed bugs or any ev dence of a pest  nfestat on of any type  n the Un t.

8. Res dent agrees f Land ord f nds the presence, or an  nfestat on, of any pests,  nc ud ng bed bugs,  n the Un t after Res dent vacates, Res dent may be respons b e for the cost of c ean ng and pest contro  treatments to erad cate the pests.

9. Res dent agrees that a fa ure to cooperate w th Land ord  n the  nspect on or treatment of the Un t  for pests,  nsects or bed bugs,  n Land ord s so e d scret on, w  be a defau t under the Lease, for wh ch Land ord may seek to enforce remed es conta ned  n the Lease for

  
On-Site

PR SM Biella, LLC

**ALLIANCE**

Res dent s defau t.

10. In the event  t s determ ned that a treatment of the Un t  for any pests,  nc ud ng bed bugs,  s necessary, Res dent agrees to coord nate the  c ean ng  and/or  d sposa  of the r  persona  property  ( .e.  furn ture,  c oth ng,  persona  be ong ngs,  etc.)  w th  the  treatment be ng performed  n the Un t,  so as to protect aga nst a re- nfestat on of any pests,  nc ud ng bed bugs.

11. Res dent adv ses Land ord that they are not aware that bed bugs were present  n the r  ast res dence and that  f bed bugs were present  n any of the r furn ture, c oth ng and persona  property they have been erad cated. Res dent agrees that the r representat on to Land ord of the r  ack of awareness of bed bugs be ng present  n the r  pr or  res dence  or  n the r persona  property  s a mater a   nducement to Land ord  eas ng the Un t  descr bed  n the Lease to them.

Res dent(s) acknow edges to have read th s Addendum and understands the terms and cond t ons conta ned here n.



**Signed by Joseph N. Prencipe**
Fri Aug 17 02:19:01 AM PDT 2018
Key: 55741031; IP Address: 189.221.43.215

**Signed by Anna Afanasyeva**
Fri Aug 17 02:18:16 AM PDT 2018
Key: F32041B2; IP Address: 189.221.43.215

Joseph N  Prencipe *(Resident)*      *Date*

Anna Afanasyeva *(Resident)*      *Date*

*(Agent for Owner)*      *Date*

    nitials

19



PR SM Biella, LLC

**ALLIANCE**

# SMOKE-FREE ADDENDUM

Th s document  s an addendum to the Lease Contract dated **August 20, 2018** between **Joseph N. Prencipe and Anna Afanasyeva** and **PR SM Biella, LLC** for the **Unit # 506**  ocated at **1411 7th Street, Santa Monica, CA  90401**.

1.   Res dent agrees and acknow edges that the Commun ty has been des gnated as a smoke-free  v ng env ronment.

2.   Res dent acknow edges that certa n un ts and/or bu  d ngs at the Commun ty are trans t on ng to smoke-free. Res dent s Un t # **506**  s current y des gnated **non-smoking.**

3.   For the purpose of th s Addendum, "Smok ng" means  nha ng, exha ng, breath ng, or carry ng any  t c gar, c garette, p pe, chew ng tobacco or other tobacco product or s m ar  ghted product  n any manner or  n any form. Res dent, other occupants and Res dent s guests sha  not smoke anywhere  n the Commun ty.

4.   The no-smok ng proh b t on at the Commun ty  nc udes a  areas outs de of Res dent s Un t,  nc ud ng but not  m ted to, a  areas n or around the bu  d ng where Res dent s Un t  s  ocated, the pat o or ba cony, or  n any of the common areas or adjo n ng grounds of such bu  d ng or other parts of the Commun ty. L kew se, nor sha  Res dent perm t any occupants, guests or v s tors to smoke  n the Commun ty  n any proh b ted manner. Res dent understands that  t s the r respons b  ty to  nform occupants, guests or v s tors of the no-smok ng po  cy and to mon tor the act ons of the r occupants, guests or v s tors to ensure comp  ance.

5.   Land ord may at  ts so e d scret on post no-smok ng s gns throughout the Commun ty. The exc us on of a no-smok ng s gn  n an area of the Commun ty does not mean that smok ng  s perm tted  n the area.

6.   A breach of th s Addendum sha  be cons dered a mater a  breach of the Lease and grounds for term nat on of the Res dent s r ght to possess on of Res dent s Un t.

7.   Res dent acknow edges that the Commun ty s move to a smoke-free Commun ty, does not  n any way make Land ord the guarantor of Res dent s hea th or of the smoke-free cond t on of Res dent s Un t and the common areas. Res dent understands that the r hea th and safety  s the r respons b  ty. Res dent further acknow edges that the Commun ty s des gnat on as a smoke-free Commun ty does not  n any manner change the standard of care that the Land ord or  ts manag ng agent wou d have towards Res dent. Land ord spec f ca  y d sc a ms any  mp ed or express warrant es that the bu  d ng, common areas, or prem ses w  have any h gher or  mproved a r qua ty standards than any smoke-perm tted Commun ty. Land ord cannot and does not warranty or prom se that the Commun ty w  be free from secondhand smoke. Res dent acknow edges that Land ord s ab  ty to mon tor or enforce the content of th s Addendum  s dependent  n s gn f cant part on vo untary comp ance by Res dent, other occupants and Res dent s guests. Res dents w th resp ratory a ments, a erg es, or any other phys ca  or menta  cond t ons re ated to exposure to smoke are put on not ce that Land ord does not assume any h gher duty of care to enforce th s Addendum than any other Land ord ob  gat on under the Lease. Res dent understands that current res dents res d ng  n the comp ex under a pr or  ease w  not be  mmed ate y subject to the no-smok ng po  cy.

8.   Res dent hereby express y agrees to  ndemn fy, save, protect, defend and ho d harm ess Land ord from and aga nst any and a c a ms, damages, su ts,  osses, payments and expenses,  nc ud ng reasonab e attorneys  fees for any damages, a egat ons, c a ms, and/or demands re at ng to, caused by, or ar s ng from a v o at on of the smoke-free po  cy by Res dent, other occupants or Res dent s guests.

9.   The part es hereto represent and acknow edge that  n execut ng th s Agreement they do not re y upon and have not re  ed upon any representat on made by the other party w th regard to the subject matter of th s Agreement, or  ts effects, other than those representat ons spec f ca  y set forth here n. Each party to th s Agreement agrees, represents, and warrants that  n execut ng th s document  t does so w th fu  know edge of the r ghts  t may have  n respect to the other part es to th s Agreement, and that  t has rece ved, or had the opportun ty to rece ve,  ndependent  ega  adv ce as to these r ghts and the consequences of th s Agreement.

Res dent(s) acknow edges to have read th s Addendum and understands the terms and cond t ons conta ned here n.

**Signed by Joseph N. Prencipe**
Fri Aug 17 02:19:19 AM PDT 2018
Key: 55741031; IP Address: 189.221.43.215

Joseph N  Prencipe *(Resident)*                                                              *Date*

**Signed by Anna Afanasyeva**
Fri Aug 17 02:18:28 AM PDT 2018
Key: F32041B2; IP Address: 189.221.43.215

Anna Afanasyeva *(Resident)*                                                              *Date*

*(Agent for Owner)*                                                              *Date*

  


**ALLIANCE**

# UTILITY ADDENDUM

| UTILITY/ SERVICE | UTILITY'S CUSTOMER OF RECORD | CHARGED TO RESIDENT? | CALCULATION METHOD FOR CHARGES TO RESIDENT | COMMON AREAS |
|---|---|---|---|---|
| Water | ☒ Landlord | ☒ Yes | ☒ Sub metering<br>Formula method  Utility rates | ☒ Are separately metered and are not charged to Resident |
| Sewer | ☒ Landlord | ☒ Yes | Formula method  Utility Rates<br>☒ Sub metering<br>Formula method  Utility Rates | ☒ Are separately metered and are not charged to Resident |
| Trash | ☒ Landlord | ☒ Yes | ☒ RUBS Formula<br>Formula method  Based on Occupant Multiplier | ☒ Resident will pay a pro rata share of the utilities consumed in common areas |
| Gas | ☒ Resident | ☒ Yes | ☒ Direct billing from utility | ☒ Are separately metered and are not charged to Resident |
| Common Area Gas and Electric | ☒ Landlord | ☐ Yes<br>☐ No | | n/a |
| Electricity | ☒ Resident | ☒ Yes | ☒ Direct billing from utility | ☐ Are separately metered and are not charged to Resident<br>☐ Are not separately metered and a deduction of _____ % for estimated common area charges is made before calculating Resident s bill |
| Hot Water Energy | ☒ Landlord | ☒ Yes | ☒ RUBS Formula<br>Formula method  50% Sq  Footage and 50% Occupancy | ☒ Are not separately metered and a deduction of **10%** for estimated common area charges is made before calculating Resident s bill |
| Pest | ☒ Landlord | ☒ Yes | ☒ Flat fee of **$1.00** per month | n/a |

Th s document  s an addendum to the Lease Agreement dated **August 20, 2018** between **Joseph N. Prencipe and Anna Afanasyeva** and **PR SM Biella, LLC** for the **Unit # 506**  ocated at **1411 7th Street, Santa Monica, CA  90401**.

1. **Resident Not the Direct Customer of Record.**   The fo ow ng  prov s ons  app y to  ut t es/serv ces  wh ch  are  the  Res dent s respons b ty, but of wh ch Land ord  s the ut ty/serv ce customer of record.

   .   Sub-metered  Ut t es.    B  ngs based on sub-meter read ngs w  tem ze the beg nn ng and end ng meter read ngs ( f ava ab e). Res dent agrees to a ow Land ord, or a b ng serv ce prov der des gnated by Land ord, access to Res dent s Prem ses  n order to  nsta , repa r, remove or read sub-meters. Res dents b  sw  be ca cu ated based on the consumpt on (or est mat on thereof)  n the Prem ses and one of the fo ow ng methods:

   a.  Ut ty Rates: Rates w  be based on the  oca  ut ty rates charged to the Land ord and accord ng to re evant  aws.
   b.  Part A  ocat on/Average Rates:   Rates w  be ca cu ated by d v d ng the Land ord s water (and sewer) b s by the consumpt on conta ned on those b s.
   c.  Fu  A ocat on: Rates w  be ca cu ated by d v d ng the Land ord s water (and sewer) b s by the tota  consumpt on of tenants. Res dent understands that common area costs w  be charged to Res dent under th s b  ng method.
   d.  Part a Capture A ocat on:  The submeter n Res dent s un t w  on y measure a port on of the water used by Res dent. Rates w  be ca cu ated by d v d ng the Land ord s water (and sewer) b s by the tota  consumpt on of tenants. Res dent understands that common area costs w  be charged to Res dent under th s b  ng method.

   Un ess otherw se set forth here n, Land ord may use any of the methods  sted above.

   .   RUBS Formu a B  ng Used.    If formu a b  ng s used, the spec f c formu a used  s  nd cated above. Deta s about Formu as are be ow.

   a.  Square footage:  For any Square Footage formu a, Res dent s share  s ca cu ated by compar ng the approx mate square footage of Res dent s Un t as compared to the tota  square footage of a  Un ts w th n the Commun ty.
   b.  Occupants:  Res dent s share us ng an Occupant formu a s ca cu ated by compar ng the number of occupants res d ng  n Res dent s Un t as compared to a  occupants  n a  Un ts  n the Commun ty as of the f rst day of the month. Res dent represents that a  occupants that w  res de n Res dent s Un t are dent f ed n the Lease. Res dent agrees to  mmed ate y not fy Land ord of any change n the number of Occupants.
   c.  PerUn t:  D v d ng the b  equa y among a  occup ed (or tota  at Land ord s so e d scret on) Un ts at the Commun ty.
   d.  F at:  Standard amount charged each month.

2. **Water, Sewer, Trash, Gas, Hot Water Energy, Pest, Common Area Gas and Electric Charges.**    If e ther sub-meter ng or formu a methods are used to ca cu ate Res dent s share for water, sewer, trash, gas, hot water energy, pest, common area gas and e ectr c, a re ated charges assessed to Land ord may be used to ca cu ate the amount charged to Res dent. These may  nc ude (but are not  m ted to) re ated charges conta ned on tax b s, and a  charges conta ned on the  oca  water prov der s b s to Land ord. Land ord and Res dent agree that  t s  mpract ca  or extreme y d ff cu t to determ ne the exact amount of the ut  t es consumed by Res dent (and/or  n the common areas), but that the methods used to determ ne Res dent s share descr bed above are reasonab y accurate est mates. Trash costs to be charged to Res dent may  nc ude actua  trash nvo ces, costs on tax b s, Land ord s  nterna  costs re ated to trash d sposa , trash management costs, trash aud t ng costs, porter serv ce, jan tor a  serv ce, and recyc ng charges.

   The above  s on y a genera  overv ew of the  aws regard ng submeters. The comp ete  aw can be found at Chapter 2.5 (commenc ng w th Sect on 19.54.201) of T t e 5 of Part 4 of D v s on 3 of the C v  Code, ava ab e on ne or at most  brar es.

3. **Utility Billing Service.**    Land ord current y uses the serv ces of **Conservice, Resident Services, P.O. Box 4718, Logan, Utah, 84323-4718** ("Ut  ty B  ng Company") to b  for ut  t es. Land ord reserves the r ght to change ut  ty b  ng serv ce prov ders at any t me. If Land ord changes the ut  ty b  ng serv ce dur ng Res dent s tenancy, Res dent w  be g ven not ce by Land ord. The Ut ty B  ng Company  s not the ut ty prov der. Res dent Quest ons and Concerns Regard ng Ut  ty B  ngs may be addressed to **Conservice, Resident Services, (866) 947-7379**.

    

PR SM Biella, LLC

**ALLIANCE**

4.   **Utility Billing Statements.**  Res dent w  rece ve month y b  ng statements. A  amounts due to Land ord are payab e to **PR SM Biella, LLC**. Fa ure of the Res dent to pay the ut  ty charges by the r due date w   be cons dered a mater a  breach of the Lease and grounds for term nat on. A  monetary amounts due under th s Ut  ty Addendum are deemed add t ona  rent. Ut  ty b  ngs w   be prorated as necessary.

5.   **Payment from Security Deposit.**   Any ob gat on that rema ns unpa d, nc ud ng ut  ty charges that have accrued but have not been  nvo ced when Land ord reacqu res possess on of the Un t, may be deducted from the Res dent s secur ty depos t. If actua  amounts have not been determ ned before Land ord prov des Res dent w th an account ng of Res dent s secur ty depos t, Land ord may est mate the amount based on pr or consumpt on or unt l actua  numbers become ava ab e.

6.   **Utility Payment.**   Res dent must make payment n fu l to Land ord or the Ut  ty B  ng Company for the ut  ty charges pr or to the due date  sted on each b  .

  .   Land ord and Res dent agree that the actua  cost to Land ord and/or Ut  ty B  ng Company when Res dent fa s to pay the ut  ty b  on t me s d ff cu t or mposs b e to ascerta n, but the part es agree that Land ord and/or Ut  ty B  ng Company does, n the event of a  ate payment, ncur certa n costs, such as add t ona  bookkeep ng and adm n strat ve charges, add t ona  charges from the b  ng prov der, costs n pr nt ng and mana ng ate not ces, ost opportun ty costs of the payment, etc. Accord ng y, Land ord and Res dent agree that f the payment s rece ved after the enumerated due date then:

  a.   A ate fee of **$0.00** w   be added after the f rst offense and **$0.00** after subsequent offenses. Late fees w   be app ed _____ days after the b  s ma ed.

  .   Res dent s b  ng statement w   nc ude a month y serv ce charge of up to **$4.75**. A new account set up charge of **$0.00** and f na  b  fee of **$0.00** w   a so be app ed to Res dent s b  . The serv ce charge represents the reasonab e va ue of serv ces prov ded by Land ord or the ut  ty b  ng company to a ocate the ut  ty costs to the respons b e part es, prov des b  ng to Res dent, and process payments. The month y serv ce charge s subject to change upon **sixty (60) days** wr tten not ce of ncrease. Res dent agrees to pay any fees charged by a co ect on agency to Land ord to co ect amounts due from Res dent.

7.   **No Waiver.**  Land ord s wa ver of any covenant of th s Ut  ty Addendum, or the Lease w l not const tute a wa ver of any other breach. Land ord s acceptance of rent or any other payment w th know edge of Res dent s fa ure to pay ut  ty charges does not wa ve Land ord s r ght to enforce any prov s on of th s Ut  ty Addendum or the Lease. No wa ver w l ex st un ess made n wr t ng and s gned by both Res dent and Land ord.

8.   **Estimation.**   Land ord may est mate Res dent s consumpt on f Res dent s sub-meter s broken or does not transm t a Meter read ng or  f Land ord has not rece ved b s from ut  ty prov ders n t me to prepare Res dent s nvo ces.

Res dent agrees that t s reasonab e to est mate charges for sub-metered ut t es n these c rcumstances, so  ong as Res dent s re mbursed for any excess charges f the actua  ut  ty b  ngs u t mate y show that Res dent s usage or share was ess than the amount of the "est mated" b  pa d by Res dent. Est mated charges w   be based upon e ther the average or med an b  for water n s m ar y s tuated dwe ng un ts at the property over a three-month per od ( m ted to the past s x-months), or based upon the average ndoor water use of a fam y of four that uses approx mate y 200 ga ons per day.

9.   In order to a ow my commun ty to track our who e bu d ng ut  ty data, wh ch may be used to determ ne what upgrades can be done to reduce ut  ty expenses n each un t, I hereby grant author ty for **PR SM Biella, LLC**, the owner of **PR SM Biella, LLC** to obta n the usage and ut  ty data  for my ut  ty accounts dur ng my tenancy at th s  ocat on for the so e purpose of benchmark ng through the Energy Star® Portfo o Manager system. In order to do th s, I agree to grant my Land ord the r ght to s gn my account up to e ectron ca y rece ve ut  ty data, where necessary, and to rece ve my account deta s as necessary to accomp sh such benchmark ng. Where ava ab e, such deta s w   be co ected n aggregate so that no un t nformat on s ava ab e, and no un t nformat on w   be d str buted except as requ red by aw, nor used for any market ng purposes.

Therefore, I hereby author ze any ut  ty prov der serv ng my apartment un t,  ocated at **1411 7th Street #506, Santa Monica, CA  90401** to prov de such ut  ty deta s and h story about the accounts t ed to my apartment un t upon request through the term of th s  ease, and  nc ud ng up to the 24 months pr or to the s gn ng of th s agreement.

Res dent(s) acknow edges to have read th s Addendum and understands the terms and cond t ons conta ned here n.

Signed by Joseph N. Prencipe
Fri Aug 17 02:19:38 AM PDT 2018
Key: 55741031; IP Address: 189.221.43.215

Signed by Anna Afanasyeva
Fri Aug 17 02:18:53 AM PDT 2018
Key: F32041B2; IP Address: 189.221.43.215

_____
Joseph N  Prencipe *(Resident)*                    *Date*

_____
Anna Afanasyeva *(Resident)*                    *Date*

_____
*(Agent for Owner)*                    *Date*

  


**State law requires that you be given the following information:**
CAUTION—PESTICIDES ARE TOXIC CHEMICALS. Structural Pest Control
Operators are licensed and regulated by the Structural Pest Control Board
and apply pesticides which are registered and approved for use by the
California Department of Pesticide Regulation. Registration is granted when
the state finds that based on existing scientific evidence, there are no
appreciable risks if proper use conditions are followed or that the risks are
outweighed by the benefits. The degree of risk depends upon the degree of
exposure, so exposure should be minimized.

## WECO'S LIST OF APPROVED PRODUCTS 1/2016

Restricted Labeled Product.

| INSECTICIDES | | INSECT BAITS | | RODENTICIDES | |
|---|---|---|---|---|---|
| Arilon Insecticide | 225 | Alpine Pressurized Fly Bait | 308 | | |
| Bedlam Plus | 281 | Advance 375A | 241 | DeTour For Rodents | 976 |
| Borid | 2 | Advance G Carpenter Ant Bait | 138 | FirstStrike Soft Bait | 208 |
| CB 80 | 120 | Advion Cockroach Arena | 256 | Fumitoxin Tablets | 78 |
| Cimexa | 282 | Advion Cockroach Gel Bait | 193 | Ground Squirrel Bait by Wilco Ag | 286 |
| Cy-Kick CS | 137 | Advion Insect Granule limit 4.6 lbs/1000sf/yr | 201 | Liqua-Tox II | 66 |
| Cy-Kick Crack & Crevice | 155 | InTice Thiquid Ant Bait | 252 | Maki Mini-Block | 22 |
| Delta Dust (AZ & NV only) | 109 | End Zone | 292 | No Tox | 293 |
| Demand CS | 113 | Magnetic Roach Bait | 300 | Omega Gopher Bait | 272 |
| Nibor-D | 149 | Maxforce FC Roach Bait Station -small | 118 | Rozol Blue Tracking Powder | 298 |
| Eco PCO AR X aerosol, residual | 182 | Maxforce FC Magnum roach gel | 194 | Talpirid | 172 |
| Eco Via EC | 995 | Maxforce G Fly Bait | 162 | Terad3 Blox | 216 |
| Essentria G | 983 | Maxforce Fly Spot Bait | 186 | | |
| EverGreen Pyrethrum Conc | 253 | Maxforce Quantum | 233 | | |
| EverGreen Pyrethrum Dust | 255 | Niban-FG Fine G Bait | 140 | | |
| ExciteR | 204 | Niban Granular Bait | 101 | | |
| Gentrol IGR Concentrate | 63 | Optigard Ant Gel Bait | 213 | | |
| Gentrol Point Source | 92 | Terro PCO | 154 | | |
| Harmonix Insect Spray | 284 | Zyrox Fly Bait | 309 | | |
| Nyguard Plus Flea & Tick | 295 | | | WDO | |
| Nyguard IGR Concentrate | 206 | Allure MD | 288 | Altriset | 237 |
| Phantom | 166 | Avitrol Whole Corn | 103 | Cimexa | 282 |
| Phantom Pressurized | 238 | Bird B Gone Products (Sand color not-no sun) | | Cy Kick C/C | 155 |
| Premise 2 | 181 | Epoleon NnZ | | Recruit IV | 170 |
| PT 565 Plus XLO | 43 | No Foam B | 176 | Recruit IV AG | 171 |
| Onslaught Fast Cap | 276 | PignX | 211 | Recruit HD | 230 |
| Steri-fab | 296 | Sluggo (Leaf Life) | 157 | Premise 75 Insecticide | 104 |
| Suspend SC | 75 | Sniper | 723 | Premise Foam | 169 |
| Suspend Polyzone | 264 | | | Termidor HE | 270 |
| Talstar Pro | 187 | Probac Products | | Termidor SC | 144 |
| Tempo SC Ultra (lawns 6 x yr) | 153 | 5 gallon formulation | 968 | Termidor Dry | 269 |
| Tempo Ultra WP (lawns 6 x yr) | 161 | Cont Release Cartridge | 971 | Tim-bor | 58 |
| Temprid (WECO-Bed Bugs) | 228 | Fast Flow | 992 | | |
| Termidor SC | 144 | Micro Drip Dispenser | 956 | | |
| Transport GHP (WECO-Bed Bugs) | 229 | Micro Tab | 993 | | |
| ULD BP 100 Contact Insecticide II | 294 | Micro Mini Tab | 994 | | |
| ULD BP 300 Contact Insecticide II | 299 | Quick Clean Foam | 972 | | |
| Wasp Freeze II | 310 | Quick Clean | 973 | WEED CONTROL | |
| | | Trap Formulation | 975 | Esplanade EZ | 722 |
| | | In Vade Bio Foam | 917 | Dimension 2EW | 714 |
| | | In Vite Fruit Fly Trap | 915 | Razor Pro | 721 |
| | | | | | |
| | | | | | |

DO NOT USE ANY PRODUCT UNLESS YOU HAVE BEEN TRAINED ON THE PRODUCT'S LABEL AND MSDS.
DOCUMENT THE TRAINING ON FORM 415P/415T
CALIFORNIA DPR WEB SITE FOR INFO ON IPM IN SCHOOLS  http://www.cdpr.ca.gov/

Updated 12/22/15



nitials  

23



# EXEMPT PRODUCTS

- ❖ **Exempt from registration**
- ❖ **Part of FIFRA (25B) passed to encourage use of "non-toxic" pesticides**
- ❖ **Do not need to report on School Usage Reports**
- ❖ **Do not need to post (CA) public schools or Child Care Facilities**
- ❖ **Still need to report on Service Slip/Pest Pac/Sanitation Report**

## CALIFORNIA DPR WEB SITE FOR INFO ON IPM IN SCHOOLS
http://www.cdpr.ca.gov/

| INSECTICIDES | | OTHER | | OTHER | |
|---|---|---|---|---|---|
| Essentria G | 983 | No Tox | 293 | | |
| Eco Via EC | 995 | DeTour for Rodents | 976 | | |
| | | | | | |

- • **DO NOT USE ANY PRODUCT UNLESS YOU HAVE BEEN TRAINED ON THE PRODUCT'S LABEL AND MSDS. DOCUMENT THE TRAINING ON FORM 415P OR 415T**

# PRODUCTS THAT CAN BE USED IN/AROUND ACCOUNTS SET UP FOR ORGANIC PEST CONTROL

Products on USDA's National Organic Program (NOP) list of ingredients, products on the Organic Materials Review Institute's (OMRI) list, or products produced "NOP compliant"---

| INSECTICIDES | | INSECTICIDES | | OTHER | |
|---|---|---|---|---|---|
| BorActin | 205 | EverGreen Pyrethrum Conc* | 253 | No Tox | 293 |
| Borid | 2 | Evergreen Pyrethrum Dust* | 255 | DeTour for Rodents | 976 |
| Eco PCO AR X Aerosol, residual | 182 | In Tice Thiquid Ant Bait | 252 | Pheromones | |
| Eco PCO WP X | 180 | Magnetic Roach Bait | 300 | Pignx | 211 |
| ECO Via EC | 995 | Niban FG* | 140 | Sluggo | 157 |
| Essentria G | 984 | Niban Granular Bait* | 101 | Terad3 Blox | 216 |
| | | Terro PCO | 154 | | |
| | | | | | |

* OMRI Listed

- • **DO NOT USE ANY PRODUCT UNLESS YOU HAVE BEEN TRAINED ON THE PRODUCT'S LABEL AND MSDS. DOCUMENT THE TRAINING ON FORM 415P OR 415T**

Updated 12/22/15


nitials  

24



# MOVE-IN/MOVE-OUT INSPECTION FORM

| Resident Name(s)<br>Joseph N  Prencipe and Anna Afanasyeva | Move-In Inspection Date | Move-In Inspection By | Move-In Date<br>August 20  2018 |
|---|---|---|---|
| Apartment Address<br>1411 7th Street #506  Santa Monica  CA  90401 | Move-Out Inspection Date | Move-Out Inspection By | Move-Out Date |

The condition of this Unit is clean  free of any visible pest  undamaged  in good working order and adequate for customary use unless otherwise noted hereon
Use condition codes and comments to describe exceptions and mark NA for items not applicable

**CONDITION CODES: · EXC**  Excellent · **FR**  Fair · **PR**  Poor · **NCL**  Needs cleaning · **REP**  Replace · **PE**  Pest · **NR**  Needs repair
· **PT**  Needs painting · **SCR**  Scratched · **CLN**  Clean · **NEW**  New

| | MOVE  N NSPECT ON | | PRE MOVE OUT  NSPECT ON | | MOVEOUT  NSPECT ON | |
|---|---|---|---|---|---|---|
| **KITCHEN** | CODE | COMMENT | CODE | COMMENT | CODE | COMMENT |
| Walls/Ceiling | | | | | | |
| Floor | | | | | | |
| Hood/Filter/Vent | | | | | | |
| Counter Top | | | | | | |
| Sink/Disposal | | | | | | |
| Cabinets/Drawers | | | | | | |
| Shelves | | | | | | |
| Windows/Screens | | | | | | |
| Window Treatment | | | | | | |
| Light Fixtures | | | | | | |
| Refrigerator | | | | | | |
| Dishwasher | | | | | | |
| Stove/Oven | | | | | | |
| Microwave | | | | | | |
| Other | | | | | | |
| **DINING ROOM** | CODE | COMMENT | CODE | COMMENT | CODE | COMMENT |
| Walls/Ceiling | | | | | | |
| Floor | | | | | | |
| Window Treatment | | | | | | |
| Closet/Doors | | | | | | |
| Window/Screen | | | | | | |
| Fixtures/Fan | | | | | | |
| Other | | | | | | |
| **LIVING ROOM** | CODE | COMMENT | CODE | COMMENT | CODE | COMMENT |
| Walls/Ceiling | | | | | | |
| Floor | | | | | | |
| Window Treatment | | | | | | |
| Closet/Doors | | | | | | |
| Window/Screen | | | | | | |
| Fixtures/Fan | | | | | | |
| Fireplace | | | | | | |
| Other | | | | | | |
| **BATHROOM (ONE)** | CODE | COMMENT | CODE | COMMENT | CODE | COMMENT |
| Walls/Ceiling | | | | | | |
| Floor | | | | | | |
| Cabinets/Drawers | | | | | | |
| Door | | | | | | |
| Mirror | | | | | | |
| Tub/Shower | | | | | | |
| Sink/Faucet | | | | | | |
| Countertop | | | | | | |
| Toilet | | | | | | |
| Towel Rack | | | | | | |
| Fixtures/Exhaust Fan | | | | | | |
| Other | | | | | | |
| **BATHROOM (TWO)** | CODE | COMMENT | CODE | COMMENT | CODE | COMMENT |
| Walls/Ceiling | | | | | | |
| Floor | | | | | | |
| Cabinets/Drawers | | | | | | |
| Door | | | | | | |
| Mirror | | | | | | |
| Tub/Shower | | | | | | |
| Sink/Faucet | | | | | | |
| Countertop | | | | | | |
| Toilet | | | | | | |
| Towel Rack | | | | | | |
| Fixtures/Exhaust Fan | | | | | | |
| Other | | | | | | |

| BEDROOM (ONE) | CODE | COMMENT | CODE | COMMENT | CODE | COMMENT |
|---|---|---|---|---|---|---|
| Walls/Ceiling | | | | | | |
| Floor | | | | | | |
| Closet/Doors | | | | | | |
| Windows/Screen | | | | | | |
| Window Treatment | | | | | | |
| Fixtures/Fan | | | | | | |
| Other | | | | | | |
| **BEDROOM (TWO)** | CODE | COMMENT | CODE | COMMENT | CODE | COMMENT |
| Walls/Ceiling | | | | | | |
| Floor | | | | | | |
| Closet/Doors | | | | | | |
| Windows/Screen | | | | | | |
| Window Treatment | | | | | | |
| Fixtures/Fan | | | | | | |
| Other | | | | | | |
| **BEDROOM (THREE)** | CODE | COMMENT | CODE | COMMENT | CODE | COMMENT |
| Walls/Ceiling | | | | | | |
| Floor | | | | | | |
| Closet/Doors | | | | | | |
| Windows/Screen | | | | | | |
| Window Treatment | | | | | | |
| Fixtures/Fan | | | | | | |
| Other | | | | | | |
| **ADDITIONAL ROOM** | CODE | COMMENT | CODE | COMMENT | CODE | COMMENT |
| Walls/Ceiling | | | | | | |
| Floor | | | | | | |
| Closet/Doors | | | | | | |
| Window/Screen | | | | | | |
| Window Treatment | | | | | | |
| Fixtures/Fan | | | | | | |
| Other | | | | | | |
| **ENTRY/PATIO/ BALCONY** | CODE | COMMENT | CODE | COMMENT | CODE | COMMENT |
| Walls/Ceiling | | | | | | |
| Doors | | | | | | |
| Window/Screen | | | | | | |
| Window Treatment | | | | | | |
| Fixtures/Fan | | | | | | |
| Other | | | | | | |
| **GARAGE/CARPORT** | CODE | COMMENT | CODE | COMMENT | CODE | COMMENT |
| Remote/Opener | | | | | | |
| Other | | | | | | |
| **MECHANICAL** | CODE | COMMENT | CODE | COMMENT | CODE | COMMENT |
| Air Conditioner | | | | | | |
| Smoke Detector | | | | | | |
| Locks | | | | | | |
| Other | | | | | | |

| ACCESS DEVICES | Move In Count | Move Out Count |
|---|---|---|
| Door | | |
| Common Area | | |
| Mailbox | | |
| Fob | | |
| Amenity | | |
| Other | | |

Any security deposit shall be held by the Landlord for Resident who is party to the Lease  The claim of a Resident to the security deposit shall be prior to the claim of any creditor for the Landlord  **(Civil Code Section 1950.5(d)).**

From the time of the Pre Move Out nspection until the termination of the tenancy  the Resident may remedy the deficiencies identified in a manner consistent with the rights and obligations of the parties under the Lease  in order to avoid deductions from the security deposit

The law allows the Owner/Agent to use the security deposit for legal deductions itemized in this statement that are not corrected by the Resident prior to the termination of tenancy or that were not identified during the time of the Pre Move Out nspection and for damages to the Unit/Community  A final itemized statement will be provided to Resident

**Move-In Inspection:**

_____
(Resident)                                                    Date


_____
(Resident)                                                    Date


_____
(Agent for Owner)                                          Date

**Pre Move-Out Inspection:**                                    **Move-Out Inspection**


_____          _____
(Resident)                                Date          (Resident)                                Date


_____          _____
(Resident)                                Date          (Resident)                                Date


_____          _____
(Agent for Owner)                         Date          (Agent for Owner)                         Date

# RESIDENT COMMUNICATION LOG

| DATE: | APARTMENT #: | COMMUNITY: | | ASSOCIATE'S NAME: |
|---|---|---|---|---|
| | 506 | PR SM B e a, LLC | | |

| RESIDENT'S NAME: | CONTACT NUMBER: | ALTERNATE NUMBER: | RESIDENT'S EMAIL: |
|---|---|---|---|
| Joseph N. Prenc pe | (310) 728-9994 | | jnprenc pe@gma .com |

| RESIDENT'S NAME: | CONTACT NUMBER: | ALTERNATE NUMBER: | RESIDENT'S EMAIL: |
|---|---|---|---|
| Anna Afanasyeva | (310) 728-9994 | | anna  afanasyeva@bk.ru |

A new Res dent Conversat on Log  s to be comp eted w th each new conversat on. F  e comp eted  og  n the Res dent s f  e.

# EXHIBIT 3

# McLear Ltd.

## Consultancy Agreement

This consultancy agreement (***Agreement***) is executed as of 1 January 2017 (***Effective Date***) by McLear Ltd., a limited company registered in the United Kingdom (***Company***) and Joseph Prencipe, a resident of the United States of America (***Consultant***).

### Recitals

**A.**     Company desires to compensate Consultant for Consultant's personal services as a consultant of Company; and

**B.**     Consultant wishes to be contracted by Company and provide personal services to Company in return for compensation.

The parties agree to the following:

**1.     Consultancy**

**1.1     Contracting**. Company hereby contracts Consultant and Consultant hereby accepts such consultancy.

**1.2     Term.** The term of consultancy commenced on 1 January 2017 and shall continue until the Agreement is terminated pursuant to Article 6 (the ***Term***).

**1.3     Position.** Company has already provided Consultant the title of Chief Executive Officer of McLear Ltd.

**1.4     Duties.** Consultant shall perform the tasks as identified by Company.

**1.5     Policies.** The relationship between the parties shall also be governed by the employment policies and practices of Company relevant to contractors, which may be implemented and amended from time to time, including those relating to protection of confidential information and assignment of inventions, and the terms of the employment policies shall be and hereby are incorporated herein. When the terms of the Agreement differ from the Company's employment policies or practices, the Agreement shall control.

**1.6     Independent contractor status.** You shall be an independent contractor and nothing in this agreement shall render you an employee, worker, agent, or partner of Company and you shall not hold yourself out as such

**2.     Compensation**

1

**2.1     Salary.** Company shall pay Consultant for Consultant's services a yearly salary of USD120k beginning on 1 January 2017 and payable no less frequently than monthly in accordance with Company's standard payroll practices.

**2.2     Invoicing**. Consultant shall submit invoices to the Company on a bi-weekly or monthly basis setting out the hours that Consultant has worked for Company during the preceding two-week period or month and any VAT payable. Company shall pay such invoices within 5 business days of receipt.

**2.3     Standard Company benefits.** Consultant shall be entitled to all rights and benefits for which Consultant is eligible under the terms and conditions of the standard Company benefits as are generally provided to contractors of Company and compensation practices which may be in effect from time to time and provided by Company to its contractors generally.

**2.4     Expense reimbursement**. Company shall reimburse Consultant promptly for reasonable business expenses incurred in accordance with Company's standard reimbursement policy, as amended from time to time.

**3.     PROPRIETARY INFORMATION AND INVENTIONS OBLIGATIONS**

Consultant shall execute and satisfy the obligations of the Confidentiality and Inventions Assignment Agreement to be provided to Consultant by Company.

**4.     OUTSIDE ACTIVITIES**

**4.1     Conflicting interests.** Except as permitted by Article 4.2, while contracted by Company, Consultant agrees not to acquire, assume or participate in, directly or indirectly, any position, investment or interest known by him to be adverse or antagonistic to Company, its business or prospects, financial or otherwise.

**4.2     Competing enterprises.** While contracted by Company, except on behalf of Company, Consultant shall not directly or indirectly, whether as an officer, director, stockholder, partner, proprietor, associate, representative, consultant, or in any capacity whatsoever engage in, become financially interested in, be employed by or have any business connection with any other person, corporation, firm, partnership or other entity whatsoever which were known by him to compete directly with Company, throughout the world, in any line of business engaged in (or planned to be engaged in) by Company; provided, however, that anything above to the contrary notwithstanding, Consultant may own, as a passive investor, securities of any **public competitor** corporation, so long as Consultant's direct holdings in any one such corporation shall not in the aggregate constitute more than 1% of the voting stock of such corporation and may own, as a passive investor, securities of any **private competitor** corporation so long as Consultant's direct holdings in any one such corporation shall not in the aggregate constitute more than 5% of the voting stock of such corporation.

5. **FORMER EMPLOYMENT OR CONSULTANCY**

**5.1    No conflict with existing obligations.** Consultant represents that Consultant's performance of all the terms of the Agreement and as a contractor of Company does not and shall not breach or conflict with any agreement or obligation of any kind made prior to Consultant's contracting by Company, including agreements or obligations Consultant may have with prior employers or entities. Consultant has not entered into, and shall not enter into, any agreement or obligation either written or oral in conflict with the Agreement.

**5.2    No disclosure of confidential information.** If, in spite of the second sentence of Article 5.1, Consultant should find that confidential information belonging to any former employer might be usable in connection with Company's business, Consultant shall not intentionally disclose to Company or use on behalf of Company any confidential information belonging to any of Consultant's former employers except in accordance with agreements between Company and any such former employer. However, during Consultant's contracting by Company, Consultant may use in the performance of Consultant's duties all information which is generally known and used by persons with training and experience comparable to Consultant's own and all information which is common knowledge in the industry or otherwise legally in the public domain.

6. **TERMINATION OF CONTRACT**

**6.1    Termination.** Company may terminate the Agreement at any time by giving notice to consultant.

**6.2    Cooperation with company after termination**. Following termination of Consultant's contract for any reason, Consultant shall fully cooperate with Company in all matters relating to the winding up of Consultant's pending work including, but not limited to, any litigation in which Company is involved, and the orderly transfer of any such pending work to such other employees or consultants as may be designated by Company. To the extent that such cooperation continues for an extended period or requires an excessive amount of time, Company shall reasonably compensate Consultant for such services.

**6.3    Publicity; non-disparagement.** Consultant may not issue any press release, make any public announcement, or speak with any third party with respect to the Agreement or the relationship between them. Regardless of any dispute that may arise in the future, Consultant shall not disparage, criticize or make statements which may be interpreted as negative, detrimental, or injurious to the other to any individual.

7. **DATA PROTECTION**

**7.1**    Consultant consents to the Company holding and processing data relating to him for legal, personnel, administrative and management purposes and in particular to the processing of any "sensitive personal data" (as defined in the Data Protection Act 1998) relating to the Consultant including, as appropriate:

 **(a)**  information about the Consultant's physical or mental health or condition in order to monitor sickness absence;

 **(b)**  the Consultant's racial or ethnic origin or religious or similar beliefs in order to monitor compliance with equal opportunities legislation; and

 **(c)**  information relating to any criminal proceedings in which the Consultant has been involved, for insurance purposes and in order to comply with legal requirements and obligations to third parties.

**7.2** Consultant consents to the Company making such information available to those who provide products or services to the Company such as advisers, regulatory authorities, governmental or quasi governmental organisations and potential purchasers of the Company or any part of its business.

**7.3** Consultant consents to the transfer of such information to the Company's business contacts outside the European Economic Area in order to further its business interests.

**8.** **TRADE SECRET PROTECTION**

In addition to the protections provided below, Consultant shall sign a Proprietary Information and Inventions Assignment agreement with Company. So as to protect the trade secrets of Company, Consultant shall not during the Term and for a period of twenty-four (24) months thereafter:

 **(a)**  as Consultant hereby acknowledges that Consultants knows and will know through his service for Company that certain employees or contractors of Company or affiliates of Company hold trade secrets of Company which may be of value to Consultant or a third party, and only to the extent that an employee or contract of the Company may hold trade secrets of Company: directly or indirectly solicit, encourage, or take any other action which is intended to induce any other employee or contractor of the Company to terminate his or her employment with the Company, or directly interfere in any manner with the contractual or employment relationship between the Company and any such employee of the Company;

 **(b)**  as Consultant hereby acknowledges that Consultant knows and will know through his service for Company trade secrets of Company, some of which comprise client or partner lists: directly or indirectly, whether for his own account or for the account of any other individual or entity, solicit the business or patronage of any clients or partners of the Company;

 **(c)**  as Consultant hereby acknowledges that Consultant knows and will know through his service for Company trade secrets of Company, as Company is an engineering company and has a policy of transparency for employees to learn everything about Company, and in consideration of the receipt of the compensation for services rendered set out in the Agreement, and as a condition of and material inducement to Consultant's employment with the Company: directly or indirectly, for any reason, whether with or without cause, engage in a business activity which may be interpreted by

4

any individual as possibly using such trade secrets, and which competes directly or indirectly with Company.

Due to the difficulty of identifying trade secret theft and the violation of the obligations under the Agreement, where it appears to Company that Consultant is in violation of the obligations, then Consultant shall provide to Company Consultant's records so that Company may determine whether Consultant has violated the obligation.

## 9.    MISCELLANEOUS

**9.1    Notices.** Any notices provided under the Agreement shall be in writing and shall be deemed effective upon the earlier of (i) personal delivery (including personal delivery by hand); (ii) email (with confirmation of receipt) or (iii) the third day after mailing by first class mail, to Company at its primary office location and to Consultant at Consultant's address as listed on Company payroll.

**9.2    Severability.** Whenever possible, each provision of the Agreement shall be interpreted in such manner as to be effective and valid under applicable law. Where any provision or part provision of the Agreement is held to be invalid, illegal, or unenforceable in any respect under any applicable law or rule in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other provision or part provision, or any determination in another jurisdiction. The Agreement shall be reformed, construed and enforced in such jurisdiction as if such invalid, illegal or unenforceable provision or part provision was never in the Agreement.

**9.3    Waiver.** If either party should waive any breach of any provisions of the Agreement, it shall not thereby be deemed to have waived any preceding or succeeding breach of the same or any other provision of the Agreement.

**9.4    Complete agreement.** The Agreement constitutes the entire agreement between Consultant and Company. The Agreement is the complete, final, and exclusive embodiment of the agreement of Consultant and Company with regard to this subject matter and supersedes any prior oral discussions or written communications and agreements. The Agreement is entered into without reliance on any promise or representation other than those expressly contained in the Agreement, and it cannot be modified or amended except in writing signed by an authorized officer of Company.

**9.5    Counterparts.** The Agreement may be executed in any number of counterparts, including by facsimile delivery, all of which taken together shall constitute one and the same agreement.

**9.6    Headings.** The headings of the sections of the Agreement are inserted for convenience only and shall not be deemed to constitute a part of the Agreement nor to affect the meaning thereof.

**9.7    Successors and assigns.** The Agreement is intended to bind and inure to the benefit of and be enforceable by Consultant and Company, and their respective successors, assigns, heirs, executors and administrators, except that Consultant may not assign any of Consultant's duties under the Agreement and Consultant may not assign

5

DocuSign Envelope ID: 98FAA689-E9FD-4455-97A4-9B4F5D657858

any of Consultant's rights under the Agreement without the written consent of Company, which shall not be withheld unreasonably.

**9.8     Attorney fees.** If either party brings any action to enforce its rights under the Agreement, it shall be entitled to recover its reasonable attorneys' fees and costs incurred in connection with such action should it prevail in the action.

**9.9     Governing law; jurisdiction.** The Agreement shall be construed in accordance with, and all matters arising out of or relating in any way, whether in contract, tort or otherwise, to the Agreement shall be governed by the law of England and Wales. Each party hereby irrevocably and unconditionally submits, for itself and its property, to the exclusive jurisdiction of the courts of England and Wales without giving effect to principles of conflict of laws. Each party hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, the defense of an inconvenient forum and any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to the Agreement in any court referred to in this paragraph.

**9.10     Independent Counsel.** Consultant has been provided with an opportunity to consult with Consultant's own counsel with respect to the Agreement. Consultant acknowledges that Company or its counsel did not represent Consultant with respect to the Agreement.

*This space is intentionally left blank*

Each party has duly read, understood and executed the Agreement in counterpart as of the date first set forth above.

McLear Ltd.

By: _____

Name: John McLear

Title: Chairman & CTO

Consultant

By: _____

Name: Joseph Prencipe

# EXHIBIT 4



# EXHIBIT 5



# EXHIBIT 6



# Elysi Inc.

*Executive summary*

## Confidential

Elysi Inc, 15 September 2015

# Create a reformist revolution

ELYSI

## *Introduction*

Food trucks can generate 5000% profit per year. The **key risks** are market risk (are there customers?) and food quality. We have an exclusive monopoly agreement with Spokane Falls Community College, and my father is a master chef.

### Phase 1

The first truck costs $40k. The **projected first-year revenue is $500k**. Please see our separate spreadsheets for the data.

### Phase 2

We allocate all profits to building out a fleet of trucks. We can **build 10 trucks in the first year** using the profits. We use the same market strategy with these trucks at other campuses across the country.

### Phase 3

That is only the beginning. We want to **take over the cafeteria contracts** themselves.

Sodexo is a French conglomerate that operates over 800 college campuses in the US. Their group annual profit was EU966m in 2014.  Sodexo is  37.11% owned by the French billionaire Pierre Bellon and his family. In other words, the Bellon family makes nearly a half a billion dollars a year in part due to serving disgusting food to Americans at a huge markup.

We rip those profits away from Pierre.

We create an NPO that sticks all of those profits right back into the colleges and into the local communities including homeless shelters and juvenile reform programs.

Confidential



# Entity structure pre-conversion

*Corporation*

## Corporate Board & Executives

**CEO & Chairman**
Joseph Prencipe

**COO & Director**
Joel Creamer

**CFO & Director**
Dane Fickel

## Truck Team 1

**Chef**
Matt Prencipe

**Employee**
Michael Prencipe

**Employee**
Mario Prencipe

## Expansion Teams

Hire from local population of friends etc.



# Entity structure post-conversion

*Tax exempt non-profit organization*

## NPO Board & Executives

**Chairman**
Joseph Prencipe

**COO & Director**          **CFO & Director**
Joel Creamer              Dane Fickel

## Truck Team 1

**Chef**
Matt Prencipe

**Employee**              **Employee**
Michael Prencipe          Mario Prencipe

## Expansion Teams

Hire from local population of friends etc.

# Key contract terms



## *Contract with Spokane Falls Community College*

- **Exclusive right** to park food truck on campus.
  - There are no stores nearby.
  - There is only the college cafeteria.
  - The cafeteria serves terrifying food at a high markup.

- **$300 monthly rent**.

- Food item cost must be **under $7 per item** (this is easily accomplishable with still over a 50% profit margin).

# Upfront risk review



- **Market penetration and competition risk**.
  - Overall these risks are low.
  - There are over 8,000 students.
  - There is little competition. There are no nearby restaurants and there is only the college cafeteria. The cafeteria serves terrifying food at a high markup.
  - Matt's food is terrifyingly good.
  - We can maintain a high profit margin and still sell at $5 an item.

- **Food quality risk.**
  - This risk is low
  - Matt's food is five star. It will sell without a doubt.

- **College termination risk (and later risk colleges don't let us expand).**
  - This risk is unknown. For example college may decide to cancel agreement.
  - Mitigation measure #1 is that we can sue them.
  - Mitigation measure #2 is we enter into NPO profit sharing agreements. The community colleges love money, and hey will love profit sharing.

Confidential

# Upfront cost review

- **Truck acquisition and development**.
  - Ranges $20-40k depending on quality.

- **Home industrial kitchen.**
  - Will cost 1k to build out.
  - [Issue: against law, needs to be permitted location?]

- **Upfront food cost.**
  - Invest $1k for the first week.
  - The profits will be used to buy further food.

- **Licensing etc.**
  - Imagine it will cost $1k.

Confidential

7

# Phase 1



*Day 1: first truck dispatched*

# Phase 2



*Day 60: Order 2 new trucks.*

*Day 180: 4 new trucks are ordered. Blitzscale across country.*

*Day 360: Order 4 new trucks. Blitzscale.*

Confidential

# Phase 3



*Day 365: start negotiation discussions regarding cafeteria.*

# Vision



## *Reformist revolution in modern American society*

- **By transferring ownership of base-level corporate sectors** to the community, our society gains **economic efficiencies**. These include an increase to worker efficiency caused by an increase in happiness and morale, increase in worker retention because of pride in jobs working for the community, and a reduction of wasteful spending (certain business should not be spending on expansion and marketing but they throw the money at it).

- Our **communities gain the cash profits** of these sectors instead of them hiding in the bank accounts of the super elite. With that money we can reduce crime, reduce poverty, increase education quality, and care for the homeless.

- Other **reformist target sectors** include:
  - Banking deposits;
  - Low level retail clothing;
  - Low level manufacturing; and
  - Low level healthcare.

Confidential

# Vision



## *Limitations to the vision*

- To reduce our risk and increase economic output to the community, we will have **highly lean companies**. This means no R&D innovation spending, very lean salaries (just enough to retain talent at the executive level), and very limited business staff (for example, no marketing teams).

- This also means we should **not be in industries that require innovation, competition, or high salaries** to propel forward or to keep competitors on their toes, such as in high tech, doctors, marketing, etc..

- We will avoid geographic locations that have too high of cost. For example, Georgia and not Manhattan will be a good first target.

- The philosophy can be summed up such that:
  - Capitalism propels innovation and expansion. When those are no longer needed, capitalism only harms society with unfair wealth distribution. Those companies should be realigned to **maximize benefits to the community**.

# Vision



## *Thought experiment*

- There are 100 men and 100 coconut trees. Each man could have one tree. But the most intelligent man decides to compete, and he ends up controlling all trees and the distribution of coconuts.

- He exports 90 trees worth of coconuts and keeps the capital. He gives the coconuts from the remaining 10 trees as payment to his people.

- He is the most intelligent and that keeps him in power. But his **society is at a great loss** of its own resources. This causes workers to **lose health, morale and happiness**.

- The man could reproduce more children than other men, and therefore the society would benefit from having on average more intelligent children each generation of competition. But in this society, each man has the same number of children on average.

- The 90% pooled capital could be used for the society, and therefore the society gain greater benefits than if each person only held 1% of the capital. But this man **does not share any capital**. Occasionally he donates one extra coconut to the other people.



# Why convert to NPO and not just take profits?

- **Contribute to our society** by giving profits to the colleges and local community.

- **Remove customer loss risk** by inking profit-sharing agreements with the customers themselves.

- **Greatly increase expansion rate** because colleges will give us recommendation letters to other colleges etc.

- **Greatly increase efficiency** of workers because they will have an unprecedented morale boost due to our vision.

- **Greatly reduce worker turnover** because workers will have an unprecedented morale boost.

- **Remove taxes** by taking NPO status.

Confidential

# Our next steps



- **Execute** investment agreement to fund the first truck.

- **Iron out** our business plans.

- **Legal work** including incorporation and licenses.

Confidential

15

# Investment Agreement key terms

- **Investment** of capital:

  - Joseph ($15k), Joel ($10k), Dane ($10k)

- **Repayment** of 300% of the amount invested to each investor within 12 months.

- **Employment** as an executive and director with an attached high executive and director pay.

- **Profit split** on first truck (excluding amount re-invested):

  - Prencipe family (80%), Joel (10%), Dane (10%)

- **Profit split** on later trucks until NPO conversion:

  - Prencipe family (50%), Joel (25%), Dane (25%)

Confidential

# Appendix 1: Projections



- **See** attached financial projections.

# Appendix 2: Sodexo overview

- **Sodexo** has a 95% client retention rate. **<u>What???</u>**

- **Pierre Bellon's** autobiography is entitled '*I Have Had a Great Time*'.

- Lets destroy them.



Elysi Inc is a joint-stock corporation incorporated in Delaware. This material is confidential and distributed in accordance with the mutual NDA agreed to be signed by the recipient upon request of these materials.

© Elysi Inc 2015

Confidential

# EXHIBIT 7

M Gmail

Joe Prencipe <j.n.prencipe@gmail.com>

## Sodexo analysis
2 messages

**Joseph Prencipe** <joseph_prencipe@tokyo-gas.co.jp>                 Wed, Sep 16, 2015 at 7:56 PM
To: j.n.prencipe@gmail.com

http://www.sodexo.com/en/Images/sodexo-key-figures-FY2014_EN342-829345.pdf

Sodexo supplies catering services to the U.S. military, New York City public hospitals and University campuses in the US (including George Washington University, Stevens Institute of Technology, and Binghamton University).[3]

Global Fortune 500 company.
French services conglomerate.

EU18bn in revenues.
EU966mn in operating profit.

Market share.
38% in North America of globe.
21% in Education of industries.

History.
1998 Gained large NA growth by merging with Marriott Management Services.
2002 IPO.

Contracts.
2011 executed 8-yr contract to supply food to 51 US Marine Corps mess halls.

Weak point: bad food.

Implement profit free corporation idea?
We distribute profits to:
1) school (dividend);
2) local community (dividend);
   - homeless shelters
   - food banks
   - schools
3) executive staff (salary).
Limit expenses and sell for small profit margin.
Food should be controlled by the people and a non-profit industry except for pay for executives.
Shareholders want dividends from profits, but we make the people the shareholders and give them the dividends. Strategy destroys regulatory hurdles. Encourages people to throw away their current food service provider and go to us. Encourages local farmers (eg organic) to sell us their food. Will help greatly with staff retention and hiring - we say 'We are the people, we make no profits, we give the money back to the local community. But we need you to operate, otherwise we simply can't run the business. If you are a person that can give your life to your local community and country, then we need you to work for us.'

Culture.
We should build a strong culture that literally guides the people to operate effectively to reduce problems and keep food quality high. We make sure there's a strong love for the local community that drives everyone to work hard. We pay them well so no one feels like they are wasting. We make exit options very obvious - if you want to go work

somewhere else (you just feel that you need to do something, maybe join the military or study philosophy and become a lawyer like me), please do and you can come back any time.

Societal values.
Align the company's values with society's values. Make sure the society realizes that very clearly. Make sure they realize that competitors aren't doing that, and that they realize what competitors actually do. Then impose those values upon the society - love for fellow American, freedom, independence, etc.

Transparency strategy.
With this kind of profit free idea, there is big risk of some mistake or fraud occurring and then when people find out about it, they would go nuts and it'd be a big problem. What we need to do is implement ridiculous transparency measures, such as posting the accounting books online, all salaries, etc. Streaming video from the offices, etc.

Profitability inquiry.
Would it be profitable? Could we expand the great food and keep quality high across all platforms? Every military base in the states? Why can't we? We need a dedicated staff that does their gd job and does a good one, and that's hard. If we incentivize them with equity, then... that might help. And we keep a strict rulebook for firing.

Sodexo boycotts.
There have been at least nine boycotts of Sodexo, for varying reasons: at Brandeis University in Waltham, Massachusetts,[13] at Clark University in Worcester, Massachusetts, at the School of Oriental and African Studies at the University of London, at the American University in Washington D.C., and at Université Laval in Quebec City, at Binghamton University in New York, and Allegheny College in Meadville, Pennsylvania, at DePauw University in Indiana, Hollins University in Roanoke, Virginia, Emory University in Atlanta, Georgia,[14][15][16] at Nordea banks in Finland, at the University of Tampere,...

Proud to work there.
One key issue in staff retention and quality of work is that it is embarrassing to work in food services. We change that concept. We align ourselves with the society's values, brand ourselves as the very image of the great american culture, make staff feel proud they're working for a company that represents that country's values and goals, pay them well, etc.

Staff pay.
This is an interesting issue because by foregoing profits we'll be able to pay staff more than the market standard. We will need to be careful because profits only go so far when you're paying for the salary of 20,000 people. For example, if you raise the pay of 20,000 people from $25,000 to $35,000, then you have just spent $200,000,000.

Revenue calculation.
Assume 800 sites feeding average of 10,000 people who pay average of $5 each for one day. $8,000,000x5= $40,000,000/week day. $800,000,000/month. Employee count would need to be high, maybe 300,000.

Separation of control.
Companies of different industries (eg food services, clothing retail) should not be owned by the same parent company. It is naturally beneficial to the people to avoid power accumulation. Power should not be dispersed such that efficiencies are lost. But it must not all reside in one oligarchy.

Research 'reformism' as part of Socialism.
https://en.wikipedia.org/wiki/Reformism

Next stage: Transparency reforms.
Given such a large reform to the food services sector, what is next? The momentum can be applied to other reforms. Government transparency should be priority. Balancing between what can be shown (politician's donor sources) and what cannot be shown (military strategy) must be set out.

Pride to work in the sectors.
We need to bring out society's pride to work in these sectors such as transparent government and food services. Everyone hates them now.

Reformist banking.
Banking is just waiting to be disrupted in the same way.

Reformist industries.
- Food services.
- Bank deposits.
- Government.
- Retail clothing.
- Some manufacturing.
- Basic healthcare (not advanced healthcare, that requires innovation etc).

Tax structuring.
Query tax structuring of entity. Tax breaks for contributions.

Example capital outlay.
- Revenues.
8000 customers.
Average $5/day.
20 days/month for 12 months = 240 days.
Revenues = 9.6m.
- Costs.
35 staff x $35,000/year average = 1,225,000.
50% profit margin on food sales (ie revenues) therefore food cost = 4.8m.
- Profits.
Thus $3,575,000.
- Taxes.
Assume 30% tax on profits.
-Remainder:
$2,502,500.
Distribution:
$1,000,000 to expansion.
$1,000,000 to school.
$502,500 to community.

Calculate in summer holiday.
Revenue: (8000 people) x ($5/day) x (20 days/month for 8 months = 160 days) = 6.4m.
Profit margin = 3.2m.
Staff = 1,225,000m.
Profits = 1,975,000.
Tax = 30% = 592,500.
Post-tax profits = $1,382,500.
Distribution:
$500,000 to expansion.
$500,000 to school.
$382,500 to local community.

Staff conversion.
- Staff hiring. Take all of the staff from Sodexo and put them directly to work for the new entity. Sodexo may be paying some staff more than others. Must align their interests but keep our rules in place.
- Management hiring risk. Sodexo will have regional management hubs at which managers get paid a lot more than we will want to pay. We run a risk by cutting them off because then we have to do the same activity. At the same time, we can't take over the management hub. We will probably need to gradually create our own management hubs.
- Cleaning, maintenance services. Query if Sodexo is also providing these services. It's going to be a tough addition for us to start doing this also. Can team with ABM for those services?

NPO structure.

It appears that the NPO structure is optimal.

Sodexo salaries (Glassdoor).
http://www.glassdoor.com/Salary/Sodexo-USA-Salaries-E425.htm
Food Services Manager ($48k).
General Manager ($71k, $84k).
Cashier ($10/hour).
Executive Chef ($60k).
Operations Manager ($60k).
Cook ($12/hour).

Managers are ranging $50-$80k.
Cooks, cashiers around $10/hour.
Chefs around $60k.
Hire people who aren't going anywhere and pay them a real living wage to reduce retention risk.

Business scope.
Focus only on community college campuses at first. These are very stable locales and large enough to support us spending the time on developing them. Why is time an issue? Because if we're entering 50 corporate cafeterias and 50 public schools in Spokane alone, it'll take us 10 years to develop it out.

We can geographically scale faster with the best locale (community colleges). Geographic scaling is important to reduce competition risk. Once we have reduced competition risk we turn inward and focus on the other cafeterias where possible. If it's not possible to save every cafeteria of bad food, that's fine. We have to act within the limits of reasonability.

Wealth redistribution.
So what happens is the profits which would normally go straight to shareholders will instead be redistributed to the schools and the community.

This introduces school failure risk. If these school should not be in business at all (I doubt the contribution to society of some community colleges) then we should not be giving them a lifeline. This is because it is a risk to us to be associated with and depending on a school that may fail. We should also not support schools that are detrimental to the community.

Sodexo shareholders.
http://www.sodexo.com/en/finance/shareholders/shareholding/structure.aspx
Public (52%)
Bellon SA (37.71%).
First Eagle Investment Management (2.8%).
Allianz Global (2.7%).
Employees (.69%).

Bellon SA shareholders.
http://www.sodexo.com/en/finance/shareholders/bellon/sa.aspx
Pierre Bellon and his four children hold 68.5% of the shares.
Bernard Bellon, who is Pierre Bellon's brother, and other members of the Bellon family own 13% of the shares of Bellon SA.
Sofinsod, one of the Sodexo wholly owned subsidiaries, holds 18.5% of the shares of Bellon SA.

Profit distribution.
So the company is making EU966m/year in profits. 37.71% of that is distributed as dividends to the Bellon family. That's EU364m/year. Instead of Americans eating healthy food, the Bellon family is making nearly half a billion a year. Pierre Bellon is worth $4.4bn and is the chairman and president of Sodexo. His autobiography is entitled 'I Have Had a Great Time'.
https://en.wikipedia.org/wiki/Pierre_Bellon

Sodexo client retention rate.
2008 (93.3%), 2009 (94.2%). This is way too high. There is clearly no competition. Get more figures. I am pushing the
angle of 'They are sick, weak, rich French selling us chemical endowed food'.

Sodexo competitors.
Identify other players in the market alongside Sodexo.

Lifespan of community colleges.
Need to consider if we're planning on a 20+ year horizon and they're not even funded anymore in 20 years.

Strategy by phase.
1) One truck enters Spokane Falls campus. Strong relationship. Preferred food. Cheaper.
2) Two, then three trucks on campus. Very strong relationship. Bankrupt the Sodexo cafeteria. Take over the contract.
3) Take those trucks mobile to Eastern University and SCC. Repeat the same strategy. Get the reference of the dean
and directors of Spokane Falls. Get the contracts for their cafeterias.
4) Blitzscale to the best locations in the country then going down to the least preferrable.
This is very reminiscent of a siege tank attacking a fort. We sit outside and filter off their customers by attacking their
weak points (expense and bad food). We amplify association with the school and the people by notifying them of our
NPO policy. We get the contract and stick around for life, give them and the community back the profits.

---

**JN Prencipe** <j.n.prencipe@gmail.com>                              Tue, Feb 25, 2020 at 12:00 PM
To: Afshin Pishevar <ap@eatsizzle.com>

Here's notes I took on Sodexo in 2015 when we were considering attacking the 'cafeteria' market to obtain the
contracts to supply food.

Cheers

---------- Forwarded message ---------
From: **Joseph Prencipe** <joseph_prencipe@tokyo-gas.co.jp>
Date: Wed, Sep 16, 2015 at 10:56 PM
Subject: Sodexo analysis
To: <j.n.prencipe@gmail.com>


http://www.sodexo.com/en/Images/sodexo-key-figures-FY2014_EN342-829345.pdf

Sodexo supplies catering services to the U.S. military, New York City
public hospitals and University campuses in the US (including George
Washington University, Stevens Institute of Technology, and Binghamton
University).[3]

Global Fortune 500 company.
French services conglomerate.

EU18bn in revenues.
EU966mn in operating profit.

Market share.
38% in North America of globe.
21% in Education of industries.

History.

1998 Gained large NA growth by merging with Marriott Management Services.
2002 IPO.

Contracts.
2011 executed 8-yr contract to supply food to 51 US Marine Corps mess halls.

Weak point: bad food, high prices, no competition.

Sodexo boycotts.
There have been at least nine boycotts of Sodexo, for varying reasons:
at Brandeis University in Waltham, Massachusetts,[13] at Clark
University in Worcester, Massachusetts, at the School of Oriental and
African Studies at the University of London, at the American University
in Washington D.C., and at Université Laval in Quebec City, at
Binghamton University in New York, and Allegheny College in Meadville,
Pennsylvania, at DePauw University in Indiana, Hollins University in
Roanoke, Virginia, Emory University in Atlanta, Georgia,[14][15][16] at
Nordea banks in Finland, at the University of Tampere,...

[Quoted text hidden]
[Quoted text hidden]
Sodexo shareholders.
http://www.sodexo.com/en/finance/shareholders/shareholding/structure.aspx
Public (52%)
Bellon SA (37.71%).
First Eagle Investment Management (2.8%).
Allianz Global (2.7%).
Employees (.69%).

Bellon SA shareholders.
http://www.sodexo.com/en/finance/shareholders/bellon/sa.aspx
Pierre Bellon and his four children hold 68.5% of the shares.
Bernard Bellon, who is Pierre Bellon's brother, and other members of the
Bellon family own 13% of the shares of Bellon SA.
Sofinsod, one of the Sodexo wholly owned subsidiaries, holds 18.5% of
the shares of Bellon SA.

Profit distribution.
So the company is making EU966m/year in profits. 37.71% of that is
distributed as dividends to the Bellon family. That's EU364m/year.
Instead of Americans eating healthy food, the Bellon family is making
nearly half a billion a year. Pierre Bellon is worth $4.4bn and is the
chairman and president of Sodexo. His autobiography is entitled 'I Have
Had a Great Time'. Rofl.
https://en.wikipedia.org/wiki/Pierre_Bellon

Sodexo client retention rate.
2008 (93.3%), 2009 (94.2%). This is way too high? There is clearly no
competition. Get more figures. I think a marketing line of 'They are some
asshole French capitalists getting rich off of selling us overpriced shit food."

Sodexo competitors.
Identify other players in the market alongside Sodexo.

[I removed about half of the content since there was a lot of info on a strategy around making it a Non-Profit Org which
is what I wanted to do]

# EXHIBIT 8

Sodexo client retention rate.
2008 (93.3%), 2009 (94.2%). This is way too high. There is clearly no competition. Get more figures. I am pushing the angle of 'They are sick, weak, rich French selling us chemical endowed food'.

Sodexo competitors.
Identify other players in the market alongside Sodexo.

Lifespan of community colleges.
Need to consider if we're planning on a 20+ year horizon and they're not even funded anymore in 20 years.

Strategy by phase.
1) One truck enters Spokane Falls campus. Strong relationship. Preferred food. Cheaper.
2) Two, then three trucks on campus. Very strong relationship. Bankrupt the Sodexo cafeteria. Take over the contract.
3) Take those trucks mobile to Eastern University and SCC. Repeat the same strategy. Get the reference of the dean and directors of Spokane Falls. Get the contracts for their cafeterias.
4) Blitzscale to the best locations in the country then going down to the least preferrable.
This is very reminiscent of a siege tank attacking a fort. We sit outside and filter off their customers by attacking their weak points (expense and bad food). We amplify association with the school and the people by notifying them of our NPO policy. We get the contract and stick around for life, give them and the community back the profits.

---

**JN Prencipe** <j.n.prencipe@gmail.com>                                                    Tue, Feb 25, 2020 at 12:00 PM
To: Afshin Pishevar <ap@eatsizzle.com>

Here's notes I took on Sodexo in 2015 when we were considering attacking the 'cafeteria' market to obtain the contracts to supply food.

Cheers

---------- Forwarded message ---------
From: **Joseph Prencipe** <joseph_prencipe@tokyo-gas.co.jp>
Date: Wed, Sep 16, 2015 at 10:56 PM
Subject: Sodexo analysis
To: <j.n.prencipe@gmail.com>


http://www.sodexo.com/en/Images/sodexo-key-figures-FY2014_EN342-829345.pdf

Sodexo supplies catering services to the U.S. military, New York City public hospitals and University campuses in the US (including George Washington University, Stevens Institute of Technology, and Binghamton University).[3]

Global Fortune 500 company.
French services conglomerate.

EU18bn in revenues.
EU966mn in operating profit.

Market share.
38% in North America of globe.
21% in Education of industries.

History.

1998 Gained large NA growth by merging with Marriott Management Services.
2002 IPO.

Contracts.
2011 executed 8-yr contract to supply food to 51 US Marine Corps mess halls.

Weak point: bad food, high prices, no competition.

Sodexo boycotts.
There have been at least nine boycotts of Sodexo, for varying reasons:
at Brandeis University in Waltham, Massachusetts,[13] at Clark
University in Worcester, Massachusetts, at the School of Oriental and
African Studies at the University of London, at the American University
in Washington D.C., and at Université Laval in Quebec City, at
Binghamton University in New York, and Allegheny College in Meadville,
Pennsylvania, at DePauw University in Indiana, Hollins University in
Roanoke, Virginia, Emory University in Atlanta, Georgia,[14][15][16] at
Nordea banks in Finland, at the University of Tampere,...

[Quoted text hidden]
[Quoted text hidden]
Sodexo shareholders.
http://www.sodexo.com/en/finance/shareholders/shareholding/structure.aspx
Public (52%)
Bellon SA (37.71%).
First Eagle Investment Management (2.8%).
Allianz Global (2.7%).
Employees (.69%).

Bellon SA shareholders.
http://www.sodexo.com/en/finance/shareholders/bellon/sa.aspx
Pierre Bellon and his four children hold 68.5% of the shares.
Bernard Bellon, who is Pierre Bellon's brother, and other members of the
Bellon family own 13% of the shares of Bellon SA.
Sofinsod, one of the Sodexo wholly owned subsidiaries, holds 18.5% of
the shares of Bellon SA.

Profit distribution.
So the company is making EU966m/year in profits. 37.71% of that is
distributed as dividends to the Bellon family. That's EU364m/year.
Instead of Americans eating healthy food, the Bellon family is making
nearly half a billion a year. Pierre Bellon is worth $4.4bn and is the
chairman and president of Sodexo. His autobiography is entitled 'I Have
Had a Great Time'. Rofl.
https://en.wikipedia.org/wiki/Pierre_Bellon

Sodexo client retention rate.
2008 (93.3%), 2009 (94.2%). This is way too high? There is clearly no
competition. Get more figures. I think a marketing line of 'They are some
asshole French capitalists getting rich off of selling us overpriced shit food."

Sodexo competitors.
Identify other players in the market alongside Sodexo.

[I removed about half of the content since there was a lot of info on a strategy around making it a Non-Profit Org which
is what I wanted to do]

# EXHIBIT 9

 Gmail

Joe Prencipe <j.n.prencipe@gmail.com>

---

## Your U-Haul order
1 message

---

**service@uhaul.com** <service@uhaul.com>                                   Fri, Jan 10, 2020 at 1:33 PM
To: jnprencipe@gmail.com



[My Account](My Account)

# Your Order Is Confirmed

## Next Steps:
### Express Check-In

Order #: **84220054**

Save time at the counter with Express On-Line Check-In, and experience Moving Made Easier[TM] on your own personal page at [uhaul.com/orders](uhaul.com/orders).

**Start Online Check-In**

Dear joseph,

This communication contains a summary of the order you placed on **January 10, 2020** and information on what you can expect next. Additionally, we have set-up a free resource page just for you at [uhaul.com](uhaul.com), which provides helpful information on your move.

**Thank you for choosing U-Haul.**

---

## Order Summary

---

## Rental Equipment

| | |
|---:|:---|
| **Reservation #:** | 84220054 |
| **Preferred Pick Up Location:** | U-Haul of Santa Monica<br>1747 Lincoln Bl<br>Santa Monica, CA 90404 |
| **Pick Up Date:** | Wednesday, January 15, 2020 at 4:00 PM |
| **Drop Off Location:** | MIAMI, FL |
| **Drop Off Date:** | Friday, January 24, 2020 |
| **Equipment:** | 6' x 12' Cargo Trailer |



If, for any reason, you need to make changes or cancel this reservation, please visit your account at uhaul.com by **Tuesday, January 14, 2020**.

## 11 Tips for Driving a Moving Truck

Driving a U-Haul truck isn't too different from driving a regular vehicle. Our trucks are designed to make moving and driving a simple experience that any DIY mover can accomplish.

**Learn More**



     



For hotel discounts, please visit www.uhaul.com/discounts.

You are receiving this email because of an order you placed with U-Haul. To keep our promises with you, all calls to and from U-Haul Company are recorded. Questions, concerns, comments? Respond back to this email or click the link below for additional assistance.

Questions or Comments | Privacy Policy | uhaul.com

# EXHIBIT 10



# RENTAL APPLICATION

## Applicant Information

| | |
|---|---|
| Name: | Email Address: |

| | | |
|---|---|---|
| Date of birth: | SSN: | Phone: |

| |
|---|
| Current address: |

| | | |
|---|---|---|
| City: | State: | ZIP Code: |

| | | |
|---|---|---|
| Own    Rent    (Please circle) | Monthly payment or rent: | How long? |

| |
|---|
| Previous address: |

| | | |
|---|---|---|
| City: | State: | ZIP Code: |

| | | |
|---|---|---|
| Owned          Rented | Monthly payment or rent: | How long? |

## Employment Information

| |
|---|
| Current employer: |

| | |
|---|---|
| Employer address: | How long? |

| | | |
|---|---|---|
| Phone: | E-mail: | Fax: |

| | | |
|---|---|---|
| City: | State: | ZIP Code: |

| | | |
|---|---|---|
| Position: | Hourly          Salary | Annual income: |

## Emergency Contact

| |
|---|
| Name of a person not residing with you: |

| |
|---|
| Address: |

| | | |
|---|---|---|
| City: | State: | ZIP Code: | Phone: |

| |
|---|
| Relationship: |

## Co-applicant Information, if Married

| | |
|---|---|
| Name: | Email Address: |

| | | |
|---|---|---|
| Date of birth: | SSN: | Phone: |

| |
|---|
| Current address: |

| | | |
|---|---|---|
| City: | State: | ZIP Code: |

| | | |
|---|---|---|
| Own    Rent    (Please circle) | Monthly payment or rent: | How long? |

| |
|---|
| Previous address: |

| | | |
|---|---|---|
| City: | State: | ZIP Code: |

| | | |
|---|---|---|
| Owned          Rented | Monthly payment or rent: | How long? |

## Co-applicant Employment Information

| |
|---|
| Current employer: |

| | |
|---|---|
| Employer address: | How long? |

| | | |
|---|---|---|
| Phone: | E-mail: | Fax: |

| | | |
|---|---|---|
| City: | State: | ZIP Code: |

| | | |
|---|---|---|
| Position: | Hourly          Salary | Annual income: |

## References

| Name: | Address: | Phone: |
|---|---|---|
|  |  |  |
|  |  |  |

I have received a copy of this application.  I authorize Howard Chase Real Estate, LLC and/or its affiliates to conduct a check on my credit, background, employment and living verifications.  I acknowledge that this form does not constitute the acceptance of a lease.

| Signature of applicant: | Date: |
|---|---|
| Signature of co-applicant: | Date: |

# EXHIBIT 11

 Gmail

Joe Prencipe <j.n.prencipe@gmail.com>

## GM application for goPuff - Action Required
1 message

**Natalie Childershacker** <natalie.childershacker@gopuff.com>          Fri, Jan 15, 2021 at 12:34 PM
To: j.n.prencipe@gmail.com

Hi Joseph,

My name is Natalie and I am your HR business Partner. As you know, you will be converting over to be on the goPuff team on 1/25.  Welcome to the FAM! The first step in this process is to fill out the online General Manager application so our HR team can send you your formal offer letter.  Please click the link below to do so and send me an email once your application has been submitted.

Thanks and let me know if you have any questions.

[GM application link](#)

--



**Natalie Childers Hacker - People Operations Business Partner: Region 3,5**
**C:** 817-361-3040
natalie.childershacker@gopuff.com
**_gopuff.com_**

# EXHIBIT 12

# EXHIBIT 13

# EXHIBIT 14

# EXHIBIT 15